James S. Monroe (State Bar No. 102328)
Monroe Law Group
101 California Street, Suite 2450
San Francisco, CA 94111
Telephone: (415) 869-1575
Facsimile:  (415) 723-7423
Email: jim@monroe-law.com

Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>THE RYNESS COMPANY, INC., a California corporation,<br><br>                          Debtor.<br><br>801 San Ramon Valley Blvd.<br>Danville, CA 94526<br><br>Employer's Tax ID No.: 14-1878323 | Chapter 11<br><br>Case No. 09-41466<br><br>**MOTION FOR ORDER (1) AUTHORIZING POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(C)(1); (2) AUTHORIZING THE USE OF CASH COLLATERAL; (3) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (4) PROVIDING ADEQUATE PROTECTION; (5) MODIFYING AUTOMATIC STAY; AND (6) GRANTING RELATED RELIEF**<br><br>Date: March 4, 2009<br>Time: 10:00 a.m.<br>Place: 1300 Clay Street, Room 215<br>        Oakland, CA 94612<br>Judge: Hon. Edward D. Jellen |

### I. Introduction and Summary of Relief Requested

The Ryness Company, a California corporation ("TRC"), The Ryness Company California, Inc., a California corporation ("TRC California"), and TRC Services Corporation, a California

MOTION FOR ORDER AUTHORIZING POST-PETITION
FINANCINC, USE OF CASH COLLATERAL, ETC.

Case: 09-41466   Doc# 7   Filed: 03/02/09   Entered: 03/02/09 19:34:34   Page 1 of 18

corporation ("TRC Services") are debtors and debtors in possession (collectively, the "Debtors"), in their respective voluntary bankruptcy cases (the "Bankruptcy Cases") under Chapter 11 of the Bankruptcy Code which were filed together on February 26, 2009.  By this motion, filed by each of the Debtors in their respective Bankruptcy Cases, the Debtors move the court for interim and final orders (1) Authorizing Post-Petition Financing Pursuant to 11 U.S. C. §§ 105, 361, 362, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1); Authorizing the Use of Cash Collateral; and (3) Granting Security Interests and Superpriority Claims, pursuant to section 364 of the Bankruptcy Code, Rule 4001 of the Federal Rules of Bankruptcy Procedure and Rule 9014-1 of the Bankruptcy Local Rules (the "Motion").  Specifically, the Debtors seek entry of an order:

(a) Granting the Debtors interim authorization to borrow up to $250,000.00 from Jean C. Mills (the "Lender") on a secured and superpriority basis and on the terms set forth in the Agreement For Post-Petition Financing, the Granting of Security Interests, Superpriority Administrative Expense Treatment, Use of Cash Collateral, Modifying the Automatic Stay, the Granting of Replacement Liens, and Related Matters by and among the Debtors, Lender, and the Debtors' pre-petiton secured lender, Adrienne Albert ("Albert"), a true and correct copy of which is attached as Exhibit A to the Declaration of George A. Ryness III ("Ryness Declaration") filed in support of this Motion (the "Agreement") and solely in compliance with the Approved DIP Budget (as defined below) (the "DIP Loan");

(b) Granting the Debtors interim authorization to use Pre-Petition Collateral (as defined below), including Cash Collateral (as defined below) and non-cash collateral in accordance with the terms and conditions of the Agreement and solely in compliance with the Approved DIP Budget;

(c) Scheduling a final hearing on the Motion; and

(d) At such final hearing, granting the Debtors final authorization to borrow up to a total of $250,000 (including the amount authorized in the interim order) from Lender and to use Cash Collateral on a secured and superpriority basis and on the terms and conditions set forth in the Agreement and the Approved DIP Budget.

This Motion is based on the Notice of Hearing, the supporting Declaration of George A. Ryness III, the Certificate of Compliance with Guidelines for Cash Collateral and Financing Motions and Stipulations, the pleadings and papers on file herein, and upon such oral and documentary evidence as may be presented at the hearing of the Motion.

