James S. Monroe (State Bar No. 102328)
Monroe Law Group
101 California Street, Suite 2450
San Francisco, CA 94111
Telephone: (415) 869-1575
Facsimile:  (415) 723-7423
Email: jim@monroe-law.com

Attorneys for Debtor

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| In re:<br><br>THE RYNESS COMPANY, INC., a California corporation,<br><br>                            Debtor.<br><br>801 San Ramon Valley Blvd.<br>Danville, CA 94526<br><br>Employer's Tax ID No.: 14-1878323 | Chapter 11<br><br>Case No. 09-41466<br><br>**DECLARATION OF GEORGE A. RYNESS III IN SUPPORT OF MOTION FOR ORDER (1) AUTHORIZING POST-PETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 364(C)(1); (2) AUTHORIZING THE USE OF CASH COLLATERAL; (3) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (4) PROVIDING ADEQUATE PROTECTION; (5) MODIFYING AUTOMATIC STAY; AND (6) GRANTING RELATED RELIEF**<br><br>Date:    March 4, 2009<br>Time:   Time: 10:00 a.m.<br>Place:   1300 Clay Street, Room 215<br>           Oakland, CA 94612<br>Judge:  Hon. Edward D. Jellen |

I, George A. Ryness III, hereby declare:

DECLARATION OF GEORGE A. RYNESS III IN SUPPORT OF
MOTION FOR ORDER AUTHORIZING POST-PETITION
FINANCING, USE OF CASH COLLATERAL, ETC.

1. I am the President of The Ryness Company, a California corporation ("TRC"), The Ryness Company California, Inc., a California corporation ("TRC California"), and TRC Services Corporation, a California corporation ("TRC Services"), debtors and debtors in possession (collectively, the "Debtors"), in their respective voluntary bankruptcy cases (the "Bankruptcy Cases") under Chapter 11 of the Bankruptcy Code which were filed together on February 26, 2009. I have personal knowledge of the matters stated herein except as to those matters stated on information and belief, and as to those matters, I am informed and believe them to be true. If called as a witness, I could and would competently testify as to those facts.

2. I am the responsible individual appointed for all three Debtors.

### A. History and Events Leading to the Debtors' Bankruptcy Cases

3. I founded The Ryness in 1975 to provide marketing and real estate brokerage services to homebuilders. Until 2003, it conducted business mainly in Northern California, initially with builders of mainly suburban subdivisions, and over time the business also included representing developers of condominium conversion projects. The basic business model of The Ryness Company was an innovation at the time, in that the company, instead of working for the then-standard broker's commission of 6%, worked at a substantially lower rate while having the builder-client incur the direct and indirect costs of marketing and advertising the project. By contracting with The Ryness Company, builders were able to engage a company of new homes professionals (as contrasted with resale specialists) without incurring selling costs internally through an in-house sales staff.

4. In 2003, The Ryness Company merged with Pickford New Homes Real Estate, Inc. ("PNH"), owned by Eddy D. Monce ("Monce") which conducted a similar business in Southern California and Nevada, and which business differed from The Ryness Company's in that it also included the representation of developers of new high-rise condominiums. Following the merger, the combined company ("The Ryness Company") began a period of expansion, moving into markets in the Pacific Northwest (Washington and Oregon), the Southwest (Arizona and Nevada), and Colorado.

5. In the first quarter of 2006, The Ryness Company acquired The Marketing Directors ("TMD"), a New York company which had as its primary business representing urban condominium

DECLARATION OF GEORGE A. RYNESS III IN SUPPORT OF MOTION FOR ORDER AUTHORIZING POST-PETITION FINANCING, USE OF CASH COLLATERAL, ETC.

-2-

Case: 09-41466   Doc# 8   Filed: 03/02/09   Entered: 03/02/09 19:56:05   Page 2 of 9

developers in New York City. The Ryness Company used a credit facility with Bank of America to fund a portion of the purchase price, with the balance carried by the seller, Adrienne Albert ("Albert"). Subsequently, in 2007, The Ryness Company launched a new division ("TMD-Southeast") under the TMD name in various markets in the Southeast, representing builders of new high-rise condominiums and also developers of condominium conversions. TMD-Southeast proved to be a serious drain on The Ryness Company's resources, losing a total of $7.7 million in 2007 and 2008.

6. At its peak in 2006, The Ryness Company sold and closed over 10,000 homes and had gross revenues of $79.2 million. However, the acquisition of TMD in 2006 coincided with the beginning of the slowdown in the new home sales market which has continued to the present. In early 2007, The Ryness Company sold most of its Pacific Northwest operation back to the previous owners. In mid-2007, the acquisition loan for the TMD purchase was restructured, with Albert paying off the Bank of America credit line and becoming The Ryness Company's primary lender on the entire acquisition loan, with a first security interest in all of The Ryness Company's assets (including all of the assets of the Debtors).