In support of the Motion, the Debtors represent as follows:

## II. Notice and Procedure

1. On February 26, 2009 (the "Petition Date"), the Debtors filed their respective voluntary petitions under Chapter 11 of the Bankruptcy Code and are presently operating their businesses as debtors in possession pursuant to the provisions of 11 U.S.C. §§ 1107 and 1108. An ex parte motion has been filed separately with the Court for joint administration of the three bankruptcy cases. Copies of this Motion and the Notice of Hearing, in accordance with Rule 4001(d) of the Federal Rules of Bankruptcy procedure and the applicable local rules of the Court, are being served by email and mail on the United States Trustee, the Lender, Albert, and any party having requested special notice, and by Federal Express to the creditors included on the lists filed under Rule 1007(d) of the Federal Rules of Bankruptcy Procedure.

## III. Factual Summary

2. The Ryness Company was founded by George A. Ryness III ("Ryness") in 1975 to provide marketing and real estate brokerage services to homebuilders. Until 2003, it conducted business mainly in Northern California, initially with builders of mainly suburban subdivisions, and over time the business also included representing developers of condominium conversion projects. The basic business model of The Ryness Company was an innovation at the time, in that the company, instead of working for the then-standard broker's commission of 6%, worked at a substantially lower rate while having the builder-client incur the direct and indirect costs of marketing and advertising the project. By contracting with The Ryness Company, builders were able to engage a company of new homes professionals (as contrasted with resale specialists) without incurring selling costs internally through an in-house sales staff.

3. In 2003, The Ryness Company merged with Pickford New Homes Real Estate, Inc. ("PNH"), owned by Eddy D. Monce ("Monce") which conducted a similar business in Southern California and Nevada, and which business differed from The Ryness Company's in that it also included the representation of developers of new high-rise condominiums. Following the merger, the combined company ("The Ryness Company") began a period of expansion, moving into markets in the Pacific Northwest (Washington and Oregon), the Southwest (Arizona), and Colorado.

4. In the first quarter of 2006, The Ryness Company acquired The Marketing Directors ("TMD"), a New York company which had as its primary business representing urban condominium developers in New York City. The Ryness Company used a credit facility with Bank of America to fund a portion of the purchase price, with the balance carried by the seller, Adrienne Albert ("Albert"). Subsequently, in 2007, The Ryness Company launched a new division ("TMD-Southeast") under the TMD name in various markets in the Southeast, representing builders of new high-rise condominiums and also developers of condominium conversions. TMD-Southeast proved to be a serious drain on The Ryness Company's resources, losing a total of $7.7 million in 2007 and 2008.

5. At its peak in 2006, The Ryness Company sold and closed over 10,000 homes and had gross revenues of $79.2 million. However, the acquisition of TMD in 2006 coincided with the beginning of the slowdown in the new home sales market which has continued to the present. In early 2007, The Ryness Company sold most of its Pacific Northwest operation back to the previous owners. In mid-2007, the acquisition loan for the TMD purchase was restructured, with Albert paying off the Bank of America credit line and becoming The Ryness Company's primary lender on the entire acquisition loan, with a first security interest in substantially all of The Ryness Company's assets (including all of the assets of the Debtors).

6. In early 2008, it became clear that the co-ownership of The Ryness Company by Ryness and Monce was no longer viable and Monce's interest in The Ryness Company was acquired by Ryness. In March 2008, the restructured Albert loan went into default, and the loan was again restructured. As part of that restructuring, TMD was sold back to Albert, and TMD-Southeast was

transferred to an entity controlled by Albert. After the 2008 restructuring transaction, a balance of $9,000,000 was still owed to Albert, with interest payable on a monthly basis and a specified repayment schedule for principal.

7. By early 2009, after the significant worsening of the housing and credit markets in the fall of 2008, it had become clear that The Ryness Company could not continue to meet its ongoing obligations, including without limitation the Albert loan, thereby necessitating the present bankruptcy filings. Prior to the Petition Date, the Debtors negotiated the terms of a restructuring (as described below, the "Proposed Restructuring") with Albert as follows:

(a) the distribution of equity interests in a reorganized entity to unsecured creditors of the Debtors and to the current owner of the Debtors, with the percentage ownership to be determined;