7. In early 2008, it became clear that the co-ownership of The Ryness Company by Monce and I was no longer viable and I acquired Monce's interest in The Ryness Company. In March 2008, the restructured Albert loan went into default, and the loan was again restructured. As part of that restructuring, TMD was sold back to Albert, and TMD-Southeast was transferred to an entity controlled by Albert. After the 2008 restructuring transaction, a balance of $9,000,000 was still owed to Albert, with interest payable on a monthly basis and a specified repayment schedule for principal.

8. By early 2009, after the significant worsening of the housing and credit markets in the fall of 2008, it had become clear that The Ryness Company could not continue to meet its ongoing obligations, including without limitation the Albert loan, thereby necessitating the present bankruptcy filings.

DECLARATION OF GEORGE A. RYNESS III IN SUPPORT OF MOTION FOR ORDER AUTHORIZING POST-PETITION FINANCING, USE OF CASH COLLATERAL, ETC.

-3-

9. At the present time, The Ryness Company is still active only in the California and Nevada (Las Vegas) markets. At its peak, the company had approximately 800 total personnel. At present, the company has approximately 200 personnel remaining, with 20 employees and the rest independent contractor sales agents; it is anticipated that this number will steadily dwindle as projects are closed or cancelled.

10. Presently, The Ryness Company business is conducted via the three inter-related corporations that are the Debtors herein – TRC, TRC California, and TRC Services. TRC is the holding company for TRC California and TRC Services, and is wholly owned by George and Kathleen Ryness. TRC California is the primary operating entity for the State of California. This is the same entity as PNH (the entity owned by Monce), which previously had changed its name to The Ryness Company (Southern California), Inc., and subsequently changed its name to The Ryness Company California, Inc. when the operating entity for Northern California (named The Ryness Company (Northern California), Inc.) was merged into it in 2007. Historically, TRC Services was the original company founded by Ryness. Post-merger, it has provided accounting and administrative services for the overall group of companies. It is party to most of the service and vendor agreements, but does not provide brokerage services.

## B. Assets and Liabilities

11. The Debtors' significant tangible assets that can be valued at this time are the open sale escrows for which commissions may be earned upon the closing of the sales. These assets are all held by TRC California – the only entity that provides brokerage services. TRC and TRC Services have no significant assets. Other assets that are more difficult to value at this time include trade names and other intellectual property and goodwill.

12. Presently, there are approximately 940 open escrows which would generate gross profit of approximately $2 million if they all were to close. However, in the current economic climate, the cancellation rate for these escrows has been and continues to be high. Based thereon, the Debtors anticipate that no more than 367 of these escrows will close in 2009, generating gross profit of approximately $900,000.

DECLARATION OF GEORGE A. RYNESS III IN SUPPORT OF MOTION FOR ORDER AUTHORIZING POST-PETITION FINANCING, USE OF CASH COLLATERAL, ETC. -4-

Case: 09-41466   Doc# 8   Filed: 03/02/09   Entered: 03/02/09 19:56:05   Page 4 of 9

13. The Debtors also anticipate generating some new sales and business in Northern California in 2009 (where its business is now focused), the volume of which is difficult to forecast in the current economic climate which has caused large operational losses during the last few years.

14. The Debtors' aggregate liabilities are believed to total approximately $17 million or so. Of these, the primary debts are the secured claim of Albert in the amount of approximately $5.5 million which is a debt of all 3 Debtors and is secured by a first security interest in substantially all of their assets, and a debt for approximately $8.6 million for unsecured loans made to the Debtors by my wife, Kathleen Ryness, and I. The Debtors' remaining liabilities consist primarily of certain claims related to real property leases signed by TRC (mostly for premises that have been or are in the process of being vacated), equipment leases signed by TRC Services and miscellaneous vendor, agent, tax and employee claims against TRC California and, in some case, TRC Services.

15. The Debtors have some equipment leasing creditors, but no other secured creditors.

## C. Pre-Petition Secured Financing from Albert

16. The Debtors and Albert are parties to, *inter alia*, an Amended and Restated Loan Agreement dated as of June 28, 2007, an Amended and Restated Pledge Agreement dated as of June 28, 2007, a First Amendment to Amended and Restated Loan Agreement dated as of July 7, 2008, and a First Amendment to Amended and Restated Pledge Agreement dated as of July 7, 2008 (the "Pre-Petition Loan Documents"), which formed the basis for Albert to provide the prepetition financial accommodations to the Debtors described, true and correct copies of which are attached hereto as Exhibits B through E and incorporated herein by reference.