(b) the restructuring of Albert's current secured indebtedness, as described below, of the same amount with substantially the same terms and covenants, save for (a) a restating of the interest rate thereunder to be 0% for the first year following the Petition Date, 2% for the second year following the Petition Date, 3% for the third year following the Petition Date, 4% for the fourth year following the Petition Date, 5% in for the fifth year following the Petition Date, 6% for the sixth year following the Petition Date, and 7% for the seventh year following the Petition Date, (b) the final maturity thereof being the seventh anniversary of the Petition Date (or, if earlier, the date of any change of control of the reorganized entity, sale of the reorganized entity, or the date the current owner of the Debtors ceases to devote substantially all of his business time with the Debtors or ceasing to be involved with the Debtors), (c) amortization installments thereunder consisting of 50% of free cash flow, defined in a customary manner to be agreed, with the remaining 50% thereof payable as determined by Debtors' management, in their sole discretion, the timing and manner of payment in each instance to be agreed, and (d) limits on payments to be made to the current owner of the Debtors and any affiliates and approval over expenses above an amount to be agreed (it being understood that such current owner may draw a salary of $10,000 per month; provided, however, that this is no way limits the discretion of Debtors' management to allocate additional compensation thereto from the remaining 50% of free cash flow as provided in clause (c) above); and

(c) no modification or change to any personal guarantees regarding or related to Albert's current indebtedness.

The Debtors hope to effectuate the Proposed Restructuring through a plan of reorganization to be filed within 60 days of the Petition Date.

8. At the present time, The Ryness Company is still active only in the California and Nevada (Las Vegas) markets. At its peak, the company had approximately 800 total personnel. At present, the company has approximately 200 personnel remaining, with 20 employees and the rest independent contractor sales agents; it is anticipated that this number will steadily dwindle as projects are closed or cancelled.

9. Presently, The Ryness Company business is conducted via the three inter-related corporations that are the Debtors herein – TRC, TRC California, and TRC Services. TRC is the holding company for TRC California and TRC Services, and is wholly owned by George and Kathleen Ryness. TRC California is the primary operating entity for the State of California. This is the same entity as PNH (the entity owned by Monce), which previously had changed its name to The Ryness Company (Southern California), Inc., and subsequently changed its name to The Ryness Company California, Inc. when the operating entity for Northern California (named The Ryness Company (Northern California), Inc.) was merged into it in 2007. Historically, TRC Services was the original company founded by Ryness. Post-merger, it has provided accounting and administrative services for the overall group of companies. It is party to most of the service and vendor agreements, but does not provide brokerage services.

### IV. Pre-Petition Secured Financing

10. The Debtors and Albert are parties to, *inter alia*, an Amended and Restated Loan Agreement dated as of June 28, 2007, an Amended and Restated Pledge Agreement dated as of June 28, 2007, a First Amendment to Amended and Restated Loan Agreement dated as of July 7, 2008, and a First Amendment to Amended and Restated Pledge Agreement dated as of July 7, 2008 (the "Pre-Petition Loan Documents"), which formed the basis for Albert to provide certain prepetition

financial accommodations to the Debtor, true and correct copies of which are attached to the Ryness Declaration as Exhibits B through E.

11. (a) As of the Petition Date, the Debtors are jointly and severally indebted to Albert in the amount of approximately $5.5 million principal, plus accrued and unpaid interest and any and all other amounts due under the terms of the Pre-Petition Loan Documents, as may be adjusted pursuant to Section 8.8 of that certain Securities Purchase and Sale Agreement dated July 7, 2008. Substantially all of the Debtors' pre-petition assets and cash as described in the Pre-Petition Loan Documents (the "Pre-Petition Collateral") are encumbered by valid, enforceable and perfected, first priority liens and security interests in favor of Albert ("Pre-Petition Liens") to secure all indebtedness, liabilities and obligations of the Debtors to Albert as provided for in the Pre-Petition Loan Documents (the "Pre-Petition Obligations"). The Debtors have no other secured creditors.

(b) To perfect her Pre-Petition Liens, Albert filed UCC-1 financing statements with the California Secretary of State against TRC California and TRC Services on or about July 2, 2007 and against TRC on or about July 16, 2008, true and correct copies of which are attached to the Ryness Declaration collectively as Exhibit F and incorporated herein by reference. In addition, Albert filed UCC financing statement amendments with the California Secretary of State on or about July 2, 2007, reflecting the assignments she obtained of Bank of America's former blanket security interest against the assets of TRC and TRC Services. True and correct copies of these filed assignments and the financing statements filed by Bank of America are attached to the Ryness Declaration collectively as Exhibit G and incorporated herein by this reference.