17. As of the Petition Date, the Debtors are jointly and severally indebted to Albert in the amount of approximately $5.5 million principal, plus accrued and unpaid interest and any and all other amounts due under the terms of the Pre-Petition Loan Documents, as may be adjusted pursuant to Section 8.8 of that certain Securities Purchase and Sale Agreement dated July 7, 2008. Substantially all of the Debtors' pre-petition assets and cash as described in the Pre-Petition Loan Documents (the "Pre-Petition Collateral") are encumbered by valid, enforceable and perfected, first priority liens and security interests in favor of Albert ("Pre-Petition Liens") to secure all

DECLARATION OF GEORGE A. RYNESS III IN SUPPORT OF MOTION FOR ORDER AUTHORIZING POST-PETITION FINANCING, USE OF CASH COLLATERAL, ETC.

-5-

Case: 09-41466   Doc# 8   Filed: 03/02/09   Entered: 03/02/09 19:56:05   Page 5 of 9

indebtedness, liabilities and obligations of the Debtors to Albert as provided for in the Pre-Petition Loan Documents (the "Pre-Petition Obligations"). The Debtors have no other secured creditors.

18. To perfect her Pre-Petition Liens, Albert filed UCC-1 financing statements with the California Secretary of State against TRC California and TRC Services on or about July 2, 2007 and against TRC on or about July 16, 2008, true and correct copies of which are attached hereto collectively as Exhibit F and incorporated herein by reference. In addition, Albert filed UCC financing statement amendments with the California Secretary of State on or about July 2, 2007, reflecting the assignments she obtained of Bank of America's former blanket security interest against the assets of TRC and TRC Services. True and correct copies of these filed assignments and the financing statements filed by Bank of America are attached hereto collectively as Exhibit G and incorporated herein by this reference.

19. Attached hereto collectively as Exhibit H are true and correct copies of search reports obtained on March 1, 2009 from the California Secretary of State's website showing the UCC filings against TRC, TRC California and TRC Services. These reports reflect the following:

(a) That Albert has the only UCC-1 financing statements of record against TRC California and TRC Services; and

(b) That in addition to Albert, IOS Capital, IKON Financial Services, CIT Bank, and Citicorp Vendor Finance, Inc., have filed UCC-1 financing statements against TRC (the "Lease Filings"), and, in addition, Wells Fargo Bank ("Wells") filed a blanket UCC-1 financing against TRC on or about March 11, 2005. The Lease Filings cover only specifically described equipment that was leased to TRC by the respective equipment lessors. The Wells filing is of no effect since the Debtors have no pre-petition indebtedness to Wells and, in any event, TRC is a holding company without substantial property.

**D. Proposed Restructuring**

20. Prior to the Petition Date, the Debtors negotiated the terms of a restructuring (as described below, the "Proposed Restructuring") with Albert as follows:

DECLARATION OF GEORGE A. RYNESS III IN SUPPORT OF MOTION FOR ORDER AUTHORIZING POST-PETITION FINANCING, USE OF CASH COLLATERAL, ETC.   -6-

Case: 09-41466    Doc# 8    Filed: 03/02/09    Entered: 03/02/09 19:56:05    Page 6 of 9

(a) the distribution of equity interests in a reorganized entity to unsecured creditors of the Debtors and to the current owner of the Debtors (their largest unsecured creditor), with the percentage ownership to be determined;

(b) the restructuring of Albert's current secured indebtedness, as described below, of the same amount with substantially the same terms and covenants, save for (a) a restating of the interest rate thereunder to be 0% for the first year following the Petition Date, 2% for the second year following the Petition Date, 3% for the third year following the Petition Date, 4% for the fourth year following the Petition Date, 5% in for the fifth year following the Petition Date, 6% for the sixth year following the Petition Date, and 7% for the seventh year following the Petition Date, (b) the final maturity thereof being the seventh anniversary of the Petition Date (or, if earlier, the date of any change of control of the reorganized entity, sale of the reorganized entity, or the date the current owner of the Debtors ceases to devote substantially all of his business time with the Debtors or ceasing to be involved with the Debtors), (c) amortization installments thereunder consisting of 50% of free cash flow, defined in a customary manner to be agreed, with the remaining 50% thereof payable as determined by Debtors' management, in their sole discretion, the timing and manner of payment in each instance to be agreed, and (d) limits on payments to be made to the current owner of the Debtors and any affiliates and approval over expenses above an amount to be agreed (it being understood that such current owner may draw a salary of $10,000 per month; provided, however, that this is no way limits the discretion of Debtors' management to allocate additional compensation thereto from the remaining 50% of free cash flow as provided in clause (c) above); and

(c) no modification or change to any personal guarantees regarding or related to Albert's current indebtedness.