(c) Attached to the Ryness Declaration collectively as Exhibit H are true and correct copies of search reports obtained on March 1, 2009 from the California Secretary of State's website showing the UCC filings against TRC, TRC California and TRC Services. These reports reflect the following:

(i) That Albert has the only UCC-1 financing statements of record against TRC California and TRC Services; and

(ii)    That in addition to Albert, IOS Capital, IKON Financial Services, CIT Bank, and Citicorp Vendor Finance, Inc., have filed UCC-1 financing statements against TRC (the "Lease Filings"), and, in addition, Wells Fargo Bank ("Wells") filed a blanket UCC-1 financing against TRC on or about March 11, 2005.  The Lease Filings cover only specifically described equipment that was leased to TRC by the respective equipment lessors.  The Wells filing is of no effect since the Debtors have no pre-petition indebtedness to Wells and, in any event, TRC is a holding company without substantial property.

## V.  Necessity for DIP Financing

12.    The Debtors have an immediate need to obtain the DIP Loan in order to permit, among other things, the orderly continuation of the operation of their business, to maintain business relationships with vendors and suppliers, and to satisfy other working capital needs. The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors and its successful reorganization. The Lender has requested the Debtors to be co-borrowers under the DIP Loan.

13.    The Lender is willing to allow the Debtors to obtain financing under the DIP Loan only upon the terms and conditions set forth in the Agreement.  The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.  The Debtors are also unable to obtain secured credit allowable under section 364(c)(2) or 364(c)(3) of the Bankruptcy Code, except under the terms and conditions set forth in the Agreement.

## VI.  DIP Financing

14.    Subject to the terms and conditions of the Agreement, the Lender has agreed to advance an aggregate amount not to exceed $250,000 for the payment of disbursements as set forth in the "Approved DIP Budget," attached as Exhibit A to the Agreement, provided that the proceeds of any advance made pursuant to the Approved DIP Budget will be used solely to fund those items in

the Approved DIP Budget. All advances under the DIP Loan shall bear interest at the rate of 10% per annum from the date of each advance to the date of payment.

### VII. Superpriority Claim

15. As security for the Debtors' obligations and indebtedness arising under or in respect of the DIP Loan (the "DIP Obligations"), the Lender shall be granted, pursuant to section 364(c)(1) of the Bankruptcy Code, a claim (the "Superpriority Claim") with priority over any and all administrative expenses or other claims of the kind specified in, or ordered pursuant to, sections 105, 326, 327, 328, 330, 331, 503(b), 506(c), 507(a), the "equity" exception in section 552(b), 726 or any other provision of the Bankruptcy Code (whether incurred in this Bankruptcy Case or in any successor case), including, without limitation, the Junior Superpriority Claim (as such term is defined in paragraph 24 herein), subject only, in the event of the occurrence of an Event of Default (as such term is defined in paragraph 28 herein), to the payment of the Carve-Out (as defined in paragraph 27 herein).

### VIII. DIP Liens

16. The DIP Obligations shall also be secured by the grant of the following security interests and liens for the benefit of Lender (such security interests and liens being collectively referred to as the "DIP Liens," and all property identified in clauses (a) (b) and (c) below being collectively referred to as the ("DIP Collateral"), subject only to the payment of the Carve-Out:

(a) Pursuant to section 364(c)(2) of the Bankruptcy Code, a perfected first priority senior security interest in and lien upon all pre- and post-petition property of the Debtor, whether existing on the Petition Date or thereafter acquired, that, as of the Petition Date is not subject to valid, perfected and non-avoidable liens; provided, however, that Lender shall not receive a security interest in or lien upon any causes of action arising under sections 542, 544, 545, 547, 548, 549, 500, 551, 553(b), or 724(a) of the Bankruptcy Code or any proceeds thereof (the "Avoidance Actions").