The Debtors hope to effectuate the Proposed Restructuring through a plan of reorganization to be filed within 60 days of the Petition Date.

**E.  Proposed Post-Petition Financing**

21.  By this Motion, the Debtors seek court approval to enter into an Agreement (the "<u>DIP Loan Agreement</u>") For Post-Petition Financing, the Granting of Security Interests, Superpriority

DECLARATION OF GEORGE A. RYNESS III IN SUPPORT OF MOTION FOR ORDER AUTHORIZING POST-PETITION FINANCING, USE OF CASH COLLATERAL, ETC.  -7-

Case: 09-41466    Doc# 8    Filed: 03/02/09    Entered: 03/02/09 19:56:05    Page 7 of 9

Administrative Expense Treatment, Use of Cash Collateral, Modifying the Automatic Stay, the Granting of Replacement Liens, and Related Matters by and among the Debtors, Jean C. Mills ("Lender"), and Albert (the "DIP Loan"), a true and correct copy of which is attached hereto as Exhibit A and incorporated herein by reference. Specifically, the Debtors seek authority to borrow, pursuant to the terms and conditions of the DIP Loan Agreement, up to an aggregate amount not to exceed $250,000, consisting of advances by the Lender secured by a blanket lien against all of the Debtors' assets which will prime the Pre-Petition Liens of Albert, and for the consensual use of Albert's cash collateral to assist with the funding of the Debtors' efforts to reorganize in accordance with a budget approved by Lender and Albert (the "Approved DIP Budget"), a true and correct copy of which is attached as Exhibit A to the DIP Loan Agreement. The proceeds of the DIP Loan advances and Albert's cash collateral will be used solely to fund expenditures pursuant to the Approved DIP Budget. It is the Debtors' goal to use this post-petition financing to enable them to confirm the Proposed Restructuring Plan and to help implement the restoration of the Debtors' business operations.

22. The DIP Loan Agreement and Approved DIP Budget, in combination with revenue anticipated to be generated from the Debtors' continued business operations as forecasted in the Approved DIP Budget, provide what I believe are the necessary funds to satisfy the Debtors' administrative expenses until a plan of reorganization can be confirmed.

23. The Debtors have an immediate need to obtain the DIP Loan in order to permit, among other things, the orderly continuation of the operation of their business, to maintain business relationships with vendors and suppliers, and to satisfy other working capital needs. The ability of the Debtors to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtors and its successful reorganization. The Lender has requested the Debtors to be co-borrowers under the DIP Loan.

24. As reflected in the Approved DIP Budget, the Debtors anticipate that it will be necessary to borrow at least $81,258 and use cash collateral as set forth on a weekly basis in the

DECLARATION OF GEORGE A. RYNESS III IN SUPPORT OF
MOTION FOR ORDER AUTHORIZING POST-PETITION
FINANCING, USE OF CASH COLLATERAL, ETC.

-8-

Case: 09-41466    Doc# 8    Filed: 03/02/09    Entered: 03/02/09 19:56:05    Page 8 of 9

Approved DIP Budget to make necessary expenditures prior to the final hearing and without which the Debtors will be irreparably harmed. The vast majority of such expenditures are for personnel related expenses (wages and real estate agent commissions due for sale closings).

25. The Debtors are unable to obtain adequate unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code or pursuant to sections 364(a) and 364(b) of the Bankruptcy Code. The Debtors are also unable to obtain secured credit allowable under section 364(c)(2) or 364(c)(3) of the Bankruptcy Code, except under the terms and conditions set forth in the DIP Loan Agreement.

26. The terms of the DIP Loan have been negotiated in good faith and at arm's length and without collusion between the Debtors and the Lender, and are fair and reasonable under the circumstances.

27. I believe that the relief requested in the Motion is necessary, essential and appropriate for the continued operations of the Debtors business and the management and preservation ot the Debtors' property. I also think that it is in the best interest of the Debtors' estates to be allowed to enter into, and perform under, the DIP Loan Agreement.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.

Executed this 2nd day of March 2009 at Danville, California.

*/s/ George A. Ryness III*
George A. Ryness III

DECLARATION OF GEORGE A. RYNESS III IN SUPPORT OF MOTION FOR ORDER AUTHORIZING POST-PETITION FINANCING, USE OF CASH COLLATERAL, ETC. -9-

Case: 09-41466   Doc# 8   Filed: 03/02/09   Entered: 03/02/09 19:56:05   Page 9 of 9