(b) Pursuant to section 364(c)(3) of the Bankruptcy Code, a perfected security interest in and lien upon all of the pre- and post-petition tangible and intangible property of the Debtors, whether now existing or hereafter acquired, which lien shall be junior to valid, perfected and

unavoidable liens in existence as of the Petition Date or to valid and unavoidable liens in existence immediately prior to the Petition Date that were perfected subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code (other than the existing liens on the Pre-Petition Collateral, which liens shall be primed by the liens to be granted to the Lender as described in clause (c) below); and

(c) Pursuant to Section 364(d)(1) of the Bankruptcy Code, a perfected first priority, senior lien (the "Priming Liens") on all of the Pre-Petition Collateral, which lien shall be senior to and prime the existing liens that presently secure the Pre-Petition Obligations (but subject to any liens in existence on the Petition Date to which the liens being primed hereby are subject or become subject subsequent to the Petition Date as permitted by section 546(b) of the Bankruptcy Code).

17. The DIP Liens shall not be subject or subordinate to (i) any lien or security interest that is avoided and preserved for the benefit of the Debtors and their estates under section 551 of the Bankruptcy Code, (ii) any liens arising after the Petition Date; or (iii) the Adequate Protection Liens (as defined herein).

### IX. Use of Pre-Petition Collateral

18. The parties contemplate that the Debtors will use and have agreed that the Debtors are authorized to use Pre-Petition Collateral, including Cash Collateral within the meaning of section 363(a) of the Bankruptcy Code (the "Cash Collateral") and non-cash collateral (the "Pre-Petition Non-Cash Collateral"), but solely in accordance with the terms and conditions set forth in the Agreement and in the Approved DIP Budget. Except as otherwise provided in the Agreement, the parties agree that the Debtors may use Pre-Petition Collateral only so long as (a) subject to any applicable right to cure, no Event of Default (as defined in paragraph 28 herein) shall have occurred and be continuing, and (b) the Termination Date (as defined in paragraph 31 herein) shall not have occurred.

19. Subject to the other provisions of the Agreement, the continued use of the Pre-Petition Collateral shall be conditioned upon Debtors' compliance with the expense line items in the Approved DIP Budget, including any permitted variances and the Agreement.

20. Debtors may use Cash Collateral only to pay the following post-petition expenses, subject to any bankruptcy law requirements that such sums be paid only after notice and approval by the Court, and subject (except for (ii)), to the Approved DIP Budget: (i) reasonable and necessary general operating expenses incurred by the Debtors in the ordinary course of operating their business, (ii) all statutory fees of the Court and the United States Trustee, (iii) professional fees of the Debtors and any Committee(s), to the extent authorized to be paid and to the extent set forth in the Approved DIP Budget, and (iv) the DIP Obligations and the Adequate Protection Obligations.

21. Debtors shall be authorized to exceed any line item in the Approved DIP Budget by 10% provided that it does not exceed the aggregate budgeted expenditures for any period by more than 5%. The weekly variance report will be for the period of each week, ending on the close of business on Friday, for every week until the Termination Date, and shall be delivered to Albert and Lender by the close of business on Wednesday of the following week.

22. Debtors will provide access during business hours on 24 hours notice to an authorized representative designated by Albert and/or Lender for the purpose of inspecting the Debtors' financial books and records and will make officers available to discuss the revenues and disbursements set forth in the Approved DIP Budget.

23. The Approved DIP Budget may be further amended or extended without Court approval with Albert's and Lender's consent in their sole and absolute discretion and upon five (5) days notice and opportunity to object to any Committee. The Committee shall be deemed to have objected so long as the Committee has delivered a written communication (in any form, including email, facsimile or courier) to counsel for the Debtor, counsel for Albert, and Lender (i) stating that the Committee objects to the proposed amendment, and (ii) briefly identifying the reason(s) for such objection.

24. As adequate protection, the Debtors will provide the following protections (collectively, the "<u>Adequate Protection Obligations</u>") pursuant to sections 361, 363(c) and 363(e) of the Bankruptcy Code for any and all decrease, diminution, or decline in the value of the Pre-Petition Collateral from and after the Petition Date caused by or resulting from (i) the use of the Cash Collateral, (ii) the use, sale, or lease of the Pre-Petition Non-Cash Collateral, (iii) the imposition of the automatic stay by section 362 of the Bankruptcy Code, (iv) from the granting of the Superpriority Claim and the Priming Liens, and (v) the subordination to the Carve-Out:

(a) Pursuant to sections 361 and 363(e) of the Bankruptcy Code, effective from the Petition Date, Albert shall have a continuing, perfected replacement lien and security interest (the "<u>Adequate Protection Liens</u>") upon: (i) all assets of Debtors' bankruptcy estates acquired after the Petition Date of the same type and description as the Pre-Petition Collateral (the "<u>Post-Petition Like Kind Collateral</u>") and (ii) all other property of Debtors' bankruptcy estates that is not Pre-Petition Collateral or Post-Petition Like Kind Collateral (the "<u>Additional Collateral</u>" and, collectively with the Post-Petition Like Kind Collateral, the "<u>Adequate Protection Collateral</u>").

(b) The Adequate Protection Liens on the Post-Petition Like Kind Collateral shall have the same priority, validity and extent as Albert's liens and security interests in the Pre-Petition Collateral. The Adequate Protection Liens shall be subject and subordinate to: (i) with respect to the Additional Collateral only, any valid and unavoidable existing liens on or security interests in such Additional Collateral, (ii) the DIP Liens, and (iii) the Carve-Out (as defined in paragraph 27 herein). The Adequate Protection Liens shall not extend to the proceeds of any Avoidance Actions.

(c) To the extent that the Adequate Protection Liens are inadequate to provide sufficient protection for the Adequate Protection Obligations, Albert is granted a claim (the "<u>Junior Superpriority Claim</u>") for the remaining portion of the Adequate Protection Obligations under section 507(b) with priority over and above all administrative expenses of any kind incurred in the Bankruptcy Cases or any successor cases including, without limitation, those of the kind specified in, or ordered pursuant to, sections 105, 326, 327, 330, 331, 503(b), 506(c), 507(a), the "equity exception" in section 552(b), 726, or any other provision of the Bankruptcy Code, except that such

Junior Superpriority Claim shall be subject to and subordinate to (i) the Superpriority Claim, and (ii) the Carve-Out.

(d) As further adequate protection, Debtors shall comply with the following reporting requirements: (i) Debtors will provide Albert with an annual financial statement no later than ninety (90) days after the end of the fiscal year of the Debtors; (ii) Debtors will provide Albert with a quarterly financial statement as soon as available but in any event not later than forty-five (45) days after the end of each of the first three fiscal quarters of each fiscal year of the Debtors, commencing with the first quarter for fiscal year 2009; (iii) Debtors will provide Albert with a copy of all reports required by the United States Trustee related to financial operations (i.e. the Monthly Operating Reports) concurrently with filing said reports with the Office of the United States Trustee; (iv) on or before noon on Wednesday of each week, Debtors will provide Albert with a revised version of the Approved DIP Budget, updated for any variances, as well as a budget to actual for the preceding week; (v) Debtors will provide Albert with such other information as is requested thereby; and (vi) simultaneously with the delivery of any information listed above, the Debtors will provide Albert a certificate of an authorized officer stating that he or she has reviewed the provisions of the Agreement and the Loan Documents and that the Debtors are in compliance therewith.

### X. Automatic Stay and Certain Remedies

25. The automatic stay provisions of section 362 of the Bankruptcy Code shall be modified to the extent necessary to permit (i) the Debtors to grant the DIP Liens and to perform the Debtors' obligations hereunder, and (ii) Lender or Albert, as applicable, to deliver a Default Notice (as defined in paragraph 30 herein). Upon the occurrence of an Event of Default and delivery of a Default Notice, Lender or Albert, as applicable, shall be entitled to an expedited hearing in the Bankruptcy Court, on five (5) days prior notice to the parties entitled to receive the Default Notice, for authority to exercise all rights and remedies provided for in the Agreement and the Pre-Petition Loan Documents. In no event shall Albert or Lender be subject to the equitable doctrine of "marshaling" or any similar doctrine with respect to the DIP Collateral, the Pre-Petition Collateral or the Adequate Protection Collateral. Nothing in the Agreement shall limit the Debtors' right to seek

authority from this Court (nor the right of Albert or Lender to object to such application) to use Pre-Petition Collateral, including Cash Collateral on any other terms once the DIP Obligations have been indefeasibly discharged in full in cash, and any and all commitments under the DIP Loan have been terminated.

26. Notwithstanding anything to the contrary herein, no borrowings under the DIP Loan or any Cash Collateral shall be used to:

(a) challenge the validity, priority, perfection, extent or enforceability of the obligations owed to the Lender or Albert, the security interests or liens granted to the Lender under the DIP Loan or to Albert under the Pre-Petition Loan Documents, or the security interests or liens granted by this Order; provided, however, that Cash Collateral and/or borrowings under the DIP Loan in an amount not to exceed $25,000 (inclusive of all amounts used in accordance with paragraph 26(b)) may be used by the Committee or the Debtors, but not both, to investigate the validity, priority, perfection, extent or enforceability of any Pre-Petition Obligations;

(b) assert any claims, counterclaims, defenses or causes of action against the Albert or Lender, or any of their respective officers, directors, employees, agents, attorneys, affiliates, assigns or successors, including, without limitation, attempt to assert an avoiding action against the Lender or Albert; provided, however, that Cash Collateral and/or borrowings under the DIP Loan in an amount not to exceed $25,000 (inclusive of all amounts used in accordance with paragraph 26(a)) may be used by the Committee or the Debtors, but not both, to investigate any such matters;

(c) seek to modify any rights granted to Lender or Albert under the Agreement; or

(d) prevent, hinder or otherwise delay the Lender's or Albert's exercise of any remedies with respect to the DIP Collateral, the Adequate Protection Collateral or the Pre-Petition Collateral, as applicable, except in accordance herewith.

## XI. Carve-Out

27. The DIP Liens, the Pre-Petition Obligations, the Pre-Petition Collateral, the Superpriority Claim, the Junior Superpriority Claim and the Adequate Protection Liens shall be subordinated to the payment of the following (the "Carve-Out"): (i) the U.S. Trustee's Fees; (ii) fees

payable to the Clerk of the Bankruptcy Court; and (iii) the reasonable fees and expenses incurred on or after the Petition Date in accordance with the Approved DIP Budget and approved by final order of the Bankruptcy Court of those certain professionals retained under Bankruptcy Code §§ 327 or 1103 by the Debtors or the Official Committee of Unsecured Creditors in the case of such fees and expenses, incurred through the date of delivery of a Default Notice (as defined in paragraph 30 herein). Nothing herein shall be construed to impair the ability of any party to object to any of the fees, expenses or other disbursements described herein.

### XII. Events of Default

28. Unless Lender and/or Albert, as applicable, shall have provided their prior written consent, or all DIP Obligations and all Adequate Protection Obligations shall have been indefeasibly paid in full in cash, and the commitments under the DIP Loan shall have been terminated in whole, each of the following shall constitute an "Event of Default":

(a) The interim approval order on this Motion is not entered within 21 days after the Petition Date, or the final approval order is not entered within 45 days after the Petition Date;

(b) the issuance of an order staying, reversing, modifying or vacating this interim or final approval orders, as applicable;

(c) a plan of reorganization is confirmed which does not provide for termination of the commitment under the DIP Loan and payment in full in cash of the Debtors' obligations thereunder on the effective date of the plan or payment in full of the Pre-Petition Obligations and/or which is not consistent with or not containing all terms and conditions of the Proposed Restructuring;

(d) a plan of reorganization to effectuate the Proposed Restructuring is not filed within 60 days of the Petition Date;

(e) the entry of an order dismissing the Bankruptcy Case(s), converting the Bankruptcy Case(s) to Chapter 7, or appointing a Chapter 11 trustee or an examiner with expanded powers in the Bankruptcy Case(s), if such order does not provide for the termination of the DIP Loan and payment in full in cash of all obligations thereunder or payment in full of the Pre-Petition Obligations;

(f) any action by the Debtors, including the filing of an application, in support of any of the foregoing Events of Default, or the failure of the Debtors to contest in good faith any such application filed by a person other than the Debtors, if the relief requested is granted in an order that is not stayed pending appeal;

(g) the breach by the Debtors of any term or provision of the Agreement, subject to written notice to the Debtors and any Committees and an opportunity to cure, in each case only to the extent such notice and opportunity to cure are provided for herein;

(h) the acquisition by any post-petition lender to the Debtors of a post-petition security interest in or lien upon any property of the Debtors having parity with or priority over the security interest and liens in such property held by Lender or Albert, as applicable (other than a statutory lien arising in the ordinary course of business);

(i) the automatic stay is lifted with respect to any of the collateral of Lender or Albert having an aggregate book value in excess of $100,000; and

(j) the entry of an order of any court that terminates the authority of the Debtors to conduct business.

29. With respect to any default in the obligations described in paragraphs 19, 20 or 21 above, Debtors' authorization to use Cash Collateral or any borrowings under the DIP Financing will automatically terminate and Debtors' shall have no right to use the Pre-Petition Collateral, including Cash Collateral, or any borrowings under the DIP Loan other than towards (a) the satisfaction of the DIP Obligations, (b) the satisfaction of the Adequate Protection Obligations, (c) the Carve-Out, and (d) satisfaction of claims of the Debtors' employees for unpaid wages and commissions accrued in the ordinary course of Debtors' business prior to the default (solely to the extent provided in the Approved DIP Budget).

30. In the event of a default under any other provision of the Agreement, and upon three (3) days' notice by Lender or Albert to the Debtors and any Committee(s) (the "<u>Default Notice</u>"), the Debtors' authorization to use borrowings under the DIP Loan and Cash Collateral will be terminated and the Debtors shall have no right to use borrowings under the DIP Loan or Cash Collateral other

MOTION FOR ORDER AUTHORIZING POST-PETITION
FINANCING, USE OF CASH COLLATERAL, ETC.
-16-
Case: 09-41466    Doc# 7    Filed: 03/02/09    Entered: 03/02/09 19:34:34    Page 16 of 18

than toward (a) the satisfaction of the DIP Obligations, (b) the satisfaction of the Adequate Protection Obligations, (c) the Carve-Out, and (d) satisfaction of claims of the Debtors' employees for unpaid wages and commissions accrued in the ordinary course of the Debtors' business prior to the default (solely to the extent provided in the Approved DIP Budget). Such termination is without prejudice to the right of the Debtors to seek an order contesting the Event of Default, and Lender and Albert consent to a hearing for such purpose on such notice as the Bankruptcy Court orders.

### XIII. Termination

31. All DIP Obligations and, subject to the provisions of paragraph 24 above, all Adequate Protection Obligations shall be due and payable, without notice and demand, and the authorization to use Cash Collateral or borrowings under the DIP Loan hereunder shall terminate, upon the earliest to occur (the "Termination Date") of:

   (a) the date occurring nine (9) months after the Effective Date of the Agreement;

   (b) the effective date of any plan of reorganization for the Debtors;

   (c) the consummation of a sale of all or substantially all assets of the Debtors; or

   (d) the occurrence of an Event of Default, subject to the requirements of paragraphs 29 and 30 above.

. 32. Unless and until the DIP Obligations and, subject to the provisions of paragraph 24 above, the Adequate Protection Obligations are unconditionally and indefeasibly repaid in full in cash, the protection afforded to Lender and Albert under this Agreement and under this Order shall survive the entry of any order confirming a plan of reorganization or converting the Bankruptcy Cases into a cases under Chapter 7 of the Bankruptcy Code, and the DIP Liens and the Adequate Protection Liens and the Superpriority Claim and the Junior Superpriority Claim shall continue and shall maintain their priority as provided by the Agreement until the DIP Obligations, and subject to the provisions of paragraph 24 above, the Adequate Protection Obligations are unconditionally and indefeasibly repaid in full in cash.

WHEREFORE, the Debtors respectfully request that the Court enter an Order:

1. Granting the Motion on an interim basis and authorizing the Debtors to borrow up to $250,000.00 from Lender and to use Cash Collateral, under the Agreement to fund operations of the Debtors necessary to prevent immediate and irreparable harm to the estates, as provided in the Approved DIP Budget and on the terms set forth in the Agreement and the interim Order granting this Motion;

2. Scheduling a final hearing on the Motion; and

3. Granting such other relief as the Court deems just and proper.

Dated: March 1, 2009                        MONROE LAW GROUP

By: */s/ James S. Monroe*
Attorneys for Debtor