1    James S. Monroe, Esq. (SBN 102328)
     MONROE LAW GROUP
2    101 California Street, Suite 2450
     San Francisco, CA 94111
3    Telephone: (415) 869-1575
     Facsimile: (415) 723-7423
4    Email: jim@monroe-law.com

5    Attorneys for Debtors

6

7              UNITED STATES BANKRUPTCY COURT

8              NORTHERN DISTRICT OF CALIFORNIA

9                  OAKLAND DIVISION

10

| | |
|---|---|
| In re: | Case Nos. 09-41466<br>              09-41475<br>              09-41476 |
| THE RYNESS COMPANY, INC., a California corporation; THE RYNESS COMPANY CALIFORNIA, INC., a California corporation; and TRC SERVICES CORPORATION, INC., a California corporation, | [Jointly Administered Under Case No. 09-41466; Pleading Applies to All Cases]<br><br>Chapter 11 |
| Debtors. | |
| 801 San Ramon Valley Blvd.<br>Danville, CA 94526 | **DISCLOSURE STATEMENT (DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION** |
| Employer's Tax ID No.: 14-1878323; 33-0805836; 94-2314419 | <u>Plan Confirmation Hearing</u><br><br>Date:    October 22, 2009<br>Time:   2:30 p.m.<br>Place:   1300 Clay Street, Room 215<br>             Oakland, CA 94612<br>Judge:  Honorable Edward D. Jellen |

DISCLOSURE STATEMENT (DATED AUGUST 25, 2009)
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

# **TABLE OF CONTENTS**

**PAGE**

I    INTRODUCTION AND OVERVIEW…………………………………………….....  1

     A    Introduction………………………………………………………………....  1

     B    Information Regarding The Plan………………………….………………....  5

          1.    Exclusive Authorized Source of Information…………………………  5

          2.    Source of Information………………………………………………  5

          3.    Financial Projections…………………………………………………  6

     C    Voting Instructions………………………………………………………  6

          1.    How to Vote……………………………………………………  6

          2.    Who May Vote………………………………………………….......  7

     D    Confirmation………………………………………………………….....  8

II   OVERVIEW OF THE CHAPTER 11 CASE………………………………  10

     A    Overview of Chapter 11……………………………………………  10

     B    Background and Events Precipitating the Chapter 11 Filings…………………….....  10

     C    The Debtors' Principal Assets…………………………………………  13

     D    The Debtors' Principal Liabilities……..………………………………  13

     E    Significant Events During Chapter 11 Cases………………………………  15

          1.    Joint Administration…………………………..…………………………  15

          2.    "First Day" Motions Heard on March 4, 2009……………………...………  15

               a.    Wages, Salaries and Commissions……………………..…………………  15

               b.    DIP Financing and Use of Cash Collateral………………………...……….  15

          3.    Rejection of Real Property Leases………………………………………  16

          4.    Retention of Professionals………………………...……………...............  16

          5.    Rejection of Personal Property Leases………………………………………  16

          6.    Termination of Certain Marketing Agreements and Entering Management Agreements………………………………………………………  17

          7.    Relief from Automatic Stay……………………………………………  18

i

| | | | |
|---|---|---|---|
| | a. | Litigation in Non-Bankruptcy Forum…………………………..…………..… | 18 |
| | b. | Wells Fargo Bank………………………………………………… | 18 |
| 8. | | Motion to Assume Real Property Lease…………………………..……………… | 18 |
| 9. | | Filing of Schedules and Establishment of Claims Bar Date.................................... | 19 |
| | a. | TRC……………………………………………………………… | 19 |
| | b. | TRC California…………………………………………………........... | 19 |
| | c. | TRC Services……………………………………………………........... | 19 |
| | d. | TRC……………………………………………………………......…… | 19 |
| | e. | TRC California…………………………………………………........... | 19 |
| | f. | TRC Services…………………………………………………………… | 20 |
| 10. | | Financial Information……………………………………………….................... | 20 |
| **III** | | **DESCRIPTION OF THE PLAN**…………………………..……………….............. | 20 |
| A | | Classification of Claims and Interests…………………………………………… | 21 |
| | 1. | Class 1 (DIP Lender's Claims Under the DIP Financing…………………………... | 21 |
| | 2. | Class 2 (Secured Claim of Albert) …………………………..…………………… | 21 |
| | 3. | Class 3 (Secured Claim of AICCO)…………………………..…………………… | 21 |
| | 4. | Class 4 (Other Secured Claims)…………………………………………………… | 21 |
| | 5. | Class 5 (Priority Employee Claims)…………………………..…………………… | 21 |
| | 6. | Class 6 (General Unsecured Claims) …………………………..………………… | 21 |
| | 7. | Class 7 (Interests)…………………………………………………………………… | 21 |
| B | | Treatment of Claims and Interests…………………………………………….......... | 21 |
| | 1. | Class 1 (DIP Lender's Claims Under the DIP Financing) ………………………… | 21 |
| | 2. | Class 2 (Secured Claim of Albert) …………………………..…………………… | 22 |
| | 3. | Class 3 (Secured Claim of AICCO) ……………………………………………… | 23 |
| | 4. | Class 4 (Other Secured Claims)……………………………………………………… | 23 |
| | 5. | Class 5 (Priority Employee Claims)………………………..……………………… | 24 |
| | 6. | Class 6 (General Unsecured Claims)…………………………..…………………… | 24 |

7. Class 7 (Interests)..................................................................... 25

C Unclassified Claims........................................................................ 25

1. Ordinary-Course Administrative Claims.......................................... 25

a. Allowance.................................................................. 25

b. Treatment.................................................................. 25

c. Estimated Amount....................................................... 25

2. Non-Ordinary Course Administrative Claims.................................. 26

a. Allowance.................................................................. 26

b. Treatment.................................................................. 26

c. Estimated Amount....................................................... 27

3. Allowed Priority Tax Claims....................................................... 27

a. Treatment.................................................................. 27

b. Estimated Amount....................................................... 28

IV IMPLEMENTATION OF THE PLAN OF REORGANIZATION............................ 28

A Source of Funds to Implement The Plan............................................. 28

B Merger of Debtors.......................................................................... 28

1. Merger................................................................................. 28

2. Charter................................................................................ 28

3. Vesting of Assets................................................................... 29

C New Common Stock To Be Issued Under The Plan............................. 29

1. Rights.................................................................................. 29

2. Transfer Restrictions.............................................................. 29

3. Listing................................................................................. 29

D Section 1145 Exemption.................................................................. 30

E Cancellation of Instruments............................................................. 30

F Employee Benefit Plans.................................................................. 30

G Insurance Policies......................................................................... 30

iii

| | | | |
|---|---|---|---|
| H | Intercompany Claims Extinguished……………………………………………………… | 30 |
| I | C Corporation Election……………………………………………………………… | 30 |
| J | Broker's License…………………………………………………………………… | 30 |
| K | Corporate Governance and Management……………………………………… | 31 |
| | 1. | New Board of Directors………………………………………………… | 31 |
| | 2. | New Officers…………………………………………………………… | 31 |
| | 3. | Identity of Reorganized Company Officers and Directors……………………… | 31 |
| | 4. | Corporate Action……………………………………………………… | 32 |
| | 5. | Periodic Reporting…………………………………………………… | 32 |
| L | Distributions………………………………………………………………… | 32 |
| | 1. | Manner of Distributions Under The Plan…………………………………… | 32 |
| | 2. | Delivery of Distributions……………………………………………… | 33 |
| | 3. | Undeliverable and Forfeited Distributions…………………………………… | 33 |
| | 4. | No Distributions on Account of Disputed Claims……………………………… | 34 |
| | 5. | No *De Minimis* Distributions………………………………………… | 34 |
| | 6. | No Fractional Distributions…………………………………………… | 34 |
| | 7. | Setoff, Recoupment, and Other Rights………………………………………… | 34 |
| | 8. | Compliance with Withholding and Reporting Requirements………………………… | 35 |
| | 9. | Exemption From Certain Transfer Taxes……………………………………… | 35 |
| | 10. | Compliance with Bankruptcy Code Section 1129(a)(13)……………………… | 35 |
| V | ALLOWANCE AND RESOLUTION OF CLAIMS……………………………………… | 35 |
| A | Distributions on Account of Allowed Claims……………………………………… | 35 |
| B | Estimation of Disputed Claims……………………………………………… | 36 |
| C | Treatment is in Full Satisfaction of All Rights……………………………………… | 36 |
| D | Objections to Claims and Interests……………………………………………… | 36 |
| E | Claim Resolution…………………………………………………………… | 36 |
| VI | EXECUTORY CONTRACTS AND UNEXPIRED LEASES……………………………… | 37 |

| | A | Assumption and Assignment of Contracts and Leases…………………………..……… | 37 |
|---|---|---|---|
| | B | Cure Payments Related to Assumption of Contracts and Leases........................................ | 38 |
| | C | Objections to Assumption or Proposed Cure Payment........................................................ | 39 |
| | D | Disallowance of Claims Relating to Assumed Contracts and Leases............................ | 39 |
| | E | Rejection of Contracts and Leases……………………..……………............... | 40 |
| | F | Bar Date For Rejection Damage Claims…………………..……….................. | 40 |
| | G | Postpetition Contracts and Leases…………………………..……..................... | 40 |
| VII | | BEST INTERESTS TEST AND LIQUIDATION ANALYSIS……………………………..... | 41 |
| VIII | | FEASIBILITY…………………………..……............................................................ | 41 |
| IX | | PRESERVATION OF RETAINED CLAIMS……………………..…………............ | 43 |
| X | | AVOIDANCE ACTION ANALYSIS………………………………....................... | 43 |
| XI | | PENDING LITIGATION………………..…….......................................... | 44 |
| | A | Desert (Rancho Las Flores Cases)…………………………..………............. | 44 |
| | B | El Cortez Cases…………………………..……..................................……… | 45 |
| | C | Roth v. Centre City Dev. Corp., San Diego Superior No 37-2008-00088615…………. | 45 |
| | D | Ali *et al* v. 1100 Wilshire Associates, *et al*, L.A. Superior No. BC394151.................... | 45 |
| XII | | TAX IMPLICATIONS………………..………..……...................................... | 46 |
| | A | Tax Consequences to Debtors…………………………..……......................... | 47 |
| | B | Tax Consequences to Creditors…………………………..……...................... | 47 |
| | C | Tax Consequences to Ryness…………………………..……........................... | 47 |
| | D | Wage Withholding…………………………..……....................................….. | 47 |
| | E | Backup Withholding…………………………..……...................................... | 47 |
| XIII | | CONDITIONS TO EFFECTIVENESS OF THE PLAN……………………..……… | 48 |
| | A | Occurrence of the Effective Date…………………………..…….................... | 48 |
| | B | Waiver of Conditions to Occurrence of Effective Date…………………………..…… | 49 |
| XIV | | DISCHARGE AND INJUNCTION………………………..……........................... | 49 |
| XV | | RETENTION OF JURISDICTION…………………………..…….................... | 51 |

v

Case 09-14106    Doc# 153    Filed: 08/27/09    Entered: 08/27/09 20:59:25    Page 6 of
96

| | | | |
|---|---|---|---|
| XVI | | MISCELLANEOUS PROVISIONS……………………………................... | 53 |
| | A | Limitations of Liability for Solicitation or Participation................................ | 53 |
| | B | Limitations of Liability for Actions in Connection with the Plan and Related Matters... | 53 |
| | C | Modification of the Plan…………………….…………........................... | 54 |
| | D | Revocation of the Plan……………………….…………........................... | 54 |
| | E | Post-Effective-Date Evidence of Claims and Interests…………………………..……… | 54 |
| | F | Successors and Assigns…………………….…………......................................……… | 54 |
| | G | Saturday, Sunday, or Legal Holiday………………….……..…………................... | 54 |
| | H | Governing Law…………………….…………….……........................................ | 54 |
| | I | Severability of Plan Provisions…………………….…........................…… | 55 |
| | J | No Admissions…………………….…………..…………….......………… | 55 |
| | K | Binding Effect…………………….…………..…………………………..…… | 55 |
| | L | Notices to the Debtors…………………….……….......................................…… | 55 |
| | M | U.S. Trustee Fees…………………….………….……................................ | 56 |
| | N | Post-Confirmation Status Reports…………………………..…….......................…… | 56 |
| | O | Post-Confirmation Conversion/Dismissal……….......………………….…………… | 56 |
| | P | Final Decree…………………….………………........................................ | 57 |
| | Q | Confirmation Request…………………….…….……..........................……… | 57 |
| XVII | | CONCLUSION…………………….…….……..........................……… | 57 |

DISCLOSURE STATEMENT (DATED AUGUST 25, 2009
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

Case 09-41466    Doc# 153    Filed: 08/27/09    Entered: 08/27/09 20:59:25    Page 7 of
96

# <u>TABLE OF EXHIBITS</u>

EXHIBIT 1                          Order Approving Disclosure Statement for Debtors'
Joint Plan of Reorganization (Dated August 25, 2009),
Fixing Time for Filing Acceptances or Rejections of the Debtors'
Plan, Fixing Time for Confirmation Hearing, Combined with Notice
Thereof

EXHIBIT 2                          Debtors' Promissory Note to The Ryness Trust and spreadsheet
showing the advances, payment history and balance due thereon

EXHIBIT 3                          Debtors' Monthly Operating Report for July 2009

EXHIBIT 4                          Debtors' Financial Projections for 2009 and 2010

# I. INTRODUCTION AND OVERVIEW

## A. **Introduction.**

The Ryness Company California, Inc. a California corporation ("TRC"), The Ryness Company California, Inc., a California corporation ("TRC California"), and TRC Services Corporation, a California corporation, (together, the "Debtors" or "Proponents") submit this DISCLOSURE STATEMENT (DATED AUGUST 25, 2009) (the "Disclosure Statement") pursuant to section 1125 of title 11 of the United States Code (the "Bankruptcy Code") to holders of Claims against the Debtors in connection with (i) the solicitation of acceptances of the DEBTORS' JOINT PLAN OF REORGANIZATION (DATED AUGUST 25, 2009), as the same may have been amended (the "Plan"), filed by the Debtors in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court"), and (ii) the hearing to consider confirmation of the Plan that is scheduled for **October 22, 2009, at 2:30 p.m.** Unless otherwise defined, capitalized terms contained herein shall have the same meanings ascribed to them in the Plan.

On or about _____, 2009, after notice and a hearing, the Bankruptcy Court signed an order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtors' creditors to make an informed judgment on whether to accept or reject the Plan. **APPROVAL OF THE LEGAL ADEQUACY OF THIS DISCLOSURE STATEMENT BY THE BANKRUPTCY COURT IS NOT A CERTIFICATION BY THE BANKRUPTCY COURT AS TO THE TRUTH OR ACCURACY OF THE FACTUAL MATTERS THAT ARE CONTAINED IN THIS DISCLOSURE STATEMENT OR CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN.**

This Disclosure Statement is being distributed to you for the purpose of enabling you to make an informed judgment about the Plan. The Debtors have examined various alternatives and, based on the information contained in this Disclosure Statement and for the reasons set forth below, the Debtors have concluded that the Plan provides the best recovery to Creditors.

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION

-1-

The Disclosure Statement describes the Plan and contains information concerning, among other matters, (i) the Chapter 11 Cases, (ii) a discussion of the Plan's feasibility and liquidation analysis setting forth what holders of Claims against or Interests in the Debtors would recover if the Debtors were hypothetically liquidated under Chapter 7 of the Bankruptcy Code; and (iii) the assets available for distribution to Creditors under the Plan. The Debtors urge you to carefully review the contents of the Disclosure Statement and Plan before making a decision to accept or reject the Plan.

Attached as Exhibits to the Disclosure Statement are copies of the following documents:

- Order of the Bankruptcy Court dated _____, 2009 (the "Disclosure Statement Order"), that, among other things, approved the Disclosure Statement and form of ballot, established certain voting procedures with respect to the solicitation and tabulation of votes to accept or reject the Plan, and scheduled the Confirmation Hearing (**Exhibit 1**);

- Debtors' Promissory Note to the Ryness Trust and spreadsheet showing the advances, payment history and balance due thereon (**Exhibit 2**);

- Debtors' Monthly Operating Report for July 2009 (**Exhibit 3**); and

- Debtors' Financial Projections for 2009 and 2010 (**Exhibit 4**).

In addition, a ballot for the acceptance or rejection of the Plan is enclosed with the Disclosure Statement submitted to those holders of Claims that the Debtors believe are entitled to vote to reject or accept the Plan.

For the convenience of holders of Claims, this Disclosure Statement summarizes the terms of the Plan. If any inconsistency exists between the Plan and the Disclosure Statement, the terms of the Plan are controlling. The Disclosure Statement may not be relied on for any purpose other than to determine whether to vote to accept or reject the Plan, and nothing stated therein shall constitute an admission of any fact or liability by any party, or be admissible in any proceeding involving the Debtors or any other party, or be deemed conclusive evidence of the tax or other legal effects of the Plan on the Debtors or holders of Claims or Interests. Certain of the statements contained in this Disclosure Statement, by nature, are forward-looking and contain estimates and assumptions. There can be no assurance that such statements will reflect actual outcomes.

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION

-2-

Summaries of certain provisions of agreements referred to in this Disclosure Statement do not purport to be complete and are subject to, and are qualified in their entirety by reference to, the full text of the applicable agreement, including the definitions of terms contained in such agreement.

The Disclosure Statement Order, a copy of which is annexed hereto as **Exhibit 1**, sets forth in detail the deadlines, procedures and instructions for voting to accept or reject the Plan and for filing objections to confirmation of the Plan and applicable procedures for tabulating ballots.  Your vote on the Plan is important.  In order for the Plan to be accepted by a Class of Claims, the holders of at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of Allowed Claims in such Class, who vote on the Plan, must vote to accept the Plan.  Rejection of the Plan may lead to a conversion to the Debtors' case to Chapter 7 of the Bankruptcy Code and subsequent liquidation of the Debtors by a trustee who would be appointed as of the date of such conversion.  This alternative may not provide for a distribution of as much value to holders of Allowed Claims as under the Plan.  Accordingly, the Debtors urge you to accept the Plan by completing and returning the enclosed ballot so as to be **received no later than October 13, 2009.**

The following chart briefly summarizes the treatment of Creditors and Interest holders under the Plan.  The amounts listed below are based principally on the Schedules and/or Claims filed with the Bankruptcy Court and are only estimates of the Debtor's outstanding liabilities and claims as of the Effective Date.  Actual Claims and distributions to the holders of Allowed Claims and Interests will vary depending upon the proofs of Claim filed by Creditors and the outcome of objections to Claims and the collection of Plan Proceeds.  For a complete description of the treatment of allowed Claims, Creditors should review the Plan.

[This space intentionally left blank]

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)      -3-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

| CLASS NO. | DESCRIPTION | ESTIMATED AMOUNT OF CLAIM | TREATMENT |
|---|---|---|---|
| N/A | Administrative Claims | $225,500 | Unless a holder agrees to different treatment of such Claim, each holder of an Administrative Claim shall receive Cash equal to the Allowed amount of such Claim payable as follows: (a) if an Allowed Administrative, on or as soon as practicable after the Effective Date, or (b) if a Disputed Claim, the date upon which the Claim is Allowed and only to the extent Allowed. |
| N/A | Priority Tax Claims | $45,000 | Each holder of a Priority Tax Claim shall receive Cash equal to the Allowed amount of such Claim payable, at the election of the Reorganized Company, in one of the alternative methods provided by the Plan. |
| 1 | Allowed Secured Claim of DIP Lender | $150,000 | Unimpaired. Unless otherwise agreed, the holder of the Class 1 Claim shall receive as soon as practicable after the Effective Date cash in the Allowed amount of the Claim (unless the Person holding the Class 1 Claim is also the Exit Lender, in which case the Allowed Class 1 Claim will be rolled into and become part of the Exit Financing. |
| 2 | Allowed Secured Claim of Albert | $5,061,157 | Impaired. The holder of the Class 2 Claim shall receive payment in full of the Allowed Class 2 Claim amount under the terms of the Amended Loan Agreement between the Reorganized Company and Albert. |
| 3 | Allowed Secured Claim of AICCO | $17,043 | Unimpaired. The holder of the Class 3 Claim shall receive payment in full of the Allowed Class 3 Claim amount and its legal, equitable and contractual rights shall be unaltered by the Plan. |
| 4 | Other Allowed Secured Claims | $7,100 | Unimpaired. Each holder of a Class 4 Claim shall receive payment in full, or the collateral securing such Claims will be surrendered. |
| 5 | Allowed Priority Employee Claims | $4,150 | Unimpaired. Unless the holder of a Priority Employee Claim has agreed to different treatment for such Claim, each holder of a Priority Employee Claim shall receive a cash payment equal to the Allowed amount of such Claim. Such cash payment shall be made on or as soon as practicable after the Effective Date on account of an Allowed Priority Employee Claim, or if a Disputed Claim, the date upon which the Claim is Allowed and only to the extent Allowed. |
| 6 | Allowed General Unsecured Claims | $ 11.5 million | Impaired. Each holder of a Class 6 Claim shall receive, at the election of the holder in accordance with the terms of the Plan, either: (a) cash in the amount of 5% of the Allowed amount of such Claim in deferred payments as provided in the Plan; or (b) one share of New Common Stock in the Reorganized Company for each Ten Dollars ($10.00) or their Allowed Class 6 Claim amount. |

| 7 | Interests | N/A | Impaired. Class 7 Interests shall be cancelled. |

**B.  Information Regarding The Plan.**

    **1.  Exclusive Authorized Source of Information.**

No representations concerning the Debtors or the Plan are authorized by the Bankruptcy Court or the Debtors other than as set forth in this Disclosure Statement. Any representations or inducements made to secure acceptances of the Plan other than as contained in this Disclosure Statement may not be reliable.

    **2.  Source of Information.**

Factual information contained in this Disclosure Statement has been provided by the Debtors, except where otherwise specifically noted. All financial information contained in this Disclosure Statement has been prepared by the Debtors. None of the Debtors' attorneys, accountants, financial advisors or other professionals make any representations regarding that information. The Debtors do not represent or warrant that the information contained in this Disclosure Statement is free from any inaccuracy. The Debtors have, however, attempted to present the information accurately and fairly and believe that the information contained herein is substantially accurate. The assumptions and underlying projections contained in this Disclosure Statement concerning the sources and amounts of payments to Creditors represent the best estimate of the Debtors as to what they expect to happen. Because these are only assumptions about or predictions of future events, many of which are beyond the Debtors' control, there can be no assurances that the assumptions will in fact materialize or that the projections will in fact be met. Except as otherwise provided herein, this Disclosure Statement will not reflect any events that occurred subsequent to the date that the Debtors submitted the Disclosure Statement to the Bankruptcy Court for approval on or about July 8, 2009.

This Disclosure Statement has not been submitted for approval under the Securities Act of 1933, as amended, or applicable state securities laws. Neither the Securities and Exchange

Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement.

**3.      Financial Projections.**

**THE FINANCIAL PROJECTIONS CONTAINED IN THIS DISCLOSURE STATEMENT REPRESENT THE DEBTORS' ESTIMATES OF FUTURE EVENTS BASED ON CERTAIN ASSUMPTIONS MORE FULLY DESCRIBED BELOW, SOME OR ALL OF WHICH MAY NOT BE REALIZED.   NONE OF THE FINANCIAL ANALYSES CONTAINED IN THIS DISCLOSURE STATEMENT IS CONSIDERED TO BE A "FORECAST" OR "PROJECTION" AS TECHNICALLY DEFINED BY THE AMERICAN INSTITUTE OF CERTIFIED PUBLIC ACCOUNTANTS.   THE USE OF THE WORDS "FORECAST," "PROJECT," OR "PROJECTION" WITHIN THIS DISCLOSURE STATEMENT RELATES TO THE BROAD EXPECTATIONS OF FUTURE EVENTS OR MARKET CONDITIONS AND QUANTIFICATIONS OF THE POTENTIAL RESULTS OF OPERATIONS UNDER THOSE CONDITIONS.**

**C.      Voting Instructions.**

**1.      How to Vote.**

A ballot is enclosed herewith for Creditors to use in voting on the Plan.  For the reasons described herein, Interest holders will not receive a ballot.  To vote on the Plan, indicate on the enclosed ballot that you accept or reject the Plan, provide the requested information, sign your name and mail the ballot in the envelope provided for this purpose.

In order to be counted, ballots must be completed, signed and returned so that they are actually **received no later than October 13, 2009,** at the following address:

> Monroe Law Group
> 101 California Street, Suite 2450
> San Francisco, CA  94111

If your ballot is not properly completed, signed and returned as described, it will not be counted.  If your ballot is damaged or lost, you may request a replacement by sending a written request to this same address.

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)      -6-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

### 2. **Who May Vote**.

Pursuant to the provisions of the Bankruptcy Code, only holders of Allowed Claims or Interests in classes of Claims or Interests that are impaired and that will receive distributions under the Plan are entitled to vote to accept or reject a proposed plan. Classes of Claims or Interests in which the holders are unimpaired are deemed to have accepted the Plan and are not entitled to vote to accept or reject the Plan. Classes of Claims or Interests in which the Holders will receive no recovery are deemed to have rejected the Plan and are not entitled to vote to accept or reject the Plan. For a detailed description of the treatment of Claims and Interests under the Plan, see Section III.B of this Disclosure Statement.

Classes 2 and 6 of the Plan are impaired and, to the extent Claims in such Classes are Allowed Claims, the holders of such Claims will receive distributions under the Plan. As a result, holders of Claims in those Classes are entitled to vote to accept or reject the Plan. Classes 1, 3, 4, and 5 of the Plan are unimpaired. Holders of Claims in those Classes are conclusively presumed to have accepted the Plan. Class 7, consisting of Interests, will not receive any distributions under the Plan and, as a result, are conclusively presumed to have rejected the Plan. Therefore, the Debtors are soliciting acceptances only from holders of Allowed Claims in Classes 2 and 6.

In determining acceptances of the Plan, the vote of a Creditor will only be counted if submitted by a Creditor whose Claim is an Allowed Claim. A Creditor holds an Allowed Claim if such Claim is duly scheduled by the Debtors, except a Claim that is listed as disputed, contingent or unliquidated or for which a proof of Claim has been filed, or the Creditor has timely filed with the Bankruptcy Court a proof of Claim that has not been objected to or disallowed prior to computation of the votes on the Plan. Claims allowed by a Final Order or pursuant to the Plan or any agreements entered into in connection with the Plan are also Allowed Claims. The ballot form that you received does not constitute a proof of Claim. If you are in any way uncertain whether or if your Claim has been correctly scheduled, you should review the Debtors' Schedules that are on file with the Bankruptcy Court. The Bankruptcy Court has fixed June 25, 2009, as the bar date by which all Creditors (except for governmental units) must file proofs of claim.

**D.** **Confirmation.**

"Confirmation" is the technical term for the Bankruptcy Court's approval of a plan of reorganization. At the Confirmation Hearing, in order to confirm the Plan, the Proponent must demonstrate that it has met the requirements of section 1129 of the Bankruptcy Code. If the Bankruptcy Court determines that all of the requirements of section 1129 have been satisfied, the Bankruptcy Court will enter an order confirming the Plan. The Debtors believe that the Plan satisfies all the statutory requirements of Chapter 11 of the Bankruptcy Code.

Voting is tabulated by Class. As discussed above, a class of Creditors has accepted the Plan if the Plan has been accepted by at least 2/3 in dollar amount and more than 1/2 in number of Creditors holding Allowed Claims in that class who actually vote to accept or reject such Plan. Interest holders are deemed to have rejected the Plan because their interests will be extinguished under the Plan.

If a Class of Claims entitled to vote on the Plan rejects the Plan, the Debtors reserve the right to amend the Plan or request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code, or both. Section 1129(b) permits the confirmation of a plan of reorganization notwithstanding the nonacceptance of a plan by one or more impaired classes of claims or equity interests. Under that section, a plan may be confirmed by a bankruptcy court if it does not "discriminate unfairly" and is "fair and equitable" with respect to each nonaccepting class. A plan of reorganization is "fair and equitable" with respect to a nonaccepting class for the following types of claims:

- Secured Creditors. Either (i) each impaired secured creditor retains its liens securing its secured claims and receives on account of its secured claims deferred cash payments having a present value equal to the amount of its allowed secured claim, (ii) each impaired secured creditor realizes the "indubitable equivalent" of its allowed secured claim, or (iii) the property securing the claim is sold free and clear of liens with such liens to attach to the proceeds of the sale and the treatment of such liens on proceeds to be as provided in clause (i) or (ii) above.

- Unsecured Creditors. Either (i) each impaired unsecured creditor receives or retains under the plan property of a value equal to the amounts of its allowed claim or (ii) the holders of claims and interests that are junior to the claims of the dissenting class will not receive any property under the plan.

- Equity Interests. Either (i) each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest or (ii) the holder of an interest

DISCLOSURE STATEMENT (DATED AUGUST 25, 2009) -8-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

that is junior to the nonaccepting class will not receive or retain any property under the plan.

With respect to Class 7 (Interests), which is deemed to have rejected the Plan, the Proponent intends to request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code.

A plan of reorganization does not "discriminate unfairly" with respect to a nonaccepting class if the value of the cash and/or securities to be distributed to the nonaccepting class is equal to, or otherwise fair when compared to the value of the distributions to other classes whose legal rights are the same as those of the nonaccepting class.

The Bankruptcy Court has set October 22, 2009, at 2:30 p.m., for the Confirmation Hearing at which it will determine whether the Plan has been accepted by the requisite number of Creditors and whether the other requirements for Confirmation of the Plan have been satisfied. The Confirmation Hearing may be continued from time to time and day to day without further notice. If the Bankruptcy Court confirms the Plan, it will enter the Confirmation Order. Any objections to Confirmation of the Plan must be in writing and must be filed with the Clerk of the Bankruptcy Court and served on counsel for the Debtors on or before the date set forth in the notice of the Confirmation Hearing sent to you with this Disclosure Statement and the Plan. Bankruptcy Rule 3020 and Local Rule 3018-1 govern any such objection.

Counsel on whom objections must be served are:

> Counsel for Debtors
> James S. Monroe
> Monroe Law Group
> 101 California Street, Suite 2450
> San Francisco, CA 94111
> Telephone: (415) 869-1575
> Facsimile: (415) 723-7423

**Upon Bankruptcy Court approval of the Plan, the Plan will be binding upon all holders of Claims against, and holders of Interests in, the Debtors (including, without limitation, those holders of Claims or Interests who do not submit ballots to accept or reject the Plan or who are not entitled to vote on the Plan). Therefore, it is important that creditors and shareholders read and carefully consider this Disclosure Statement, the Plan and the transactions**

Case: 09-41466   Doc# 153   Filed: 08/27/09   Entered: 08/27/09 20:59:25   Page 17 of 96

contemplated thereby. **The confirmation and effectiveness of the Plan are subject to material conditions precedent. There is no assurance that these conditions will be satisfied or waived.**

## II.       OVERVIEW OF THE CHAPTER 11 CASE

### A.       Overview of Chapter 11.

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. Under Chapter 11 of the Bankruptcy Code, a debtor is authorized to reorganize or liquidate its business for the benefit of itself, its creditors and equity interest holders. Another goal of Chapter 11 is to promote equality of treatment for similarly situated creditors and similarly situated equity interest holders with respect to the distribution of a debtor's assets.

The commencement of a Chapter 11 case creates an estate that is comprised of all of the legal and equitable interests of a debtor as of the filing date. The Bankruptcy Code provides that the debtor may continue to operate its business and remain in possession of its property as a "debtor-in-possession."

As noted above, certain holders of claims against and equity interests in a debtor are permitted to vote to accept or reject a plan. Prior to soliciting acceptances of a proposed plan, however, section 1125 of the Bankruptcy Code requires a debtor and any other plan proponents to prepare a disclosure statement containing adequate information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment about the plan. The Debtors are submitting this Disclosure Statement to holders of Claims against the Debtors to satisfy the requirements of section 1125 of the Bankruptcy Code.

### B.       Background and Events Precipitating the Chapter 11 Filings.

Set forth below is a description of the Debtors and a recitation of the significant events and factual circumstances surrounding the commencement of the Debtors' Chapter 11 Cases.

The Ryness Company was founded by George A. Ryness III ("Ryness") in 1975 to provide marketing and real estate brokerage services to homebuilders. Until 2003, it conducted business mainly in Northern California, initially with builders of mainly suburban subdivisions, and over time the business also included representing developers of condominium conversion projects. The basic

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)                 -10-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

business model of The Ryness Company was an innovation at the time, in that the company, instead of working for the then-standard broker's commission of 6%, worked at a substantially lower rate while having the builder-client incur the direct and indirect costs of marketing and advertising the project. By contracting with The Ryness Company, builders were able to engage a company of new homes professionals (as contrasted with resale specialists) without incurring selling costs internally through an in-house sales staff.

In 2003, The Ryness Company merged with Pickford New Homes Real Estate, Inc. ("PNH"), owned by Eddy D. Monce ("Monce") which conducted a similar business in Southern California and Nevada, and which business differed from The Ryness Company's in that it also included the representation of developers of new high-rise condominiums. Following the merger, the combined company ("The Ryness Company") began a period of expansion, moving into markets in the Pacific Northwest (Washington and Oregon), the Southwest (Arizona), and Colorado.

In the first quarter of 2006, The Ryness Company acquired The Marketing Directors ("TMD"), a New York company which had as its primary business representing urban condominium developers in New York City. The Ryness Company used a credit facility with Bank of America to fund a portion of the purchase price, with the balance carried by the seller, Adrienne Albert ("Albert"). Subsequently, in 2007, The Ryness Company launched a new division ("TMD-Southeast") under the TMD name in various markets in the Southeast, representing builders of new high-rise condominiums and also developers of condominium conversions. TMD-Southeast proved to be a serious drain on The Ryness Company's resources, losing a total of $7.7 million in 2007 and 2008.

At its peak in 2006, The Ryness Company sold and closed over 10,000 homes and had gross revenues of $79.2 million. However, the acquisition of TMD in 2006 coincided with the beginning of the slowdown in the new home sales market which has continued to the present. In early 2007, The Ryness Company sold most of its Pacific Northwest operation back to the previous owners. In mid-2007, the acquisition loan for the TMD purchase was restructured, with Albert paying off the Bank of America credit line and becoming The Ryness Company's primary lender on the entire acquisition

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION

-11-

loan, with a first security interest in substantially all of The Ryness Company's assets (including all of the assets of the Debtors).

In early 2008, it became clear that the co-ownership of The Ryness Company by Ryness and Monce was no longer viable and Monce's interest in The Ryness Company was acquired by Ryness. In March 2008, the restructured Albert loan went into default, and the loan was again restructured. As part of that restructuring, TMD was sold back to Albert, and TMD-Southeast was transferred to an entity controlled by Albert. After the 2008 restructuring transaction, a balance of approximately $7,500,000 remained owing to Albert, with interest payable on a monthly basis and a specified repayment schedule for principal.

By early 2009, after the significant worsening of the housing and credit markets in the fall of 2008, it had become clear that The Ryness Company could not continue to meet its ongoing obligations, including without limitation the Albert loan, thereby necessitating the present bankruptcy filings.  Prior to the Petition Date, the Debtors negotiated the principal terms of a restructuring with Albert which were substantially the same as the treatment of Albert's Claim provided in the Plan.

At the present time, The Ryness Company is still active only in the California market. At its peak, the company had approximately 800 total personnel. At present, the company has approximately 100 personnel remaining, with 8 employees and the rest independent contractor sales agents.

Presently, The Ryness Company business is conducted via the three inter-related corporations that are the Debtors herein – TRC, TRC California, and TRC Services.  TRC is the holding company for TRC California and TRC Services, and is wholly owned by The George A. Ryness III and Kathleen A. Ryness Trust dated April 9, 1987 (the "Ryness Trust").  TRC California is the operating entity. This is the same entity as PNH (the entity owned by Monce), which previously had changed its name to The Ryness Company (Southern California), Inc., and subsequently changed its name to The Ryness Company California, Inc. when the operating entity for Northern California (named The Ryness Company (Northern California), Inc.) was merged into it in 2007.  Historically, TRC Services was the original company founded by Ryness. Post-merger, it had provided accounting and

administrative services for the overall group of companies, but since the bankruptcy filings, it has ceased to have employees and has become dormant.

C.    **The Debtors' Principal Assets.**

The Debtors' significant tangible assets that can be valued at this time are the open sale escrows for which commissions may be earned upon the closing of the sales. These assets are all held by TRC California – the only entity that provides brokerage services.  As discussed further below, TRC and TRC Services have no significant assets.  Other assets that are more difficult to value include trade names and other intellectual property and goodwill.

Presently, TRC California has open escrows in Northern California (where its business is presently focused) which are anticipated to generate gross profit of approximately $980,000, open escrow in Southern California which are anticipated to generate gross profit of approximately $50,000, and open escrows in the Las Vegas area (owned by its subsidiary PNH Realty Nevada, LLC, which is winding its business down) which are anticipated to generate gross profit of approximately $50,000.   In addition, the Debtors anticipate generating some new sales from marketing agreements for projects in Northern California in 2009 which the Debtors anticipate will generate commissions of approximately another $800,000 between now and the end of the year.

In addition to the foregoing, the Debtors' remaining principal assets are presently comprised of: (1) cash in bank accounts as of June 30, 2009, as follows: TRC - $166.38; TRC California - $473,452.57; and TRC Services - $9,349.46; (2) a contract claim of TRC California against EC-Mission Verde, LLC which is valued in its bankruptcy Schedules at $50,000; (3) miscellaneous equipment and a vehicle which are owned by TRC California and which are valued in its bankruptcy Schedules at $32,000; (4) miscellaneous equipment and vehicles which are owned by TRC Services and which are valued in its bankruptcy Schedules at $38,000; and (5) a contract claim of TRC against Solution Partners NW/Windermere which is valued in its bankruptcy Schedules at $225,000.

D.    **The Debtors' Principal Liabilities.**

The Debtors' aggregate liabilities are believed to total approximately $16.8 million. Of these, the primary debts are the secured claim of the Debtors' post-petition lender for post-petition

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)     -13-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

financing which has been authorized in an amount of up to $250,000, of which $150,000 is presently outstanding, and which is secured by a security interest in all of the Debtors' assets, the secured claim of Albert in the amount of approximately $5.1 million which is a debt of all 3 debtors and is secured by a first priority security interest in all of their assets (except to the extent it has been subordinated to the post-petition financing), and a debt for approximately $8.6 million for unsecured loans made to the Debtors by Ryness Trust (for which the underlying promissory note and a spreadsheet showing the advances, payment history and balance due thereon are attached hereto as **Exhibit 3**). The Debtors' remaining liabilities consist primarily of certain claims related to real property leases signed by TRC (mostly for premises that have been vacated and the leases rejected), equipment leases signed by TRC that have mostly been rejected, and miscellaneous vendor, agent, and employee claims against TRC California and, in some case, TRC Services. In addition, TRC California has priority tax claims owing to the City of Los Angeles and the Franchise Tax Board in the approximate aggregate amount of $45,500.

The Debtors and Albert are parties to, *inter alia*, an Amended and Restated Loan Agreement dated as of June 28, 2007, an Amended and Restated Pledge Agreement dated as of June 28, 2007, a First Amendment to Amended and Restated Loan Agreement dated as of July 7, 2008, and a First Amendment to Amended and Restated Pledge Agreement dated as of July 7, 2008 (the "Pre-Petition Loan Documents"), which formed the basis for Albert to provide certain prepetition financial accommodations to the Debtors.

The Debtors are jointly and severally indebted to Albert in the amount of approximately $5.1 million principal. All of the Debtors' pre-petition assets and cash as described in the Pre-Petition Loan Documents are encumbered by valid, enforceable and perfected, first priority liens and security interests in favor of Albert to secure all indebtedness, liabilities and obligations of the Debtors to Albert as provided for in the Pre-Petition Loan Documents (the "Pre-Petition Liens"). To perfect her Pre-Petition Liens, Albert filed UCC-1 financing statements with the California Secretary of State against TRC California and TRC Services on or about July 2, 2007 and against TRC on or about July 16, 2008. In addition, Albert filed UCC financing statement amendments with the California

Secretary of State on or about July 2, 2007, reflecting the assignments she obtained of Bank of America's former blanket security interest against the assets of TRC and TRC Services.

**E.      Significant Events During Chapter 11 Cases.**

Significant events since the filing of the Debtors' Chapter 11 Bankruptcy Cases on February 26, 2009, have included the following:

**1.      Joint Administration.**

On March 3, 2009, the Bankruptcy Court granted the Debtors' *Motion For Order Authorizing and Directing Joint Administration of Estates* and ordered that all pleadings in the Bankruptcy Cases be filed in the case of "The Ryness Company, Inc.", Case No. 09-41466.

**2.      "First Day" Motions Heard on March 4, 2009.**

**a.      Wages, Salaries and Commissions.** On March 4, 2009, the Bankruptcy Court authorized TRC California in its discretion to, *inter alia*:  (i) pay outstanding pre-petition salaries, wages, commissions, expense reimbursement or vacation pay, and honor any other outstanding employee obligations including the payment of payroll taxes of TRC California and TRC Services, and (ii) pay outstanding commissions to real estate agents providing services to the Debtor as independent contractors, subject to the condition that no such individual receive in total more than the maximum amount he would have been entitled on a priority basis under § 507(a) of the Bankruptcy Code.  In accordance with this order, TRC California has, to date, paid pre-petition claims entitled to priority under §§ 507(a)(4) or 507(a)(5) of the Bankruptcy Code in the aggregate amount of $268,194.37 on behalf of TRC California and $$18,337 on behalf of TRC Services.  The Debtors estimate that the Allowed Priority Employee Claims that remain unpaid total $4,150.00.

**b.      DIP Financing and Use of Cash Collateral.**  On March 4, 2009, the Bankruptcy Court authorized the Debtors, on an interim basis, to (i) borrow up to $250,000 from Jean C. Mills (the "DIP Lender") on the terms set forth in the *Agreement For Post-Petition Financing, the Granting of Security Interests, Superpriority Administrative Expense Treatment, Use of Cash Collateral, Modifying the Automatic Stay, the Granting of Replacement Liens, and Related Matters* (the "DIP Loan Agreement") by and among the Debtors, the DIP Lender, and Albert, with advances

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)      -15-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

thereon to be secured by a blanket lien against all of the Debtors' assets (which primed the existing lien of Albert), and with interest to accrue on the advances at the rate of 10% per annum, and (ii) use Albert's cash collateral, in each case, only as necessary to fund the Debtors' post-petition operations pursuant to an approved budget and in accordance with the DIP Loan Agreement. A Final Order approving this DIP Financing and use of cash collateral was entered by the Bankruptcy Court on April 16, 2009. As of June 30, 2009, outstanding advances on the DIP Financing total $150,000.

3. **Rejection of Real Property Leases.** As of the Petition Date, TRC was a the lessee under two unexpired real property leases for the Debtors' former business premises located at 4041 MacArthur Boulevard, Suite 240, Newport Beach, California (the "Newport Lease") and 11622 El Camino Real, Suite 300, San Diego, California (the "San Diego Lease"). Both of these premises were vacated by the Debtors since they were no longer needed or used for the Debtors' business, and the Debtors determined that it would be in the best interests of the estates to reject these leases. On April 1, 2009, the Bankruptcy Court entered an order granting the Debtors' motion for an order authorizing the rejection of the Newport Lease and San Diego Lease, effective as of March 26, 2009.

4. **Retention of Professionals.** The Debtors retained James S. Monroe, Monroe Law Group, as their bankruptcy counsel, which was approved by the Bankruptcy Court by order entered on March 27, 2009. In addition, the Debtors retained the Law Office of William W. Washauer to represent the Debtors as special corporate counsel, which was approved by the Bankruptcy Court by order entered on April 1, 2009. Lastly, the Debtors' retained Krutilla & Associates, Certified Public Accountants, as the Debtors' accountants to prepare and file certain 2008 tax returns, and to provide certain tax compliance and tax advisory services, which was approved by the Bankruptcy Court by order entered on July 1, 2009.

5. **Rejection of Personal Property Leases.** As of the Petition Date, TRC was a party to two unexpired leases with IKON Financial Services ("IKON") for nine copiers, four fax machines, and related equipment and two unexpired leases with Pitney Bowes for postage equipment, and TRC California was a party to an unexpired lease with CIT Technology Financing Services (as successor to the original lessor) ("CIT") for a copier. The Debtors determined that rejection of these leases was

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION

-16-

in the best interests of the bankruptcy estates since this leased equipment was no longer needed or used in the Debtors' scaled down business platform. On April 23, 2009, the Bankruptcy Court entered an order granting the Debtors' motion for an order authorizing the rejection of the IKON, CIT and Pitney Bowes leases, effective as of April 23, 2009.

      **6.    Termination of Certain Marketing Agreements and Entering Management Agreements.** As of the Petition Date, TRCC had approximately 43 active marketing agreements involving projects in the Southern California market area (the "<u>SoCal Projects</u>"). Because of the high cost of managing the SoCal Projects, which had contributed to TRCC's historical difficulty in maintaining profitability in the Southern California region, TRCC decided to withdraw from the Southern California market in order to concentrate its efforts and resources on their more reliable business in the Northern California market. To effect its withdrawal from the Southern California and still preserve the value of the existing, open escrows for the SoCal Projects (the "<u>Pending Escrows</u>"), TRCC reached agreements with two companies formed by certain of the Debtors' former Southern California personnel - CADO Real Estate Group, a California corporation ("<u>CADO</u>"), and Strategic Sales and Marketing Group, a California corporation ("<u>Strategic</u>") - to take over performance under these marketing agreements and to also manage the Pending Escrows (in which the Debtors have an economic interest) to closing in exchange for a share of the net commissions payable to TRCC on closing (as a management fee). In furtherance of the foregoing, the Debtors filed a motion, pursuant to Bankruptcy Code § 363(b)(1), for an order authorizing the Debtors to enter into agreements for the termination of the marketing agreements for the SoCal Projects and to enter into management agreements with CADO and Strategic for these projects, which the Bankruptcy Court granted by order entered April 23, 2009. Pursuant to this order, TRCC entered into the management agreements for the SoCal Projects with CADO and Strategic and consensual termination agreements of the underlying marketing agreements. This arrangement has and will generate some positive cash flow for the Estates (as Pending Escrows close), while eliminating the operational risk and losses associated with having a fixed Southern California presence.

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION

-17-

**7. Relief from Automatic Stay.**

      **a.**    **Litigation in Non-Bankruptcy Forum.**  The Debtors stipulated to the modification of the automatic stay to permit plaintiffs: (i) to litigate their claims against TRC California in the following consolidated actions pending in the Superior Court for the State of California, County of Riverside, Indio Court, to final judgment (including any appeals), in accordance with applicable non-bankruptcy law: (x) *Carlos A. Rodriguez, et al. v. Desert Community Developers, et al.*, Case No. INC 046739; (y) *Javier Montoya, et al. v. Rosedale Properties, LLC, et al.*, Case No. INC 048979; and (z) *Arturo Flores, et al. v. Steve Hyman, et al.*, Case No. INC 048245; and (ii) to enforce any judgment, award or settlement obtained against the Debtor only by collecting upon any available insurance in accordance with applicable non-bankruptcy law. The Bankruptcy Court entered an order modifying the automatic stay in accordance with this stipulation on April 24, 2009.

      **b.**    **Wells Fargo Bank.**  The Debtors entered into a stipulation for relief from automatic stay with Wells Fargo Bank ("Wells Fargo"), to permit Wells Fargo to apply the sum of $7,100.21 being held under administrative freeze from the Debtors' pre-petition bank account with Wells Fargo in satisfaction of the Debtors' indebtedness to Wells Fargo in the same amount. A motion to approve this stipulation has been filed with the Bankruptcy Court and is scheduled for hearing on July 23, 2009.

      **8.**    **Motion to Assume Real Property Lease.**  The Debtors, as tenant, and The 801 Partnership, LLC, a California limited liability company (the "801 Partnership"), as landlord, have stipulated and agreed that the Debtors shall assume the unexpired lease of real property for the Debtors' headquarters and only remaining business premises located at 801 San Ramon Valley Boulevard, Danville, California (the "Danville Lease"), under its existing terms and cure the only pre-petition arrearage under this lease in the amount of $10,012 (for February 2009 rent) by paying 1/6 of this amount for 6 months starting in August 2009. All post-petition payments are current under the lease and no other amounts are past due. The current term of the Danville Lease expires on

| | | |
|---|---|---|
| 1 | January 1, 2011, at a monthly rental of $10,012. A motion to approve the assumption of the Danville | |
| 2 | Lease was filed with the Bankruptcy Court and granted after hearing on July 30, 2009. | |

2

9. **Filing of Schedules and Establishment of Claims Bar Date.** The Debtors filed their Schedules on March 26, 2009, listing their liabilities as of the Petition Date as follows:

a. **TRC**

| | | |
|---|---|---|
| Secured Claims: | $5,389,591 | |
| Priority Unsecured Claims: | None | |
| Non-Priority Unsecured Claims: | $10,767,811 | |

b. **TRC California**

| | | |
|---|---|---|
| Secured Claims: | $5,250,000 | |
| Priority Unsecured Claims: | $397,311 | |
| Non-Priority Unsecured Claims: | $9,843,924 | |

c. **TRC Services**

| | | |
|---|---|---|
| Secured Claims: | $5,260,148 | |
| Priority Unsecured Claims: | $18,337 | |
| Non-Priority Unsecured Claims: | $8,690,176 | |

The Debtors filed certain Amended Schedules on or about July 22, 2009, revising their listing of liabilities as follows:

d. **TRC**

| | | |
|---|---|---|
| Secured Claims: | $5,078,199 | |
| Priority Unsecured Claims: | None | |
| Non-Priority Unsecured Claims: | $10,348,464 | |

e. **TRC California**

| | | |
|---|---|---|
| Secured Claims: | $5,061,157 | |
| Priority Unsecured Claims: | $315,576 | |
| Non-Priority Unsecured Claims: | $9,464,410 | |

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

-19-

f.      **TRC Services**

|                          |             |
|--------------------------|-------------|
| Secured Claims:          | $5,068,257  |
| Priority Unsecured Claims: | $18,337   |
| Non-Priority Unsecured Claims: | $8,683,703 |

The Bankruptcy Court established June 25, 2009, as the Bar Date by which non-governmental Creditors must file proofs of Claim against the Debtors estates. August 25, 2009, is the Bar Date by which governmental Creditors must file proofs of Claim against the Debtors' estates. A Claim filed after the applicable Bar Date will be considered late and may be disallowed pursuant to Bankruptcy Code section 502(b)(9).

The Debtors will review and evaluate each proof of Claim filed prior to the Bar Date to determine whether grounds exist to object to the allowance of such Claims. The Debtors project that the Claims asserted against them will be resolved and reduced to an amount that approximates the estimate for Allowed Claims in the Disclosure Statement. However, the actual aggregate amount of the Allowed Claims in any Class may differ significantly from the Debtors' estimates thereof and any variance from such estimates may affect the value of distributions in certain Classes.

**10.      Financial Information.** Attached hereto as **Exhibit 3** is the Debtors' most recent Monthly Operating Report (July 2009), without exhibits, as of the date of this Disclosure Statement. The Reorganized Company's projected financials are referenced in Section VIII below. The Debtors will continue to file Monthly Operating Reports with the Bankruptcy Court through the Effective Date of the Plan and thereafter the Reorganized Company will file quarterly reports with the Bankruptcy Court pursuant to the Plan. These reports may be examined at the Clerk's Office of the Bankruptcy Court.

### III.      DESCRIPTION OF THE PLAN

A discussion of the principal provisions of the Plan as they relate to the treatment of Classes of Allowed Claims and Interests is set forth below. The discussion of the Plan that follows constitutes a summary only, and should not be relied upon for voting purposes. You are urged to

read the Plan in full in evaluating whether to accept or reject the Plan proposed by the Debtors.  If any inconsistency exists between this summary and the Plan, the terms of the Plan shall control.

**A.      Classification of Claims and Interests.**

The Plan divides Creditors into Classes.  Creditors with similar Claims are placed in the same Class.  There are six (6) Classes of Claims and one (1) Class of Interests under the Plan as follows:

**1.      Class 1 (DIP Lender's Claims Under the DIP Financing).**  Class 1 consists of the DIP Lender's Claims under the DIP Financing. Class 1 is unimpaired under the Plan and deemed to accept the Plan.

**2.      Class 2 (Secured Claim of Albert).**  Class 2 consists of the Allowed Claim of Albert. Class 2 is impaired under the Plan and entitled to vote.

**3.      Class 3 (Secured Claim of AICCO).**  Class 3 consists of the Allowed Secured Claim of AICCO.  Class 3 is unimpaired under the Plan and deemed to accept the Plan.

**4.      Class 4 (Other Secured Claims).**  Class 4 consists of any Allowed Secured Claim (each of which will be its own subclass under Class 4) other than the Secured Claims in Classes 2 and 3.  Class 4 is unimpaired under the Plan and deemed to accept the Plan.

**5.      Class 5 (Priority Employee Claims).**  Class 5 consists of Priority Employee Claims entitled to priority under sections 507(a)(4) and (a)(5) of the Bankruptcy Code section.  Class 5 is unimpaired under the Plan and deemed to accept the Plan.

**6.      Class 6 (General Unsecured Claims).**  Class 6 consists of all General Unsecured Claims.  Class 6 is impaired under the Plan and entitled to vote.

**7.      Class 7 (Interests).**  Class 7 consists of all Allowed Interests.  Class 7 is impaired under the Plan and deemed to reject the Plan.

**B.      Treatment of Claims and Interests.**

Treatment of Classes is as follows:

**1.      Class 1 (DIP Lender's Claims Under the DIP Financing).**  The entity holding the Class 1 Claim will receive, on the Effective Date, in full satisfaction of its Allowed Class 1 Claim, cash in the Allowed Class 1 Claim's full amount (unless the Person holding the Class 1 Claim is also

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

-21-

the Exit Lender, in which case the Allowed Class 1 Claim will be rolled into and become part of the Exit Financing).  As of June 30, 2009, outstanding advances on the DIP Financing total $150,000.

**2.** **Class 2 (Secured Claim of Albert).**  Albert shall be treated as a fully secured creditor with an Allowed Class 2 Claim in the amount of $5,061,157 and shall be paid the Allowed Class 2 Claim's full amount pursuant to the terms of an Amended Loan Agreement to be entered into between the Reorganized Company and Albert, which will be secured by a lien against all of the Reorganized Company's assets and property.  The Amended Loan Agreement will provide for the payment in full of the Allowed Class 2 Claim, contain substantially the same terms and covenants as the existing loan agreement, and will have substantially the following repayment terms: (a) a restating of the interest rate thereunder to be 0% for the first year following the Petition Date, 2% for the second year following the Petition Date, 3% for the third year following the Petition Date, 4% for the fourth year following the Petition Date, 5% for the fifth year following the Petition Date, 6% for the sixth year following the Petition Date,  and 7% for the seventh year following the Petition Date, (b) the final maturity thereof being the seventh anniversary of the Petition Date (or, if earlier, the date of any change of control of the Reorganized Company, sale of the Reorganized Company, or the date that Ryness ceases to devote substantially all of his business time with the Reorganized Company or ceasing to be involved with the Reorganized Company), (c) quarterly amortization installments thereunder (or more frequently, if any payments are made to Ryness from Free Cash Flow on a more frequent basis) consisting of (i) 50% of Free Cash Flow, with the remaining 50% of Free Cash Flow payable as determined by the Reorganized Company's management, in their sole discretion, the timing and manner of payment in each instance to be agreed, plus (ii) a payment equal to the amount of each payment  made to the Exit Lender under the Exit Financing Agreements (excluding the periodic interest payments) and made at the same time as each such payment to the Exit Lender, and (d)  limits on payments to be made to Ryness and any affiliates and approval over expenses above an amount to be agreed (it being understood that Ryness may draw a salary of $10,000 per month; provided, however, that this is no way limits the discretion of Reorganized Company's management

to allocate additional compensation thereto from the remaining 50% of Free Cash Flow as provided in clause (c) above).

**The Bankruptcy Court has not made any determinations regarding the value of the collateral securing Albert's Claim against the Debtors (which collateral consists of all assets of the Debtors' business) and under bankruptcy law, to the extent that the going-concern value of the Debtors' business is less than the amount of Albert's Claim, an argument can be made that Albert's Claim is partially unsecured. If the Bankruptcy Court determines that that the going-concern value of the Debtors' business is less than the amount of Albert's Claim and Albert does not consent to that valuation, a new plan and disclosure statement may be necessary. Any and all issues regarding this matter are reserved for the Plan Confirmation Hearing.**

3.      **Class 3 (Secured Claim of AICCO).**  The holder of the Class 3 Claim shall receive payment in full of the Allowed amount of such Claim in accordance with the terms and conditions of the insurance premium finance agreement and related transaction documents that gave rise to the Claim and will retain all lien rights granted to it under the transaction documents until paid in full. The balance remaining due to AICCO on its Allowed Class 3 Claim is $17,042.72, payable as follows: $8,521.36 on August 1 and September 1, 2009.

4.      **Class 4 (Other Secured Claims).**  Each holder of an Allowed Class 4 Secured Claim shall receive, at the Reorganized Company's option, one of the following alternative treatments for its Allowed Class 4 Claim: (a) the Reorganized Company will abandon or surrender to the holder of such Claim the property securing such Claim, in full satisfaction and release of such Claim; or (b) the Reorganized Company will pay to the holder of such Claim cash equal to the Allowed amount of such Claim, or such lesser amount to which the holder of such Claim and the Reorganized Company agree, in full satisfaction and release of such Claim. Any Allowed Claim held by the holder of such Allowed Secured Claim remaining after giving effect to the foregoing treatment shall be treated as part of Class 6. The Debtors are aware of only one Allowed Claim in this Class – the Claim of Wells Fargo Bank in the amount of $7,100.21 secured by its setoff right against the sum of $7,100.21 being

held by it under administrative freeze from the Debtors' pre-petition bank account with Wells Fargo Bank.

**5.** **Class 5 (Priority Employee Claims).** Except to the extent that the holder of a particular Class 5 Claim has agreed to a different treatment of such Claim, each holder of an Allowed Class 5 Claim shall be paid cash in the full amount of the Allowed Class 5 Claim, without interest, less the amount of any Permitted Employee Payments made to the holder of such Claim, on or before the later of (a) the Distribution Date, (b) if such Claim is initially a Disputed Claim, when it becomes an Allowed Claim. The estimated amount of Allowed Claims remaining to be paid in this Class is $4,150. Since the Petition Date, the Debtors have paid on account of Allowed Class 5 Claims, the aggregate amount of $268,194.37 on behalf of TRC California and $18,337 on behalf of TRC Services.

**6.** **Class 6 (General Unsecured Claims).** The Reorganized Company will distribute to all Persons holding Allowed General Unsecured Claims and who do not timely and properly make the Cash Distribution Election, one (1) share of New Common Stock for each Ten Dollars ($10.00) of their Allowed Class 6 Claim amount. Alternatively, the Reorganized Company will distribute to all Persons holding Allowed General Unsecured Claims who timely and properly make the Cash Distribution Election, cash distributions of the following percentages of their Allowed Class 6 Claim amount, without interest, as follows: 1% on or before December 31, 2009, 2% on or before December 31, 2010, and 2% on or before December 31, 2011. The Debtors estimate that Allowed general Unsecured Claims total approximately $11.5 million.

**Since the New Common Stock will not be listed for trading on any national securities exchange or on any automated quotation system, it is anticipated that there will be no immediate market for the New Common Stock and the stock will not be readily convertible to cash. The value of the New Common Stock will be subject to the future success of the Reorganized Company and decisions made by its management. Realization of any value with respect to the New Common Stock will also be dependent upon future decisions made by the**

Reorganized Company's management with respect to, *inter alia*, any future sale of the company, distribution of dividends, and/or listing of the stock for trading.

The Reorganized Company's ability to make payments to creditors who elect the Cash Distribution Election will also be subject to the future success of the Reorganized Company. For example, if the Reorganized Company were to default on its future obligations to Albert, Albert could foreclose her security interest against all of the assets of the Reorganized Company and creditors making the Cash Distribution Election may receive nothing or less than the full amount that they are entitled to receive under the Plan.

**7.** **Class 7 (Interests).** All Interests in the Debtors will be cancelled as of the Effective Date. Any Person holding an Allowed Class 7 Interest, including TRC, will neither receive nor retain any property or value on account of its Allowed Class 7 Interest.

**C.** **Unclassified Claims.**

The Plan proposes to treat each unclassified Claim as follows:

**1.** **Ordinary-Course Administrative Claims.**

**a.** **Allowance.** Unless the Debtors or the Reorganized Company objects to an Ordinary-Course Administrative Claim, that Claim will be allowed in accordance with the terms and conditions of the particular transaction that gave rise to the Claim, and the Person holding the Ordinary-Course Administrative Claim need not file any request for payment of its Claim.

**b.** **Treatment.** Unless the Person holding an Allowed Ordinary-Course Administrative Claim and the Debtors or Reorganized Company agree otherwise, any unpaid, Allowed Ordinary-Course Administrative Claims will be paid by the Reorganized Company in accordance with the terms and conditions of the particular transaction that gave rise to the Claims. With respect to U.S. Trustee fees, the Reorganized Company will pay to the U.S. Trustee all fees due and owing under 28 U.S.C. section 1930 in cash on or before the Effective Date.

**c.** **Estimated Amount.** The Debtors do not believe that as of the Effective Date of the Plan, that there will be any expenses that have arisen during the Bankruptcy Cases that would

constitute an Ordinary-Course Administrative Claim that have not been paid in the ordinary course of business of the Debtors.

**2.** **Non-Ordinary-Course Administrative Claims.**

      **a.** **Allowance.** Unless the Debtors or the Reorganized Company agree otherwise, Non-Ordinary-Course Administrative Claims will be allowed <u>only</u> if: (a) on or before 60 days after the Effective Date, the Person holding the Non-Ordinary-Course Administrative Claim files a request for payment of its Claim (or in the case of a Professional Fee Claim), a final fee application or a motion requesting allowance and payment of the Claim) and serves the request, application, or motion on the Reorganized Company, its reorganization counsel, and the U.S. Trustee; and (b) the Bankruptcy Court enters an Order allowing the Claim and, with respect to all Non-Ordinary-Course Administrative Claims other than Professional Fee Claims, that Order becomes a Final Order. The Reorganized Company or any other party in interest may file an objection to such a request for payment, application, or motion within the time provided by the Bankruptcy Rules or within any other period that the Bankruptcy Court establishes. Entities holding Non-Ordinary-Course Administrative Claims and that do not timely file and serve a request for payment, application, or motion will be forever barred from asserting those Non-Ordinary-Course Administrative Claims against the Debtors, the Estates, the Reorganized Company, or their respective property.

      **b.** **Treatment.** Unless the professional holding an Allowed Professional Fee Claim and the Debtors or reorganized Company agree otherwise, the Reorganized Company will pay to that professional cash in the full amount of its Allowed Professional Fee Claim, without interest, within ten days after the date on which the Bankruptcy Court allows the Claim. For all other Non-Ordinary-Course Administrative Claims, unless the Person holding the Claim and the Debtors or the Reorganized Company agree otherwise, the Reorganized Company will pay to that Person cash in the Allowed Claim's full amount, without interest, on or before the later of: (a) ten days after the date on which the Non-Ordinary-Course Administrative Claim becomes an Allowed Claim; or (b) the date on which the Allowed Non-Ordinary-Course Administrative Claim becomes due and payable in accordance with its terms.

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION

-26-

c.    **Estimated Amount.**    As of June 30, 2009, professional fees and costs have been incurred by the Debtors to the Monroe Law Group in the approximate amount of $141,000 and to the Law Office of William W. Washauer in the approximate amount of $59,000.  Both law firms have agreed to defer payment of these fees and costs as the Debtors' cash flow necessitates.  In addition, the Debtors' retained Krutilla & Associates, Certified Public Accountants, as the Debtors' accountants to prepare and file certain 2008 tax returns, and to provide certain tax compliance and tax advisory services, which was approved by the Bankruptcy Court by order entered on July 1, 2009, for a fixed fee of $26,500.  The Debtors are not presently aware of any other expenses that have arisen during the Bankruptcy Cases which would constitute Non-Ordinary Course Administrative Claims.

**3.    Allowed Priority Tax Claims.**

a.    **Treatment.**    Each Allowed Priority Tax Claim shall, at the option of the Reorganized Company, unless the holder of such Claim shall have agreed to different treatment of such Claim, (a) be paid in full in cash, without interest, by the Reorganized Company on the latest of: (i) the Effective Date, or as soon thereafter as practicable; (ii) such date as may be fixed by the Bankruptcy Court, or as soon thereafter as practicable; (iii) the tenth business day after such Claim is Allowed, or as soon thereafter as practicable; and (iv) such date as the holder of such Claim and the Reorganized Company may agree, or (b) receive deferred cash payments to the extent permitted by section 1129(a)(9) of the Bankruptcy Code with interest on the unpaid portion of such Claim at the statutory rate under applicable non-bankruptcy law or at a rate to be agreed upon by the Reorganized Company and the appropriate governmental unit or, if they are unable to agree, to be determined by the Bankruptcy Court; provided, however, that the Reorganized Company may prepay any or all such Claims at any time, without premium or penalty.  For purposes of option (b), the payment of each Allowed Priority Tax Claim shall me made in equal quarterly installments with the first installment due on the latest of: (a) the first Business Day following the end of the first full calendar quarter following the Effective Date, (b) the first Business Day following the end of the first full calendar quarter following the date an order allowing such Claim becomes a Final Order, and (c) such other time or times as may be agreed with the holder of such Claim.  Each installment shall include simple

interest on the unpaid balance of the Allowed Priority Tax Claim, without penalty of any kind, at the non-default rate of interest prescribed, agreed to or determined under option (b). Certain Claims are not classified, but must nonetheless be paid.

**b.** **Estimated Amount.** The Debtors believe that the City of Los Angeles has a Priority Tax Claim for a gross revenue tax in the amount of approximately $38,000. The Debtors have scheduled this Claim as disputed and are reviewing the City's calculation thereof. The City has filed a priority Claim related to this tax in the amount of $55,024.50, which includes penalties in the amount of $16,669.89. In addition, the Debtors believe that the Franchise Tax Board has a priority Tax Claim in the principal amount of $4,800 arising from the Debtors' failure to pay the $800 minimum franchise taxes required to have been paid in 2004, 2005, and 2007. The Debtors are not aware of any other Priority Tax Claims.

## IV.   IMPLEMENTATION OF THE PLAN OF REORGANIZATION

**A.**   **Source of Funds to Implement The Plan.** On the Effective Date, the Reorganized Company will consummate the transactions contemplated in the Exit Financing Agreement. All obligations required under the Plan to be satisfied in cash on the Distribution Date will be satisfied from cash on hand and funds available under the Exit Financing.

**B.**   **Merger of Debtors.**

**1.**   **Merger.** On the Effective Date, without further action of the Debtors or the shareholders of the Debtors, TRC California and TRC Services shall be merged into TRC, and TRC, as the surviving corporation in the merger, shall continue its corporate existence under the laws of the State of California. Upon the completion of the Merger, TRC shall be the "Reorganized Company" for purposes of consummating the transactions required in connection with the Plan. In order to consummate the Merger, each of the Debtors shall be, and hereby is, authorized and directed to (a) enter into the Merger Agreement, and (b) file articles of merger conforming to the requirements of the California general corporation law with the Secretary of State of the State of California.

**2.**   **Charter.** Upon the Effective Date, and without any further action by the shareholders or directors of TRC California or TRC Services, the Charters of TRC California and TRC Services

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)     -28-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

shall cease to have any force or effect. The Charter of TRC immediately prior to the Merger shall be the Charter of the Reorganized Company; provided that, upon the Effective Date, such Charter shall be deemed amended (a) to authorize the issuance of only one class of shares, which shall be designated "common shares" (the "New Common Stock"), (b) to provide that the total number of shares of New Common Stock to be issued is one million five hundred thousand (1,500,000), and (c) to prohibit the issuance by the Reorganized Company of nonvoting securities to the extent required by section 1123(a)(6) of the Bankruptcy Code; subject to further amendment of such Charter as permitted by applicable law.

**3.      Vesting of Assets.** Except as otherwise provided in the Plan, in any agreements contemplated under the Plan, or in the Confirmation Order, all property of the Estates will vest in the Reorganized Company free and clear of all Claims, liens, encumbrances, and Interests. From and after the Effective Date, the Reorganized Company may operate the business and use, acquire, and dispose of property without supervision by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules other than those restrictions expressly imposed by the Plan and the Confirmation Order.

**C.      New Common Stock To Be Issued Under The Plan.** All shares of New Common Stock will be, on issuance, fully paid and nonassessable, and the Persons holding the New Common Stock will have no preemptive or other rights to subscribe for additional shares. The New Common Stock will have the attributes set forth below.

**1.      Rights.** The New Common Stock will have the rights with respect to dividends, liquidation, voting and other matters as set forth in the Reorganized Company's New Articles of Incorporation and Bylaws and as provided by applicable law.

**2.      Transfer Restrictions.** The New Common Stock will be subject to no transfer restrictions, other than restrictions on "underwriters" under Bankruptcy Code section 1145.

**3.      Listing.** The New Common Stock will not initially be listed for trading on any national securities exchange or on any automated quotation system.

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)                -29-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

**D.** **Section 1145 Exemption.** The exemption from the requirements of Section 5 of the Securities Act, and any state or local law requiring registration or qualification for the offer or sale of a security provided under Bankruptcy Code section 1145 will apply to the issuance of the New Common Stock.

**E.** **Cancellation of Instruments.** Except as otherwise provided in the Plan, on the Effective Date, the promissory notes, share certificates, and other instruments evidencing any Claim against a Debtor or any Interest in the Debtors will be deemed cancelled without further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors thereunder will be discharged and released.

**F.** **Employee Benefit Plans.** As of the Effective Date, all of the Debtors' employee benefit plans, programs, and benefits (other than those pertaining to rights to acquire or receive Interests in any of the Debtors) existing immediately before the Effective Date will be retained and constitute obligations of the Reorganized Company.

**G.** **Insurance Policies.** To the extent any insurance policies exist in which either the Debtors and/or their personnel have an insurable or other interest in or right to make a claim, such policies shall remain available, before and after the Effective Date, to satisfy any and all Claims held by, or asserted against, the Debtors and/or the Debtors' current or former management or other personnel that may be covered by such policies.

**H.** **Intercompany Claims Extinguished.** Upon the Effective Date, pursuant to the Merger, all Intercompany Claims shall be deemed extinguished.

**I.** **C Corporation Election.** Upon the Effective Date of the Plan, if the Reorganized Company does not automatically cease to be an S corporation due to having a disqualified shareholder or otherwise, the Reorganized Company will elect as of the Effective Date to be taxed, for U.S. federal income tax purposes, as a C corporation.

**J.** **Broker's License.** Prior to the Effective Date, TRC will file an application with the California Department of Real Estate for issuance to the Reorganized Company of a Corporate Real Estate Broker's License in its name.

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

-30-

**K.** **Corporate Governance and Management.**

**1.** **New Board of Directors.** Upon the Effective Date, the management, control and operation of the Reorganized Company shall become the general responsibility of the board of directors of the Reorganized Company. The initial board of directors of the Reorganized Company shall be composed of George A. Ryness III, Kathleen A. Ryness, and Paul H. Desmet (the "Reorganized Company Directors"), each of whom shall serve in accordance with applicable non-bankruptcy law and the Reorganized Company's Charter, as the same may be amended from time to time. From and after the Effective Date, the members of the board of directors of the Reorganized Company shall be selected and determined in accordance with the provisions of applicable law and the reorganized Company's Charter. Entry of the Confirmation Order shall ratify and approve all actions taken by the board of directors of the Debtors from the Petition Date through and until the conclusion of the Confirmation Hearing. The Reorganized Company Directors serve with no compensation or meeting fees.

**2.** **New Officers.** Upon the Effective Date, the Reorganized Company Officers (consisting of George A. Ryness III, as President and Chief Executive Officer, Paul H. Desmet, as Vice President, and Kathleen A. Ryness, as Secretary) shall be deemed appointed to serve as officers of the Reorganized Company without further action under applicable law, regulation, order or rule including, without limitation, any action by the stockholders or directors of the Reorganized Company. The Reorganized Company Officers shall serve in accordance with applicable non-bankruptcy law, employment agreement with the Reorganized Company, and the Reorganized Company's Charter, as the same may be amended from time to time.

**3.** **Identity of Reorganized Company Officers and Directors.** George A. Ryness III founded the Debtor companies and has served as President and Chairman of the Board of TRC since 1975. His salary was $500,000 per year during 2003-2007, $250,000 in 2008, and is $120,000 in 2009. Kathleen A. Ryness served as Director, Corporate Secretary and Office Manager of TRC from 1975 until her retirement in 2004. She rejoined as a Director and Corporate Secretary in May 2008 and serves without compensation. Paul H. Desmet has served as President of TRC California fka

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION                    -31-

TRC Northern California from 1997 to the present. Between 2000 and 2007, he averaged $650,000 in salary, commissions and bonuses. In 2008 he was reduced to $275,000 and in 2009 to $120,000. George A. Ryness III and Kathleen A. Ryness presently own 100% of the issued and outstanding shares of TRC (the holding company for TRC California and TRC Services) via the Ryness Trust. After Plan Confirmation, the Ryness Trust will be the majority shareholder of the Reorganized Company due to the conversion of its $8.6 million unsecured Claim against the Debtors to equity in the Reorganized Company pursuant to the Plan.

**4.** **Corporate Action.** Under Section 1400 of the California Corporations Code, on the Effective Date all of the terms of this Plan may be put into effect and carried out without further action by the directors or shareholders of the Debtors or the Reorganized Company, who will be deemed to have unanimously approved the Plan and all agreements and transactions provided for or contemplated in the Plan.

**5.** **Periodic Reporting.** Upon emergence, the Reorganized Company will not be a public reporting company subject to periodic filing requirements under the Securities Exchange Act of 1934, as amended. Accordingly, the Reorganized Company will not make any periodic filings of financial and other information with the U.S. Securities and Exchange Commission or any stock exchange or quotation system. The Reorganized Company will furnish the following written information to Persons holding New Common Stock – within 90 days following the end of each fiscal year, an information package containing a brief summary of operations and an unaudited financial statement for the preceding year containing a balance sheet, income statement, and statement of cash flows.

**L.** **Distributions.**

**1.** **Manner of Distributions Under The Plan.** The Reorganized Company will make all cash payments and other distributions required under the Plan in accordance with the procedures set forth in this Section. All cash payments to Persons holding Allowed Claims will be denominated in U.S. dollars and will be made by checks drawn on a bank selected by the Reorganized Company.

**2. Delivery of Distributions.** The Reorganized Company will make distributions to each Person holding an Allowed Claim by sending the distribution by mail as follows: (a) to the address, if any, set forth in the filed proof of Claim, as amended by any written notice of address change received by the Debtors or Reorganized Company; or (b) if no such address is available, to the address set forth in the Schedules. If no address is available either on the proof of Claim or on the Schedules, then the distribution will be deemed to be undeliverable. Any distribution addressed as set forth in this Section and returned as undeliverable by the U.S. postal service, messenger, or overnight delivery service will also be deemed to be undeliverable under the Plan.

**3. Undeliverable and Forfeited Distributions.** If a distribution is returned to the Reorganized Company as undeliverable or is deemed to be undeliverable in accordance with Section 7.2 of the Plan, the Reorganized Company will make no further distributions to the Person holding the Claim on which the distribution is being made unless and until it is timely notified in writing of that Person's current address. Subject to the following paragraph, until they become deliverable, undeliverable distributions will remain in the possession of the Reorganized Company in an unsegregated, interest-bearing bank account for the benefit of the Persons entitled to the distributions. These Persons will be entitled to any interest actually earned on account of the undeliverable distributions.

Notwithstanding any otherwise applicable laws regarding unclaimed distributions, including the laws of escheat, any Person that is otherwise entitled to an undeliverable distribution and who does not, within six months after the Effective Date, provide the Reorganized Company with a written notice asserting its claim to or interest in that undeliverable distribution and setting forth a current, deliverable address will be deemed to forfeit any claim or interest in that undeliverable distribution and will be forever barred from receiving that undeliverable distribution or asserting any Claim against the Debtors, the Estates, the Reorganized Company, or their respective property on account of that Claim, and the Claim giving rise to the undeliverable distribution will be discharged.

Any undeliverable distributions forfeited in accordance with Section 7.2 or 7.3 of the Plan will be retained by the Reorganized Company free from any restrictions. Nothing in the Plan requires

the Debtors or the Reorganized Company to attempt to locate any Person holding an Allowed Claim and whose distribution is undeliverable.

**4. No Distributions on Account of Disputed Claims.** The Reorganized Company will not make any distribution to a Person holding a Disputed Claim on account of that Disputed Claim unless and until the Claim becomes an Allowed Claim. The Reorganized Company, in its discretion, may withhold distributions otherwise due under the Plan to a Person holding a Claim until up to 60 days following the Effective Date in order to enable the Reorganized Company to determine whether to object to the Claim. Any distributions that would otherwise be received by the holder of a Disputed Claim were such Claim to become an Allowed Claim will revest in the Reorganized Company free and clear of all Claims, liens and encumbrances.

**5. No _De Minimis_ Distributions.** Distributions of less than $25.00 will not be made on account of any Allowed Claim. No consideration will be provided in lieu of _de minimis_ distributions that are not made under this Section.

**6. No Fractional Distributions.** The Reorganized Company will issue only whole shares of New Common Stock. The number of shares of New Common Stock that any Person is entitled to receive under the Plan will be rounded to the next greater or lower whole number as follows: (a) fractions of ½ or greater will be rounded to the next greater whole number; and (b) fractions of less than ½ will be rounded to the next lower whole number. No entity will be entitled to any consideration on account of a fractional share that is rounded down and not issued.

**7. Setoff, Recoupment, and Other Rights.** The Reorganized Company may, but will not be required to, setoff, recoup, assert counterclaims, or withhold against the distributions to be made under the Plan on account of any Allowed Claim, any claims that the Debtors, the Estates, or the Reorganized Company may have against the Person holding the Allowed Claim; provided, however, that the failure to effect such a setoff or recoupment, the allowance of any Claim against the Debtors, the Estates, or the Reorganized Company, or any partial or full payment during the Cases or after the Effective Date with respect to any Allowed Claim will not constitute a waiver or release by

the Debtors, the Estates, or the Reorganized Company of any claim that they may possess against the claimant.

**8.** **Compliance with Withholding and Reporting Requirements.** The Reorganized Company will comply with all withholding and reporting requirements imposed on it by governmental units. Any federal or state withholding taxes or other amounts required to be withheld under any applicable law will be deducted and withheld from any Plan distributions. The Reorganized Company shall be permitted to withhold a distribution to any Creditor that has not provided information requested by it for the purpose of fulfilling its obligations hereunder.

**9.** **Exemption from Certain Transfer Taxes.** In accordance with Bankruptcy Code section 1146(c), the issuance, transfer, and exchange of a security or the delivery of an instrument of transfer under this Plan will not be taxed under any law imposing a stamp tax or similar tax. The Confirmation Order will direct all government officials and agents to forego the assessment and collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without payment of such a tax or other governmental assessment.

**10.** **Compliance with Bankruptcy Code Section 1129(a)(13).** The Reorganized Company will honor any "retiree benefits," as that term is defined in Bankruptcy Code section 1114, as provided in Bankruptcy Code section 1129(a)(13).

## V. ALLOWANCE AND RESOLUTION OF CLAIMS

**A.** **Distributions on Account of Allowed Claims.** Distributions under the Plan will be tendered to the Person holding the Allowed Claim on account of which the distribution is being made. Notwithstanding anything to the contrary in the Plan, the Reorganized Company will make distributions, and rights will be retained, only on account of Allowed Claims or Claims that have been deemed to be allowed for purposes of distribution, and then only to the extent that the Claim is, or is deemed to be for distribution purposes, an Allowed Claim. No Person holding a Disputed Claim will receive any distribution on account of that Disputed Claim unless and until the Disputed Claim

becomes an Allowed Claim, and then only to the extent that the formerly Disputed Claim becomes an Allowed Claim.

**B.** **Estimation of Disputed Claims.** The Reorganized Company may move the Bankruptcy Court for an order estimating the amount of any Disputed Claim, and any such estimated amount will constitute the maximum recovery that any Person holding the Disputed Claim may recover on account of the Disputed Claim, regardless of the amount ultimately determined to constitute the allowed amount of the Disputed Claim. To the extent a Disputed Claim is disallowed, the distribution that would otherwise have been received by the Person holding the Disputed Claim if that Disputed Claim had been allowed will revest in the Reorganized Company free and clear of claims, liens, and encumbrances.

**C.** **Treatment is in Full Satisfaction of All Rights.** The treatment provided under the Plan is in full and complete satisfaction and discharge of the legal, contractual, and equitable rights that each Person holding an Allowed Claim or an Allowed Interest may have in or against the Debtors, the Reorganized Company, or their respective property. This treatment supercedes and replaces any agreements or rights those Persons have in or against the Debtors, the Reorganized Company, or their respective property.

**D.** **Objections to Claims and Interests.** Except as otherwise provided in Sections 3.1.1 and 3.2.1 of the Plan, objections to any Claims or Interests must be filed and served upon the Person holding the Claim or interest no later than: (a) 120 days after the Effective Date unless such deadline is extended by the Bankruptcy Court for cause; or (b) 180 days after the date on which the proof of Claim or Interest has been filed. After the Effective Date, only the Reorganized Company will have the authority to file, settle, compromise, withdraw, or litigate to judgment objections to Claims or Interests. The Debtors and the Reorganized Company reserve the right to object to any and all of the Claims and Interests asserted against them. Claims allowed under the Plan will not be subject to objection.

**E.** **Claim Resolution.** From and after the Effective Date, the Reorganized Company will be authorized, pursuant to Bankruptcy Rule 9019(b) and Bankruptcy Code section 105(a), to

compromise and settle Disputed Claims or causes of action of the Debtors or the Estates in accordance with the following procedures, which will provide sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromise and settlement of claims:

(1)     If the amount of the Disputed Claim or the amount of the demand asserted by the Reorganized Company in a cause of action sought to be compromised is less than $50,000 and does not involve the settlement of any Claims of an insider, the Reorganized Company will be authorized and empowered to settle the Disputed Claim or cause of action and execute necessary documents, including a stipulation of settlement or release, without notice to any party;

(2)     If the amount of the Disputed Claim or the amount of the demand asserted by the Reorganized Company in a cause of action sought to be compromised equals or exceeds $50,000, the Reorganized Company will be authorized and empowered to settle the Disputed Claim or cause of action and execute necessary documents, including a stipulation of settlement or release, upon seven days' notice to the five largest holders of New Common Stock as reflected in the Reorganized Company's records, except that any stockholder may waive this notice requirement as to itself.

(3)     If any of the five largest holders of New Common Stock deliver to the Reorganized Company a written objection to the proposed settlement of a Disputed Claim or cause of action within the prescribed notice period set forth above, then (a) if the objecting party withdraws for any reason its objection to such a settlement, the Reorganized Company may enter into the proposed settlement without further notice and a hearing or entry of an order of the Bankruptcy Court, or (b) if the objecting party does not withdraw its objection, the Reorganized Company will have the option of (i) foregoing entry into the settlement agreement that is the subject of the objection, (ii) modifying the terms of the settlement in a way that results in the objecting party withdrawing its objection, or (iii) seeking an order of the Bankruptcy Court authorizing the Reorganized Company to enter into the settlement agreement over the objecting party's objection.

## VI.     EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**A.     Assumption and Assignment of Contracts and Leases.**  On the Effective Date, all Assumed Contracts and Leases (i.e., those executory contracts or unexpired leases identified on the Schedule of

Assumed Contract and Leases), to the extent that those agreements constitute executory contracts or unexpired leases under Bankruptcy Code section 365, shall be assumed by the Reorganized Company to the extent that those agreements were with TRC, and deemed assumed and assigned to the Reorganized Company to the extent that those agreements were with either TRC California or TRC Services. The Debtors reserve the right to amend the Schedule of Assumed Contracts and Leases at any time before the Confirmation Hearing Date to: (a) delete any executory contract and unexpired lease and provide for its rejection under the Plan or otherwise; or (b) add any executory contract or unexpired lease to the Schedule of Assumed Contracts and Leases and provide for its assumption (or assumption and assignment) under the Plan. The Debtors will provide notice of any amendment to the Schedule of Assumed Contracts and Leases to the party or parties to the agreement affected by the amendment. The Confirmation Order will constitute a Bankruptcy Court order approving the assumption or assumption and assignment, as of the Effective Date, of the Assumed Contracts and Leases then identified on the Schedule of Assumed Contracts and Leases.

**B.** **Cure Payments Related to Assumption of Contracts and Leases.** As required by Bankruptcy Code section 365(b)(1), all monetary defaults under each Assumed Contract or Lease will be cured in one of the following two ways: (a) the Reorganized Company will pay to the nondebtor party to the Assumed Contract or Lease the Cure Payment, as set forth on the Schedule of Assumed Contracts and Leases, in cash; or (b) the Reorganized Company will satisfy any other terms that are agreed to by both the Debtors or the Reorganized Company and the nondebtor party to the Assumed Contract or Lease. The Reorganized Company will cure all such monetary defaults on or before the Distribution Date; provided, however, that if a dispute arises regarding: (i) the amount of any proposed Cure Payment; (ii) whether the Reorganized Company has provided adequate assurance of future performance under an Assumed Contract or Lease; or (iii) any other matter pertaining to a proposed assumption (or assumption and assignment) of an agreement listed on the Schedule of Assumed Contracts and Leases, then the monetary default will be cured within 30 days after entry of a Final Order resolving the dispute and approving the assumption or assumption and assignment. The Schedule of Assumed Contracts and Leases identifies any amounts that the Debtors believe

Bankruptcy Code sections 365(b)(1)(A) or 365(b)(1)(B) require that they pay to cure defaults under the Assumed Contracts and Leases. The Debtors reserve the right to further amend the Schedule of Assumed Contracts and Leases, including modifying the cure amounts listed thereon, at any time on or before the Confirmation Hearing Date.

**C.** **Objections to Assumption or Proposed Cure Payments.** Any Person that is a party to an executory contract or unexpired lease that will be assumed or assumed and assigned under the Plan and that contend that the proposed Cure Payment specified on the Schedule of Assumed Contracts and Leases is incorrect or otherwise objects to the contemplated assumption or assumption and assignment must file with the Bankruptcy Court and serve upon the Debtors and the Debtors' reorganization counsel a written statement and supporting declaration stating the basis for its objection. This statement and declaration must be filed and served by the later of: (a) 21 days before the Confirmation Hearing Date; or (b) five days after the Debtors file and serve the Schedule of Assumed Contracts and Leases (or with respect to an executory contract or unexpired lease added to the Schedule of Assumed Contracts and Leases by amendment or any proposed Cure Payment that is reduced by amendment, five days after the Debtors file and serve the amendment). Any Person that fails to timely file and serve such a statement and declaration will be deemed to waive any and all objections to the proposed assumption or assumption and assignment and the proposed Cure Payment.

**D.** **Disallowance of Claims Relating to Assumed Contracts and Leases.** In accordance with the procedures set forth in Section 8.2 of the Plan relating to the Cure Payments to be made to nondebtor parties to the Assumed Contracts and Leases, to the extent that those parties previously filed a proof of Claim or filed a motion against the Debtors asserting prepetition arrearages under the Assumed Contract or Lease or asserting a Rejection Damage Claim, payment of the Cure Payment in accordance with Section 8.2 of the Plan will be deemed to satisfy, in full, any prepetition arrearage or monetary default require to be cured under Bankruptcy Code section 365(b)(1) as well as any Rejection Damage Claim, irrespective of whether the Cure Payment is less than the amount set forth in the proof of Claim or motion filed by the nondebtor party to the Assumed Contract or Lease.

**E.      Rejection of Contracts and Leases.**  On the Effective Date, the Debtors will reject all executory contracts and unexpired leases, including those identified on the Schedule of Rejected Contracts and Leases, other than: (a) any executory contracts or unexpired leases that were previously assumed or rejected by Final Order or under Bankruptcy Code section 365; and (b) any Assumed Contracts or Leases identified on the Schedule of Assumed Contracts and Leases and that will be assumed under the Plan.  All executory contracts and leases rejected under the Plan will be deemed to be rejected as of the Confirmation Date.  Listing an agreement on the Schedule of Rejected Contracts and Leases is not an admission that the agreement is an executory contract or unexpired lease or that the Debtors have any liability under the agreement.  The Debtors reserve the right to amend the Schedule of Rejected Contracts and Leases at any time before the Confirmation Hearing Date to: (i) delete any executory contract or unexpired lease and provide for its assumption or assumption and assignment under the Plan; or (ii) add any executory contract or unexpired lease to the Schedule of Rejected Contracts and Leases and provide for its rejection under the Plan.  The Debtors will promptly provide notice of any amendment to the Schedule of Rejected Contracts and Leases to all nondebtor parties to the executory contracts or unexpired leases affected by the amendment.  The Confirmation Order will constitute a Bankruptcy Court order approving the rejection, as of the Confirmation Date, of all Rejected Contracts and Leases.

**F.      Bar Date For Rejection Damage Claims.**  Any Rejection Damage Claim or other Claim for damages arising from the rejection under the Plan of a Rejected Contract or Lease must be filed and served upon the Debtors and the Debtors' reorganization counsel no later than 30 days after the mailing of the notice of the occurrence of the Plan's Effective Date.  Any Rejection damages Claims or other damage Claim that is not timely filed and served will be forever barred and unenforceable against the Debtors, the Estates, the Reorganized Company, and their respective property, and the Person holding such a Claim will be barred from receiving any distributions under the Plan on account of its Claim.

**G.      Postpetition Contracts and Leases.**  Except as expressly provided in the Plan or the Confirmation Order, all contracts, leases, and other agreements that the Debtors entered into after the

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)                    -40-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

Petition date will remain in full force and effect after the Confirmation Date and the Effective Date and will be retained by the Reorganized Company.

## VII.    BEST INTERESTS TEST AND LIQUIDATION ANALYSIS

Section 1129(a)(7) of the Bankruptcy Code requires that a holder of a Claim or Interest in an impaired Class receive or retain under the Plan not less than the holder would receive or retain on account of the Claim or Interest if the debtor were liquidated under Chapter 7 of the Bankruptcy Code.  The test is often referred to as the "best interest of creditors" test.  Under the Plan, the best interest of creditors test is applicable only to holders of General Unsecured Claims and Interests since all other Claims are to be paid in full.

In performing this analysis, the Bankruptcy Court must first determine the amount that would be generated from a Chapter 7 liquidation of the Debtors' assets after deducting the cost of liquidation.  If the Cases were converted to Chapter 7, the costs of liquidation would include the administrative costs of the Chapter 7 estates and compensation to the Chapter 7 trustees and other professionals retained by the trustees.  Comparing the value of the Debtors' assets and the amount of their liabilities as described in Sections II.C and II.D hereinabove, it is clear that the present liquidation value of their assets would be insufficient to pay their Administrative Claims, the DIP Financing, and the secured Claim of Albert in full. Thus, in a Chapter 7 there would be no recovery for General Unsecured Claims or Interests.  Accordingly, the Debtors believe that Creditors and Interest Holders who are impaired under the Plan will receive distributions under the Plan that are at least equal in value to the distributions they would receive in a Chapter 7 liquidation and, therefore, the Plan is in their best interests.

## VIII.   FEASIBILITY

As a condition of confirmation, the Bankruptcy Court must find that Confirmation is not likely to be followed by liquidation or the need for further reorganization.  As discussed above, the Debtors have aggressively downsized their business, significantly reduced overhead expenses to fit their new business platform, and revised their business plan to concentrate their resources on their historically profitable business in Northern California.  Detailed financial forecasts for the business

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)    -41-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

operations during the remainder of 2009 and 2010 are attached hereto as **Exhibit 4**. In addition, the Debtors estimate the following revenue and unit closings for the years 2011-2014:

- 2011 – 750 closings for $7 million gross revenue
- 2012 – 1200 closings for $11 million gross revenue
- 2013 – 1500 closings for $14 million gross revenue
- 2014 – 1850 closings for $17.5 million gross revenue

The Debtors' gross profit has historically been approximately 10% of gross revenue and is expected to continue in that range.

The foregoing estimates are based upon the premise that the industry will not see much growth before 2012 because, *inter alia*, it will take that long to attract capital back to housing in California.

The Debtors believe that based upon prior history the foregoing revenue projections should be achievable. Although the business in Northern California has performed better in the past, the Debtors are unable to forecast performance in that range because the business has changed significantly since the earlier part of this decade and because the Reorganized Company will not have the cash resources to invest as heavily in growth as was done in the past.

The historical gross revenue totals for the Debtors' Northern California business were as follows:

- 2008 - $10 million
- 2007 - $14.7 million
- 2006 - $22.1 million
- 2005 - $31 million
- 2004 - $32.4 million
- 2003 - $24.2 million
- 2002 - $19.5 million
- 2001 - $20.8 million
- 2000 - $18.5 million

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION

-42-

- 1999 - $14 million

The Debtors' believe that the foregoing establishes the probable ability of the Reorganized Company to fund the deferred payments required by the Plan. In addition, the Debtors' believe that any shortfall in revenues to pay off the secured claim of Albert when it comes due under the Plan on February 26, 2016 can be addressed by refinancing this indebtedness at such time when market conditions and the Reorganized Company's financial performance are expected to be substantially improved. The Debtors' also anticipate that the Reorganized Company will be able to satisfy all cash payments required at Plan Confirmation from cash on hand and the Exit Financing. The Debtors are prepared to offer evidence of the ability to fund the Plan at the Confirmation Hearing if necessary.

## IX. PRESERVATION OF RETAINED CLAIMS

Confirmation of the Plan effects no settlement, compromise, waiver or release of any Retained Claim unless the Plan or Order of Confirmation specifically and unambiguously so provides. The failure of the Plan to refer to any particular Retained Claim is not and shall not be construed as a settlement, compromise, waiver, or release of any such Retained Claim. All Retained Claims are hereby preserved and shall continue to remain valid after the Effective Date, and shall be retained by the Reorganized Company free and clear of all Claims and Interests, and the Reorganized Company may pursue any such Retained Claim in accordance with its best interests. Without limiting the generality of the foregoing, the Retained Claims include the Claims listed on the Schedule of Retained Claims attached as Exhibit C to the Plan. The entry of the Order of Confirmation shall not constitute res judicata or otherwise bar, estop or inhibit any actions by the Reorganized Company upon any Retained Claims. Notwithstanding the foregoing, any and all Claims, including Avoidance Actions, the Debtors and/or the Estates may have against Albert shall be released pursuant to the terms of the Amended Loan Agreement.

## X. AVOIDANCE ACTION ANALYSIS

The Debtors have not yet fully evaluated the preference and fraudulent transfer claims the Debtors may have against third parties. The Debtors intend to prosecute only those avoidance actions that are cost effective or otherwise can be raised as a valid defense to the allowance of a Claim

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION

-43-

pursuant to Bankruptcy Code section 502(d). The Debtors filed their Schedules listing all transfers that the Debtors made within ninety (90) days of the Filing Date and all transfers to insiders made by the Debtor within one (1) year of the Filing Date. Any such transfers may be the subject of an avoiding action to set aside the transfer if the transfer is avoidable under Bankruptcy Code sections 544, 545, 547, 548, 549, or 550, or otherwise. Accordingly, the Reorganized Company shall be vested with all Retained Claims, including all of the Debtors' rights to seek to avoid any transfer made within ninety (90) days of the Filing Date and one (1) year of the Filing Date (as to Insiders) or such longer periods as may be available under applicable non-bankruptcy law.

The listing of transfers made by the Debtor within 90 days (for non-insiders) and one year (for Insiders) that may be potentially avoidable as preferences or otherwise is too voluminous to be included with this Disclosure Statement. Copies of the Schedules (which include the identification of transfers made by the Debtor within 90 days (for non-insiders) and one year (for Insiders)) are on file with the Bankruptcy Court, and interested parties are encouraged to review such Schedules to determine if any transfers made to a particular creditor are included thereon. Any such transfers listed in the Schedules may be the subject of an avoiding action to set aside the transfer if the transfer is avoidable under Bankruptcy Code sections 544, 545, 547, 548, 549(a) or 550, or otherwise. However, with respect to such transfers listed on the Debtors' Statements of Financial Affairs, the Debtors have not yet determined whether the transferees of those transfers would have defenses to an avoidance action.

## XI.    <u>PENDING LITIGATION</u>

The following lawsuits are presently pending against the Debtors. As of the date of this Disclosure Statement, the Debtors are unaware of a proof of Claim having been filed by any of these litigation claimants.

**A.**    **Desert (Rancho Las Flores Cases).** Three consolidated cases: <u>Rodriguez/Montoya/Flores et al vs. Desert Community Developers, et al</u>, Riverside Superior Case Nos. INC 046739, INC 048979, and INC 048245. Defendant is TRC California. Cases allege breach of contract, misrepresentation, and fraud in connection with builder's failure to build and complete sale of homes. Builder/developer

previously filed for bankruptcy and is no longer in the cases. Lexington Insurance is handling the defense of this litigation under the Debtors' E&O policy. Defense counsel retained by Lexington advises that these cases are now finally settled by Lexington's payment of $720,000 to plaintiffs in full satisfaction of this litigation and claims.

**B.**    **El Cortez Cases.**    Dameron v. Janopual Block, San Diego Superior No. GIC874659. Plaintiffs, Robert and Tina Dameron, allege failure to disclose non-renewal of Mills Act property tax treatment and alleged misrepresentation regarding plaintiffs' ability to use roofs outside their penthouse condominium. Defendant is TRC California. Plaintiffs' demand: damages according to proof.  Defense counsel advises that case is close to being settled without financial contribution by TRC California. Lexington Insurance is handling the defense of this litigation under the Debtors' E&O policy.

**C.**    **Roth v. Centre City Dev. Corp., San Diego Superior No. 37-2008-00088615.** This is a purported class action pertaining to the Mills Act non-renewal issue; the class has not been certified and defense counsel advises that certification is unlikely. Defendant is TRC California. The claims against TRC California have been dismissed based on the statute of limitations; the case will be finally concluded unless plaintiff files an appeal. Plaintiff's demand: damages according to proof. Lexington Insurance is handling the defense of this litigation under the Debtors' E&O policy.

**D.**    **Ali *et al* v. 1100 Wilshire Associates, *et al*, L.A. Superior No. BC394151.** Approximately 61 plaintiffs allege misrepresentation with respect to unit square footage in condominium project. TRC is named as defendant; correct party should have been TRC California. The complaint was filed in July, 2008. Counsel for developer parties (1100 Wilshire Associates *et al*) accepted service on behalf of TRC per instructions of their client. Developer parties' counsel did not obtain TRC's authorization to do so and did not inform the Debtors of the lawsuit. The Debtors first learned of the lawsuit on April 30, 2009. Counsel for developer parties has served and filed notice of the Debtors' Bankruptcy Cases being filed and of the automatic stay on the remaining parties. The Debtors tendered this claim to the developer parties for defense and indemnification on June 2, 2009. Developer parties have not yet accepted tender, but preliminary indications are that they will do so.

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)        -45-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

## XII.    TAX IMPLICATIONS

The following discussion is a summary of certain federal income tax aspects of the Plan. This discussion is provided for general information only and should not be relied upon for purposes of determining the specific tax consequences of the Plan to a particular holder of a Claim. This discussion does not purport to be a complete analysis or listing of all potential tax considerations. The Plan may have significant tax consequences for all Creditors and Interest holders of the Debtors. Accordingly, each holder of a Claim or Interest is strongly urged to consult with his or her tax advisor regarding the federal, state, local and foreign tax consequences of the Plan.

This discussion is based upon existing provisions of the Internal Revenue Code ("IRC"), existing and proposed regulations thereunder, and current administrative rulings and court decisions. No assurance can be given that legislative or administrative changes or court decisions may not be forthcoming which would require significant modification to the statements expressed herein. Moreover, the tax consequences to holders of Claims and Interests may vary based upon the individual tax circumstances of each such holder.

**NO RULING HAS OR WILL BE REQUESTED OR OBTAINED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN AND NO OPINION OF COUNSEL HAS BEEN OR WILL BE OBTAINED BY THE DEBTORS IN RESPECT THEREOF.  ACCORDINGLY, NO REPRESENTATION OR ASSURANCES ARE BEING MADE WITH RESPECT TO THE FEDERAL INCOME TAX CONSEQUENCES AS DESCRIBED HEREIN.  CERTAIN HOLDERS OF CLAIMS OR INTERESTS MAY BE SUBJECT TO SPECIAL RULES NOT ADDRESSED IN THIS SUMMARY OF FEDERAL INCOME TAX CONSEQUENCES.  THERE ALSO MAY BE STATE, LOCAL OR FOREIGN INCOME TAX CONSIDERATIONS APPLICABLE TO EACH HOLDER OF A CLAIM OR INTEREST WHICH ARE NOT ADDRESSED HEREIN. THE DEBTORS AND THE REORGANIZED COMPANY MAY WITHHOLD ALL AMOUNTS REQUIRED BY LAW TO BE WITHHELD FROM PAYMENTS TO HOLDERS OF ALLOWED CLAIMS.**

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)      -46-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

**A.     Tax Consequences To Debtors.**  The Debtors are presently taxed as an S corporation. Accordingly, any ordinary income/loss and capital gain/loss realized by the Debtors will be considered, for U.S. federal income tax purposes, to be realized by the shareholders of TRC - George and Kathleen Ryness, via the Ryness Trust ("Ryness").  Upon the Effective Date of the Plan, the Reorganized Company will be taxed, for U.S. federal income tax purposes, as a C corporation.

**B.     Tax Consequences to Creditors.**  Any amount received by a Creditor in satisfaction of an Allowed Claim, to the extent such amount constitutes "gross income" within the meaning of Section 61 of the IRC, will be taxable to the Creditor in accordance with the Creditor's method of accounting., if not previously included in the Creditor's gross income.  This would include, for example, payments of interest, rent, or compensation for services.  If a Creditor previously reported as taxable income, their respective Allowed Claim then the unpaid portion of the previously reported taxable income would be deductible as a business bad debt.  A Creditor may be subject to regular income tax withholding or backup withholding, as described below, with respect to such payments.

**C.     Tax Consequences to Ryness.**  Since the Debtors are presently taxed as a Subchapter S corporation, Ryness is considered to realize the ordinary income/loss and capital gain/loss realized by the Debtors in accordance with their method of accounting for federal income tax purposes.  Until the Effective Date, such ordinary income/loss and capital gain/loss will be realized and reportable by Ryness regardless of whether any distribution is received thereby.

**D.     Wage Withholding.**  If any Allowed Claim under the Plan constitutes "wages" for U.S. federal income tax purposes, the U.S. federal income tax rules applicable to wage withholding will apply to the payment of the Allowed Claim.

**E.     Backup Withholding.**  U.S. federal income tax laws require that, to avoid backup withholding with respect to "reportable payments" (in an amount equal to 28%).  Creditors must (1) provide the Debtors with their correct taxpayer identification number on IRS Form W-9 and certify as to their eligibility for exemption from backup withholding, or (2) establish a basis for exemption from backup withholding on an appropriate IRS Form W-8 or IRS Form W-9, as applicable.  Exempt Creditors (including, among others, all corporations and certain foreign individuals) are not subject to

backup withholding and reporting requirements. If withholding is made and results in an overpayment of taxes, a refund may be obtained.

**THE FOREGOING IS INTENDED TO BE A SUMMARY ONLY AND NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX ADVISOR. THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX AND, IN SOME CASES, UNCERTAIN. SUCH CONSEQUENCES ALSO MAY VARY BASED UPON THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A CLAIM OR INTEREST. ACCORDINGLY, EACH HOLDER OF A CLAIM OR INTEREST IS URGED STRONGLY TO CONSULT WITH HIS, HER OR ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN INCOME TAX CONSEQUENCES OF THE PLAN.**

## XIII.   CONDITIONS TO EFFECTIVENESS OF THE PLAN

A.   **Occurrence of the Effective Date.**   The Plan will not become binding unless and until the Effective Date occurs. The Effective Date is the first Business Day that, as determined by the Debtors in their reasonable discretion, is a Business Day: (1) that is at least 11 days after the Confirmation Date; (3) on which no stay of the Confirmation Order is in effect; and (3) on which all of the following conditions have been satisfied or waived in writing in accordance with Section 10.2 of the Plan:

(a)   The Confirmation Order has been entered;

(b)   The Exit Financing Agreements, in form and substance satisfactory to Albert, are in full force and effect and all conditions under the Exit Financing Agreements to the obligations of the Exit Lender have been satisfied or waived as set forth in the Exit Financing Agreements;

(c)   The Amended Loan Agreement, in form and substance satisfactory to Albert, is in full force and effect and all conditions under the Amended Loan Agreement have been satisfied or waived as set forth in the Amended Loan Agreement;

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)     -48-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

(d)     The Intercreditor Agreement, in form and substance acceptable to Albert, is in full force and effect and all conditions under the Intercreditor Agreement have been satisfied or waived as set forth in the Intercreditor Agreement; and

(e)     All other agreements, writings, and undertakings required under the Plan have been fully executed and may be consummated by the parties.

**B.     Waiver of Conditions to Occurrence of Effective Date.**   The requirement that the conditions to the occurrence of the Effective Date be satisfied, as specified in Section 10.1 of the Plan, may be waived in whole or in part by the Debtors, upon consent of the Exit Lender and Albert, and the time within which these conditions must be satisfied may be extended thereby.  To be effective, the extension or waiver must be in writing and must be filed with the Bankruptcy Court. The failure to satisfy or waive any of the conditions set forth above may be asserted by the Debtors regardless of the circumstances giving rise to the failure, including any action or inaction by the Debtors.  The failure of the Debtors to exercise any of the forgoing rights will not be deemed a waiver of any other rights, and each of these rights will be deemed ongoing and assertable at any time.

## XIV.   DISCHARGE AND INJUNCTION

The rights afforded in the Plan and the treatment of all Claims and Interests will be in exchange for, and in complete satisfaction, discharge, and release of, all Claims and Interests of any nature whatsoever - including any interest accrued on such Claims from and after the Petition Date – against the Debtors, the Estates, the Reorganized Company, or any of their property.  Except as otherwise provided in the Plan or the Confirmation Order, on the Effective Date:  (1) the Debtors, the Estates, the Reorganized Company, and their property will be deemed discharged and released from all Claims and Interests, including demands, liabilities, Claims, and Interests that arose before the Confirmation Date and all debts of the kind specified in Bankruptcy Code sections 502(g), 502(h), or 502(i), regardless of whether or not (a) a proof of Claim or Interest based on such a Claim or Interest is filed or deemed filed,  (b) a Claim or Interest based on that obligation is allowed under Bankruptcy Code section 502, or (c) the entity holding a Claim or Interest based on that obligation has or has not

accepted the Plan; and (2) all entities will be precluded from asserting against the Debtors, the Estates, the Reorganized Company, and the property any other or further Claims or Interests based upon any act or omission, transaction, or other activity of any kind or nature that occurred before the Confirmation Date.

Except as otherwise provided in the Plan or the Confirmation Order, the Confirmation Order will act as a discharge of any and all Claims against and all debts and liabilities of the Debtors, as provided in Bankruptcy Code sections 524 and 1141, and that discharge will void any judgment against the Debtors obtained at any time to the extent that it relates to a discharged Claim or Interest. Except as otherwise provided in the Plan or the Confirmation Order, on and after the Effective Date all entities who have held, currently hold, or may hold a debt, Claim, or Interest discharged under the Plan are permanently enjoined from taking any of the following actions on account of any such discharged debt, Claim, or Interest:

    (1)    Commencing or continuing in any manner any action or other proceeding against the Debtors, the Estates, the Reorganized Company, or their property;

    (2)    Enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtors, the Estates, the Reorganized Company, or their property;

    (3)    Creating, perfecting, or enforcing any lien or encumbrance against the Debtors, the Estates, the Reorganized Company, or their property;

    (4)    Asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due to the Debtors, the Estates, the Reorganized Company, or their property; or

    (5)    Commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan or the Confirmation Order.

Any entity injured by any willful violation of this injunction may recover from the violator actual damages, including costs and attorneys' fees, and in appropriate circumstances, punitive damages.

## XV. <u>RETENTION OF JURISDICTION</u>

Notwithstanding the entry of the Confirmation Order or the occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over the Bankruptcy Cases after the Effective Date to the fullest extent provided by law, including without limitation, the jurisdiction to:

(1) Allow, disallow, determine, liquidate, classify, establish the priority or secured or unsecured status of, estimate, or limit any Claim or Interest;

(2) Grant or deny any and all applications for allowance of compensation or reimbursement of expenses authorized under the Bankruptcy Code or the Plan for periods ending on or before the Effective;

(3) Resolve any motions pending on the Effective Date to assume or reject any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable, and to hear, determine, and if necessary, liquidate any and all Claims arising from such a motion;

(4) Ensure that distributions to entities holding Allowed Claims are accomplished under the Plan provisions;

(5) Resolve any and all application, motions, adversary proceedings, and other matters that involve any Debtor and that are pending before the Bankruptcy Court on the Effective Date;

(6) Enter any orders necessary or appropriate to implement, consummate, or enforce the provisions of the Plan and of all contracts, instruments, and other agreements or documents entered into under or in connection with the Plan;

(7) Resolve any and all controversies, suits, or issues that may arise either in connection with the Plan's consummation, interpretation, or enforcement or in connection with any Person's rights or obligations under the Plan;

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009) CONCERNING THE DEBTORS' JOINT PLAN OF REORGANIZATION

-51-

(8)    Resolve any matters related to the assumption or rejection of any executory contract or unexpired lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom;

(9)    Except as otherwise indicated herein, recover all assets of the Debtors and property of the Debtors' Estates, wherever located;

(10)    Hear and determine all applications for compensation and reimbursement of expenses of professionals employed in these Reorganization Cases under the Plan or under Bankruptcy Code sections 330, 331, 503(b), 1103, or otherwise;

(11)    Hear and determine causes of action, including causes of action under the Bankruptcy Code, by or on behalf of any Debtor;

(12)    Hear and determine matters concerning state, local, and federal taxes in accordance with Bankruptcy Code sections 346, 505, and 1146;

(13)    Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Bankruptcy Cases;

(14)    Hear and Determine all avoidance actions under Bankruptcy Code sections 544, 547, 548, 549, and/or 550;

(15)    Under Bankruptcy Code section 1127, modify the Plan, the Disclosure Statement, or any contract, instrument, release, or other agreement or document created in connection with the Plan or Disclosure Statement;

(16)    Remedy – in any matter necessary and appropriate to consummate the Plan and to the extent authorized by the Bankruptcy Code – any defect, omission, or inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, or any contract, instrument, release, or other  agreement or document created in connection with the Plan or Disclosure Statement;

(17) Issue injunctions, enter and implement orders, or take any other actions that may be necessary or appropriate to restrict any entity's interference with the Plan's consummation or enforcement;

(18) Enter and implement any orders that are necessary and appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

(19) Determine any other matters that may arise in connection with, or relate to, the Plan, the Disclosure Statement, the Confirmation Order, the discharge to be granted herein and in the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with the Plan or the Disclosure Statement; and

(20) Enter an order closing these Bankruptcy Cases.

If the Bankruptcy Court abstains from exercising jurisdiction, or is without jurisdiction, over any matter, this Section will not effect, control, prohibit, or limit the exercise of jurisdiction by any other court that has jurisdiction over that matter.

## XVI.   <u>MISCELLANEOUS PROVISIONS</u>

**A.     <u>Limitations of Liability for Solicitation or Participation.</u>** Subject to the limitations and conditions imposed under Bankruptcy Code section 1125(e), entities who – in good faith and in compliance with applicable Bankruptcy Code provisions – solicit Plan acceptances or rejections will not be liable on account of their solicitation or participation for violation of any applicable law, rule, or regulation governing the solicitation of Plan acceptances or rejections.

**B.     <u>Limitations of Liability for Actions in Connection with the Plan and Related Matters.</u>** Neither any Debtor, any Estate, nor any of their respective employees, officers, directors, agents, members, representative, or professionals will have or incur any liability to any entity for any act taken or omission made in good faith and in compliance with the applicable provisions of the Bankruptcy Code under, in connection with, or related to formulating, implementing, confirming, or

consummating the Plan or any contract, release, or other agreement or document created under or in connection with the Plan.

**C.      Modification of the Plan.**  Subject to the restrictions set forth in Bankruptcy Code section 1127, the Debtors reserve the right to alter, amend, or modify the Plan before it is substantially consummated.

**D.      Revocation of the Plan.**  The Debtors reserve the right to revoke or withdraw the Plan before the Confirmation Date.  If the Plan is not confirmed and the Effective Date does not occur – either because the Debtors revoked or withdrew the Plan or for any other reason – the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will: (1) waive or release any Claims by or against, or any Interests in, the Debtors; or (2) prejudice in any manner any rights that the Debtors, the Estates, or any creditors or equity security holders have in any further proceedings.

**E.      Post-Effective-Date Evidence of Claims or Interests.**  Commencing on the Effective Date, notes, stock certificates, warrants, and other evidences of Claims against, or Interests in, the Debtors will represent only the right to receive the distributions contemplated under the Plan.

**F.      Successors and Assigns.**  The rights, benefits, and obligations of any entity referred to in this Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of that entity.

**G.      Saturday, Sunday, or Legal Holiday.**  If any payment or act under the Plan should be made or performed on a day that is not a Business Day, then the payment or act may be completed on the next succeeding day that is a Business Day, in which event the payment or act will be deemed to have been completed on the required day.

**H.      Governing Law.**  The rights and obligations arising under the Plan and any agreements, contracts, documents, or instruments executed in connection with the Plan will be governed by, and construed and enforced in accordance with, California law without giving effect to California law's conflict of law principles, unless a rule of law or procedure is supplied by: (1) federal law (including the Bankruptcy Code and the Bankruptcy Rules); or (2) an express choice-of-law provision in any document provided for, or executed under or in connections with, the Plan.

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)        -54-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

**I.**     **Severability of Plan Provisions.**  If, before confirmation, the Bankruptcy Court holds that any Plan term or provision is invalid, void, or unenforceable, the Bankruptcy Court may alter or interpret that term or provision so that it is valid and enforceable to the maximum extent possible consistent with the original purpose of that term or provision.  That term or provision will then be applicable as altered or interpreted.  Notwithstanding any such holding, alteration, or interpretation, the Plan's remaining terms and provisions will remain in full force and effect and will in no way be affected, impaired, or invalidated.  The Confirmation Order will constitute a judicial determination providing that each Plan term and provision, as it may have been altered or interpreted in accordance with this Section, is valid and enforceable under its terms.

**J.**     **No Admissions.**  Notwithstanding anything to the contrary in the Plan, if the Plan is not confirmed or the Effective Date does not occur, the Plan will be null and void, and nothing contained in the Plan or the Disclosure Statement will: (1) be deemed to be an admission by the Debtors with respect to any matter set forth in the Plan, including, without limitation, liability on any Claim or the propriety of any Claim's classification; (2) constitute a waiver, acknowledgment, or release of any Claims by or against , or any Interests in, the Debtors; or (3) prejudice in any manner the rights of the Debtors, the Estates, or any creditors in any further proceedings.

**K.**     **Binding Effect.**  The Plan will be binding on and inure to the benefit of the Debtors, all present and former holders of Claims against and Interest in the Debtors, their respective successors and assigns, including the Reorganized Company, and all other parties in interest in the Bankruptcy Cases.  The rights, benefits, and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor, or assign of the entity.

**L.**     **Notices to the Debtors.**  Any notice, request, or demand required or permitted to be given to the Debtors under the Plan must be in writing and must be served by hand delivery, overnight mail, first-class mail, or facsimile transmission and will be deemed to have been duly given or made when actually delivered, or in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| | |
|---|---|
| To Debtors: | The Ryness Company, Inc.<br>801 San Ramon Valley Boulevard<br>Danville, CA 94526<br>Attn: George A. Ryness III<br>Telephone: (925) 820-3432<br>Facsimile: (925) 820-8759 |
| With a copy to: | Monroe Law Group<br>101 California Street, Suite 2450<br>San Francisco, CA 94111<br>Attn: James S. Monroe<br>Telephone: (415) 869-1575<br>Facsimile: (415) 723-7423 |

**M.     U.S. Trustee Fees.**  Not later than 30 days after the end of each calendar quarter that ends after the Effective Date (including any fraction thereof), the Reorganized Company shall pay to the U.S. Trustee the quarterly fee for such quarter until the Cases are converted, dismissed, or closed pursuant to a final decree, as required by 28 U.S.C. section 1930(a)(6).

**N.     Post-Confirmation Status Reports.**  Not later than 30 days after the end of each calendar quarter which ends after the Effective Date, the Reorganized Company shall file and serve upon the U.S. Trustee, the twenty largest unsecured creditors, and Persons requesting special notice in the Cases, a quarterly post-confirmation status report in substantially the form provided by the U.S. trustee.  Further reports shall be filed and served 30 days after the end of every calendar quarter until entry of a final decree, unless otherwise ordered by the Bankruptcy Court.

**O.     Post-Confirmation Conversion/Dismissal.**  A creditor or party in interest may bring a motion to convert or dismiss the Cases under Bankruptcy Code section 1112(b), after the Plan is confirmed, if there is a default in performing the Plan.  If the Bankruptcy Court orders the Cases converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 Estates, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estates, and the automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Bankruptcy Court during the Cases.

**P.** **Final Decree.** After the Estates have been fully administered as referred to in Bankruptcy Rule 3022, the Reorganized Company shall file a motion with the Bankruptcy Court to obtain a final decree to close the Cases.

**Q.** **Confirmation Request.**

The Debtors hereby request confirmation of the Plan pursuant to section 1129(b) of the Bankruptcy Code in the event that not all impaired classes of Claims and Interests vote to accept the Plan in accordance with section 1126 of the Bankruptcy Code.


## XVII. CONCLUSION

The Debtors believe that the Plan is in the best interests of creditors and urges creditors to vote to accept the Plan.

Dated: August 25, 2009                    THE RYNESS COMPANY, INC.
                                          THE RYNESS COMPANY CALIFORNIA, INC>
                                          TRC SERVICES CORPORATION, INC.


                                          By: */s/ George A. Ryness III*
                                              George A. Ryness III, President



                                          MONROE LAW GROUP



                                          By: */s/ James S. Monroe*
                                              James S. Monroe
                                              Attorneys for Debtors

DISCLOSURE STATEMENT(DATED AUGUST 25, 2009)          -57-
CONCERNING THE DEBTORS' JOINT PLAN OF
REORGANIZATION

## **EXHIBIT 1**


**Order Approving Disclosure Statement for Debtors' Joint Plan of
Reorganization (Dated August 25, 2009)**

# **EXHIBIT 2**

**Debtors' Promissory Note to the Ryness Trust and spreadsheet
showing advances, payment history and balance due**

## *AMENDED AND RESTATED COMPANY SUBORDINATED NOTE*

$9,000,000                                                                                        July 7, 2008

A.       THE RYNESS COMPANY, a California corporation, The RYNESS COMPANY CALIFORNIA, INC., a California corporation, TRC SERVICES CORPORATION, a California corporation, and PNH REALTY NEVADA, LLC, a Nevada limited liability company (collectively, the "Borrower"), hereby jointly and severally promise to pay to the order of THE GEORGE A. RYNESS III AND KATHLEEN A. RYNESS FAMILY TRUST, DATED APRIL 9, 1987 (the "Lender" or "Subordinated Lender"), on the Maturity Date (as defined below), the principal amount not to exceed NINE MILLION DOLLARS ($9,000,000), together with interest on the outstanding principal balance at 8% per annum in lawful money of the United States of America.

B.       This Note amends and supersedes in full that certain Company Subordinated Note in favor of Lender dated on or about June 28, 2007 in the original principal amount of $2,500,000.

C.       All outstanding and unpaid principal of, and interest on, this Subordinated Note shall be due and payable in arrears on May 31, 2013 (the "Maturity Date"). Interest shall be payable monthly at a rate of 8% per annum. Notwithstanding the foregoing, no payment or prepayment of principal on this Subordinated Note may be made, directly or indirectly, and no repurchases of any Subordinated Indebtedness may be made unless and until the Borrower has paid and satisfied in full in cash all of its obligations to the Senior Lender in respect of the Senior Indebtedness; provided, however, that if no Default or Event of Default (as each term is defined below) shall have occurred and be continuing, interest may be paid to such account of the Lender as the Lender may designate in writing. If any payment hereunder becomes due and payable on a day other than a business day, the due date thereof shall be extended to the next succeeding business day.

D.       As used herein, the following terms shall have the following meanings:

(1)       "Advance" shall mean each advance of principal made from time to time by Lender to Borrower at the request of Borrower, including without limiting the Initial Advance and each Additional Advance, as such terms are hereafter defined. "Initial Advance" shall mean the initial advance of principal in the amount of $2,500,000 made by Lender to Borrower on June 28, 2007 (the "Inception Date"). "Additional Advance" shall mean each additional advance of principal made from time to time by Lender to Borrower at the request of Borrower after the Inception Date. Each advance shall be recorded on the Schedule of Advances attached to this Note as Schedule 1 and incorporated by this reference, and shall earn interest as set forth in Paragraph C above from the date of each applicable Advance.

(2)       "Credit Agreement" shall mean the Amended and Restated Loan Agreement, dated as of June 28, 2007, between the Borrower, its subsidiaries and Adrienne Albert ("Albert"), as amended, supplemented or otherwise modified from

time to time. Terms defined in the Credit Agreement are used herein with the meanings set forth in the Credit Agreement unless otherwise defined.

(3)     "Default" shall mean a "Default" as defined in the Credit Agreement.

(4)     "Event of Default" shall mean an "Event of Default" as defined in the Credit Agreement.

(5)     "Purchase Agreement" means the Stock Purchase and Sale Agreement between the Borrower and Adrienne Albert ("Albert"), The Marketing Directors, Inc., a New York corporation, and The Marketing Directors, Inc., a New Jersey corporation, as amended from time to time.

(6)     "Senior Lender" shall mean Adrienne Albert.

(7)     "Senior Indebtedness" shall mean (i) the principal amount of all loans and guarantee obligations from time to time outstanding or owing under the Credit Agreement, together with interest thereon including all fees and expenses owing under the Credit Agreement and (ii) the obligations of the Company to Albert under Section 3.1.8 of the Purchase Agreement, including in each case, without limitation, any interest subsequent to the filing by or against the Borrower of any bankruptcy, reorganization or similar proceeding, whether or not such interest would constitute an allowed claim in any such proceeding, calculated at the rate set forth for overdue loans in the Credit Agreement.

(8)     "Subordinated Indebtedness" shall mean the principal amount of this Subordinated Note from time to time outstanding and unpaid, together with accrued and unpaid interest thereon and any fees, expenses or other amounts of any kind whatsoever from time to time owing hereunder.

E.     The Subordinated Indebtedness (as defined above) evidenced hereby is subordinate and junior in right of payment to all the Senior Indebtedness (as defined above) to the extent and in the manner provided herein.

(1)     Payment of the Subordinated Indebtedness is and shall be expressly subordinate and junior in right of payment to the prior payment in full in cash of the Senior Indebtedness to the extent and in the manner set forth herein, and the Subordinated Indebtedness is hereby so subordinated as a claim against the Borrower or any of the assets of the Borrower, whether such claim be (i) in the event of any distribution of the assets of the Borrower upon any voluntary or involuntary dissolution, winding-up, total or partial liquidation or reorganization, or bankruptcy, insolvency, receivership or other statutory or common law proceedings or arrangements involving the Borrower or the readjustment of its liabilities or any assignment for the benefit of creditors or any marshalling of its assets or liabilities (collectively called a "Reorganization"), or (ii) other than in connection with a Reorganization, to the prior payment in full in cash of the Senior Indebtedness.

(2)     If the holder hereof shall receive any payment in violation of the terms hereof, it shall hold such payment in trust for the benefit of the Senior Lender

and forthwith pay it over to the Senior Lender, ratably according the respective amounts of Senior Indebtedness outstanding or owing under the Credit Agreement, for application to and payment of the Senior Indebtedness.

(3)     If the event of any Reorganization relative to the Borrower or its properties, then all of the Senior Indebtedness shall first be paid in full in cash before any payment or other distribution is made upon or in respect of the Subordinated Indebtedness, and in any such proceedings any payment or distribution of any kind or character, whether in cash or property or securities, which may be payable or deliverable in respect of this Subordinated Note shall be paid or delivered directly to the Senior Lender, for application in payment of the Senior Indebtedness, unless and until all such Senior Indebtedness is paid in full in cash, and the holder hereof hereby irrevocably authorizes the Senior Lender, as attorney-in-fact for such holder, to prove any claim in such proceedings on the Subordinated Indebtedness, and to demand, sue for, collect and receive any such payment or distribution, and to apply such payment or distribution to the payment of the then unpaid Senior Indebtedness, and to take such other action (including acceptance or rejection of any plan of Reorganization) in the name of such holder for the enforcement of the provisions hereof. The holder hereof shall execute and deliver such other and further powers of attorney, assignments, proofs of claim or other instruments as may be requested by the Senior Lender in order to accomplish the foregoing, but only with respect to such holder's capacity as a holder hereof and not in respect of any other relationship between such holder and the Borrower.

(4)     In the event that, notwithstanding the foregoing, upon any such Reorganization, any payment or distribution of the assets of the Borrower of any kind or character, whether in cash, property or securities, shall be received by the holder hereof in respect of this Subordinated Note before all Senior Indebtedness is paid in full in cash, such payment of distribution shall be held in trust for the Senior Lender and shall forthwith be paid over to the Senior Lender for application to the payment of all Senior Indebtedness remaining unpaid until all such Senior Indebtedness shall have been paid in full in cash, after giving effect to any concurrent payment or distribution to the Senior Lender.

(5)     The holder hereof agrees that, until the Senior Indebtedness has been paid in full in cash, (a) if a Default or Event of Default shall have occurred and be continuing or would result therefrom, or if a Reorganization shall have commenced, it will not take, demand or receive, or take any action to accelerate or collect, any payment of all or any part of the Subordinated Indebtedness and (b) it will not file, join in or facilitate any petition or proceeding seeking the involuntary bankruptcy of the Borrower.

(6)     In the event of any Reorganization, Subordinated Lender acknowledges that the Senior Lender may consent to the use of cash collateral, or provide financing to any Borrower, on such terms and conditions, and in such amounts as she, in her sole discretion, may decide, and the Lender shall not contest or oppose, in any manner, such cash collateral use or such financing and, further, that in connection with such cash collateral use or financing, nay Borrower (or a

trustee appointed for the estate of any Borrower) may grant to the Senior Lender Liens upon all or any part of the assets of such Borrower, including any or all of the Collateral, which Liens (i) shall secure payments of all Senior Indebtedness (whether such Senior Indebtedness arose prior to the filling of the petition for relief or arose thereafter), until all the Senior Indebtedness has been paid in full and (ii) shall be superior in priority to the Liens on the assets of such Borrower held by any other Person.

(7)     The Lender agrees that it will not object to or oppose a sale or other disposition of any assets securing the Senior Indebtedness (or any portion thereof) free and clear of Liens or other claims under Section 363 of the Bankruptcy Code or any other provision of the Bankruptcy Code if the Senior Lender has consented to such sale or disposition of such assets. In the event that the Lender has or at any time acquires any security for the Subordinated Indebtedness, the Lender agrees not to assert any right it may have to "adequate protection" of its interest in such security in any bankruptcy proceeding and agrees that it will not seek to have the automatic stay lifted with respect to such security, without the prior written consent of the Senior Lender. The Senior Lender agrees not to initiate or prosecute or encourage any other Person to initiate or prosecute any claim, action or other proceeding (i) challenging the enforceability of the Senior Indebtedness or opposing any action by the Senior Lender to enforce their respective rights or remedies hereunder or under any of the Senior Lender's Loan Documents, (ii) challenging the enforceability, validity, priority or perfected status of any Liens of the Senior Lender on any Collateral or (iii) asserting any claims which the Borrowers may hold with respect to the Senior Lender. The Lender agrees that it will not participate and will not seek to participate on any creditors' committee without the prior written and continuing consent of the Senior Lender (which may be granted or withheld in the sole discretion of the Senior Lender). In the event that the Senior Lender consents to such participation, such Lender shall immediately resign from its position on such committee at the request of the Senior Lender.

(8)     The Senior Lender at any time, and from time to time, without the consent of or notice to the holder of this Subordinated Note, without incurring any responsibility to such holder, and without impairing or releasing any of the rights of any of the Senior Lender, or any of the obligations of such holder:

(a)     increase or otherwise change the amount or terms of or increase, renew or extend any Senior Indebtedness or amend the Credit Agreement, as the case may be, in any manner or enter into or amend in any manner any other agreement relating to any Senior Indebtedness;

(b)     sell, exchange, release or otherwise deal with any property at any time pledged or mortgaged to secure any Senior Indebtedness;

(c)     release anyone liable in any manner for the payment or collection of any Senior Indebtedness; and

(d)     exercise or refrain from exercising any rights against the Borrower and others (including the holder hereof).

(9)     The holder of this Subordinated Note hereby waives notice of or proof of reliance by the Senior Lender upon the provisions hereof, and the Senior Indebtedness shall conclusively be deemed to have been created, contracted, incurred or maintained in reliance upon the provisions hereof.

(F)     The Borrower hereby waives diligence, presentment, demand, protest and notice of any kind whatsoever. The non-exercise by the holder of this Subordinated Note of any of its rights hereunder in any particular instance shall not constitute a waiver thereof in that or any subsequent instance.

(G)     The subordination provisions contained herein are for the benefit of the Senior Lender and its respective successors and assigns and neither such provisions nor this Subordinated Note may be rescinded or cancelled or modified or amended, nor may any of the Borrower's rights hereunder be waived, in any way without the prior written consent of the Senior Lender. The Senior Lender is expressly made by the Lender and the Borrower a third-party beneficiary of the terms of this Agreement.

(H)     Neither this Subordinated Note nor any interest therein shall be transferred or assigned without the prior written consent of the Senior Lender.

THIS SUBORDINATED NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF CALIFORNIA.

**THE RYNESS COMPANY**

By: _____
George A. Ryness, III, President

**THE RYNESS COMPANY CALIFORNIA, INC.**

By: _____
George A. Ryness, III, President

**TRC SERVICES CORPORTION, INC.**

By: _____
George A. Ryness, III, President

PNH REALTY NEVADA, LLC

By: _George A. Ryness_ _

George A. Ryness, III, Manager

Acknowledged and Agreed as of July 7, 2008.

**THE GEORGE A. RYNESS III AND
KATHLEEN A. RYNESS FAMILY TRUST,
DATED APRIL 9, 1987**

_____

**GEORGE A. RYNESS III, TRUSTEE**

**PNH REALTY NEVADA, LLC**

By: _George A. Ryness III_

George A. Ryness, III, Manager

Acknowledged and Agreed as of July 7, 2008.

**THE GEORGE A. RYNESS III AND
KATHLEEN A. RYNESS FAMILY TRUST,
DATED APRIL 9, 1987**

_George A. Ryness III_

**GEORGE A. RYNESS III, TRUSTEE**

# The Ryness Company
## Debt and Interest Calculations
## Gary Ryness Loans

| Beg Princ. Balance | Principal Additions | Remaining Princ. Bal. | Annual Interest Rate | Margin | Total Rate | Period Start Date | Period End Date | Days O/S | Period Interest | Interest Paid | Accrued Interest |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $ 1,500,000.00 | $ - | $ 1,500,000.00 | 8 | 0.00 | 8 | 18-Jun-07 | 30-Jun-07 | 13 | $ 4,273.97 | $ - | $ 4,273.97 |
| $ 1,500,000.00 | $ - | $ 1,500,000.00 | 8 | 0.00 | 8 | 1-Jul-07 | 4-Jul-07 | 4 | $ 1,315.07 | $ - | $ 5,589.04 |
| $ 1,500,000.00 | $ 500,000.00 | $ 2,000,000.00 | 8 | 0.00 | 8 | 5-Jul-07 | 31-Jul-07 | 27 | $ 11,835.62 | $ 14,465.75 | $ 2,958.91 |
| $ 2,000,000.00 | $ - | $ 2,000,000.00 | 8 | 0.00 | 8 | 1-Aug-07 | 31-Aug-07 | 31 | $ 13,589.04 | $ 16,547.94 | $ 0.01 |
| $ 2,000,000.00 | $ - | $ 2,000,000.00 | 8 | 0.00 | 8 | 1-Sep-07 | 30-Sep-07 | 30 | $ 13,150.68 | $ 13,150.69 | $ 0.00 |
| $ 2,000,000.00 | $ 500,000.00 | $ 2,500,000.00 | 8 | 0.00 | 8 | 1-Oct-07 | 31-Oct-07 | 31 | $ 16,986.30 | $ 16,986.31 | $ (0.01) |
| $ 2,500,000.00 | $ - | $ 2,500,000.00 | 8 | 0.00 | 8 | 1-Nov-07 | 30-Nov-07 | 30 | $ 16,438.36 | $ 16,438.35 | $ 0.00 |
| $ 2,500,000.00 | $ - | $ 2,500,000.00 | 8 | 0.00 | 8 | 1-Dec-07 | 31-Dec-07 | 31 | $ 16,986.30 | $ 16,986.30 | $ 0.00 |
| $ 2,500,000.00 | $ - | $ 2,500,000.00 | 8 | 0.00 | 8 | 1-Jan-08 | 31-Jan-08 | 31 | $ 16,986.30 | $ 16,986.30 | $ 0.00 |
| $ 2,500,000.00 | $ - | $ 2,500,000.00 | 8 | 0.00 | 8 | 1-Feb-08 | 28-Feb-08 | 28 | $ 15,342.47 | $ 15,342.47 | $ (0.00) |
| $ 2,500,000.00 | $ - | $ 2,500,000.00 | 8 | 0.00 | 8 | 1-Mar-08 | 17-Mar-08 | 17 | $ 9,315.07 | $ - | $ 9,315.07 |
| $ 2,500,000.00 | $ 500,000.00 | $ 3,000,000.00 | 8 | 0.00 | 8 | 18-Mar-08 | 31-Mar-08 | 14 | $ 9,205.48 | $ 18,520.55 | $ (0.00) |
| $ 3,000,000.00 | $ - | $ 3,000,000.00 | 8 | 0.00 | 8 | 1-Apr-08 | 30-Apr-08 | 30 | $ 19,726.03 | $ 19,726.03 | $ (0.01) |
| $ 3,000,000.00 | $ 1,500,000.00 | $ 4,500,000.00 | 8 | 0.00 | 8 | 1-May-08 | 18-May-08 | 18 | $ 17,753.42 | $ - | $ 17,753.42 |
| $ 4,500,000.00 | $ 500,000.00 | $ 5,000,000.00 | 8 | 0.00 | 8 | 19-May-08 | 31-May-08 | 13 | $ 14,246.58 | $ 32,000.00 | $ (0.01) |
| $ 5,000,000.00 | $ - | $ 5,000,000.00 | 8 | 0.00 | 8 | 1-Jun-08 | 30-Jun-08 | 30 | $ 32,876.71 | $ 32,876.70 | $ 0.01 |
| $ 5,000,000.00 | $ - | $ 5,000,000.00 | 8 | 0.00 | 8 | 1-Jul-08 | 29-Jul-08 | 29 | $ 31,780.82 | $ - | $ 31,780.83 |
| $ 5,000,000.00 | $ 1,000,000.00 | $ 6,000,000.00 | 8 | 0.00 | 8 | 30-Jul-08 | 31-Jul-08 | 2 | $ 2,630.14 | $ 33,972.61 | $ 438.36 |
| $ 6,000,000.00 | $ - | $ 6,000,000.00 | 8 | 0.00 | 8 | 1-Aug-08 | 11-Aug-08 | 11 | $ 14,465.75 | $ - | $ 14,904.11 |
| $ 6,000,000.00 | $ 500,000.00 | $ 6,500,000.00 | 8 | 0.00 | 8 | 12-Aug-08 | 14-Aug-08 | 3 | $ 4,273.97 | $ - | $ 19,178.08 |
| $ 6,500,000.00 | $ 500,000.00 | $ 7,000,000.00 | 8 | 0.00 | 8 | 15-Aug-08 | 31-Aug-08 | 17 | $ 26,082.19 | $ 45,260.27 | $ 0.00 |
| $ 7,000,000.00 | $ - | $ 7,000,000.00 | 8 | 0.00 | 8 | 1-Sep-08 | 2-Sep-08 | 2 | $ 3,068.49 | $ - | $ 3,068.50 |
| $ 7,000,000.00 | $ 500,000.00 | $ 7,500,000.00 | 8 | 0.00 | 8 | 3-Sep-08 | 30-Sep-08 | 28 | $ 46,027.40 | $ 49,095.89 | $ 0.00 |
| $ 7,500,000.00 | $ - | $ 7,500,000.00 | 8 | 0.00 | 8 | 1-Oct-08 | 31-Oct-08 | 31 | $ 50,958.90 | $ 50,958.91 | $ (0.00) |
| $ 7,500,000.00 | $ - | $ 7,500,000.00 | 8 | 0.00 | 8 | 1-Nov-08 | 13-Nov-08 | 13 | $ 21,369.86 | $ - | $ 21,369.86 |
| $ 7,500,000.00 | $ 200,000.00 | $ 7,700,000.00 | 8 | 0.00 | 8 | 14-Nov-08 | 30-Nov-08 | 17 | $ 28,690.41 | $ 50,060.27 | $ 0.00 |
| $ 7,700,000.00 | $ - | $ 7,700,000.00 | 8 | 0.00 | 8 | 1-Dec-08 | 2-Dec-08 | 2 | $ 3,375.34 | $ - | $ 3,375.34 |
| $ 7,700,000.00 | $ 200,000.00 | $ 7,900,000.00 | 8 | 0.00 | 8 | 3-Dec-08 | 11-Dec-08 | 9 | $ 15,583.56 | $ - | $ 18,958.91 |
| $ 7,900,000.00 | $ 200,000.00 | $ 8,100,000.00 | 8 | 0.00 | 8 | 12-Dec-08 | 29-Dec-08 | 18 | $ 31,956.16 | $ - | $ 50,915.07 |
| $ 8,100,000.00 | $ 200,000.00 | $ 8,300,000.00 | 8 | 0.00 | 8 | 30-Dec-08 | 31-Dec-08 | 2 | $ 3,638.36 | $ 54,553.43 | $ (0.00) |
| $ 8,300,000.00 | $ - | $ 8,300,000.00 | 8 | 0.00 | 8 | 1-Jan-09 | 21-Jan-09 | 21 | $ 38,202.74 | $ - | $ 38,202.74 |
| $ 8,300,000.00 | $ 200,000.00 | $ 8,500,000.00 | 8 | 0.00 | 8 | 22-Jan-09 | 31-Jan-09 | 10 | $ 18,630.14 | $ - | $ 56,832.87 |
| $ 8,500,000.00 | $ - | $ 8,500,000.00 | 8 | 0.00 | 8 | 1-Feb-09 | 12-Feb-09 | 12 | $ 22,356.16 | $ - | $ 79,189.04 |
| $ 8,500,000.00 | $ 50,000.00 | $ 8,550,000.00 | 8 | 0.00 | 8 | 13-Feb-09 | 25-Feb-09 | 13 | $ 24,361.64 | $ - | $ 103,550.68 |

Note to Gary Detail.xls

# EXHIBIT 3

**Debtors' Monthly Operating Report for July 2009**

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA

In re: The Ryness Company, Inc.,
The Ryness Company California, Inc.
TRC Services Corporation, Inc

**Case No.** 09-41466, 09-41475, 09-41476

**CHAPTER 11**
**MONTHLY OPERATING REPORT**
**(GENERAL BUSINESS CASE)**

## SUMMARY OF FINANCIAL STATUS

**MONTH ENDED:** Jul-09      **PETITION DATE:** 02/26/09

1. Debtor in possession (or trustee) hereby submits this Monthly Operating Report on the Accrual Basis of accounting (or if checked here the Office of the U.S. Trustee or the Court has approved the Cash Basis of Accounting for the Debtor).
Dollars reported in __$1__

| | End of Current Month | End of Prior Month | As of Petition Filing |
|---|---|---|---|
| 2. **Asset and Liability Structure** | | | |
| a. Current Assets | $844,362 | $783,686 | |
| b. Total Assets | $2,928,219 | $2,867,543 | $3,460,361 |
| c. Current Liabilities | $80,471 | $83,870 | |
| d. Total Liabilities | $16,398,478 | $16,401,877 | $16,458,525 |

| | Current Month | Prior Month | Cumulative (Case to Date) |
|---|---|---|---|
| 3. **Statement of Cash Receipts & Disbursements for Month** | | | |
| a. Total Receipts | $526,514 | $679,510 | $2,584,628 |
| b. Total Disbursements | $497,837 | $437,764 | $2,234,684 |
| c. Excess (Deficiency) of Receipts Over Disbursements (a - b) | $28,677 | $241,746 | $349,944 |
| d. Cash Balance Beginning of Month | $460,617 | $218,871 | $139,350 |
| e. Cash Balance End of Month (c + d) | $489,294 | $460,617 | $489,294 |

| | Current Month | Prior Month | Cumulative (Case to Date) |
|---|---|---|---|
| 4. **Profit/(Loss) from the Statement of Operations** | $20,587 | $65,688 | $11,088 |
| 5. **Account Receivables (Pre and Post Petition)** | $329,274 | $299,134 | |
| 6. **Post-Petition Liabilities** | $230,471 | $233,870 | |
| 7. **Past Due Post-Petition Account Payables (over 30 days)** | $0 | $0 | |

**At the end of this reporting month:**

| | | Yes | No |
|---|---|---|---|
| 8. | Have any payments been made on pre-petition debt, other than payments in the normal course to secured creditors or lessors? (if yes, attach listing including date of payment, amount of payment and name of payee) | Listed in 3/09 Report | |
| 9. | Have any payments been made to professionals? (if yes, attach listing including date of payment, amount of payment and name of payee) | | XX |
| 10. | If the answer is yes to 8 or 9, were all such payments approved by the court? | XX | |
| 11. | Have any payments been made to officers, insiders, shareholders, relatives? (if yes, attach listing including date of payment, amount and reason for payment, and name of payee) | XX | |
| | | XX | |
| 12. | Is the estate insured for replacement cost of assets and for general liability? | XX | |
| 13. | Are a plan and disclosure statement on file? | | XX |
| 14. | Was there any post-petition borrowing during this reporting period? | XX | |

15. Check if paid: Post-petition taxes __X__ ;    U.S. Trustee Quarterly Fees __X__ ; Check if filing is current for: Post-petition tax reporting and tax returns: __X__ .
(Attach explanation, if post-petition taxes or U.S. Trustee Quarterly Fees are not paid current or if post-petition tax reporting and tax return filings are not current.)

I declare under penalty of perjury I have reviewed the above summary and attached financial statements, and after making reasonable inquiry believe these documents are correct.

Date: 8/19/2009 0:00      /s/ George A. Ryness III
Responsible Individual

Revised 1/1/98

# STATEMENT OF OPERATIONS
## (General Business Case)
For the Month Ended _____ 07/31/09 _____

| | Current Month | | | | Cumulative (Case to Date) | Next Month Forecast |
|---|---|---|---|---|---|---|
| **Actual** | **Forecast** | **Variance** | | | | |
| | | | | **Revenues:** | | |
| $570,176 | $475,000 | $95,176 | 1 | Gross Sales | $2,510,339 | $510,000 |
| $0 | | $0 | 2 | less: Sales Returns & Allowances | | |
| $570,176 | $475,000 | $95,176 | 3 | Net Sales | $2,510,339 | $510,000 |
| $342,746 | $299,250 | ($43,496) | 4 | less: Cost of Goods Sold (Schedule 'B') | $1,481,306 | $321,300 |
| $227,430 | $175,750 | $51,680 | 5 | Gross Profit | $1,029,033 | $188,700 |
| | | $0 | 6 | Interest | | |
| | | $0 | 7 | Other Income: | | |
| | | $0 | 8 | | | |
| | | $0 | 9 | | | |
| $227,430 | $175,750 | $51,680 | 10 | **Total Revenues** | $1,029,033 | $188,700 |
| | | | | **Expenses:** | | |
| $14,375 | $14,000 | ($375) | 11 | Compensation to Owner(s)/Officer(s) | $41,875 | $14,500 |
| $47,148 | $46,000 | ($1,148) | 12 | Salaries | $251,915 | $47,000 |
| $53,480 | $30,000 | ($23,480) | 13 | Commissions | $194,385 | $44,000 |
| | | $0 | 14 | Contract Labor | | |
| | | | | Rent/Lease: | | |
| | | $0 | 15 | Personal Property | | |
| $10,013 | $10,500 | $487 | 16 | Real Property | $56,874 | $10,500 |
| $6,500 | $6,000 | ($500) | 17 | Insurance | $34,079 | $6,500 |
| | | $0 | 18 | Management Fees | | |
| $500 | $500 | $0 | 19 | Depreciation | $2,500 | $500 |
| | | | | Taxes: | | |
| $4,820 | $4,500 | ($320) | 20 | Employer Payroll Taxes | $25,355 | $4,600 |
| | | $0 | 21 | Real Property Taxes | | |
| | | $0 | 22 | Other Taxes | | |
| | | $0 | 23 | Other Selling | | |
| $29,081 | $28,000 | ($1,081) | 24 | Other Administrative | $164,279 | $29,000 |
| | | $0 | 25 | Interest | | |
| $913 | $6,000 | $5,087 | 26 | Other Expenses: Corporate Counsel | $60,145 | $6,000 |
| | | $0 | 27 | | | |
| | | $0 | 28 | | | |
| | | $0 | 29 | | | |
| | | $0 | 30 | | | |
| | | $0 | 31 | | | |
| | | $0 | 32 | | | |
| | | $0 | 33 | | | |
| | | $0 | 34 | | | |
| $166,830 | $145,500 | ($21,330) | 35 | **Total Expenses** | $831,407 | $162,600 |
| $60,600 | $30,250 | $30,350 | 36 | **Subtotal** | $197,626 | $26,100 |
| | | | | **Reorganization Items:** | | |
| ($32,863) | ($25,000) | $7,863 | 37 | Professional Fees | ($173,863) | ($25,000) |
| | | $0 | 38 | Provisions for Rejected Executory Contracts | | |
| | | $0 | 39 | Interest Earned on Accumulated Cash from Resulting Chp 11 Case | | |
| | | $0 | 40 | Gain or (Loss) from Sale of Equipment | | |
| ($7,150) | ($7,150) | $0 | 41 | U.S. Trustee Quarterly Fees | ($12,675) | $0 |
| | | $0 | 42 | | | |
| ($40,013) | ($32,150) | ($7,863) | 43 | **Total Reorganization Items** | ($186,538) | ($25,000) |
| $20,587 | ($1,900) | $22,487 | 44 | **Net Profit (Loss) Before Federal & State Taxes** | $11,088 | $1,100 |
| | | $0 | 45 | Federal & State Income Taxes | | |
| $20,587 | ($1,900) | $22,487 | 46 | **Net Profit (Loss)** | $11,088 | $1,100 |

Attach an Explanation of Variance to Statement of Operations (For variances greater than +/- 10% only):

<span style="color:red">NOTE - Sales exceeded forecast by $95,176 which caused COGS to exceed forecast by $43,496 and commissions to exceed forecast by $23,480.
Corporate Counsel Expense was less than forecast by $5,087 and Professional Fees exceeded forecast by $7,863 due to a true-up of accrued
legal expenses. Net legal costs were within 10% of forecast.</span>

Revised 1/1/98

# BALANCE SHEET
## (General Business Case)
### For the Month Ended ___07/31/09___

**Assets**

|   |   | From Schedules | Market Value |
|---|---|---|---|
| | **Current Assets** | | |
| 1 | Cash and cash equivalents - unrestricted | | $485,789 |
| 2 | Cash and cash equivalents - restricted | | |
| 3 | Accounts receivable (net) | A | $329,274 |
| 4 | Inventory | B | $0 |
| 5 | Prepaid expenses | | $27,099 |
| 6 | Professional retainers | | |
| 7 | Other: Deposits | | $2,200 |
| 8 | | | |
| 9 | **Total Current Assets** | | $844,362 |
| | **Property and Equipment (Market Value)** | | |
| 10 | Real property | C | $0 |
| 11 | Machinery and equipment | D | $0 |
| 12 | Furniture and fixtures | D | $15,000 |
| 13 | Office equipment | D | $25,000 |
| 14 | Leasehold improvements | D | $0 |
| 15 | Vehicles | D | $30,000 |
| 16 | Other: Note/ Value determined by knowledge | D | |
| 17 | all assets and comparable market | D | |
| 18 | prices for like kind assets. | D | |
| 19 | | D | |
| 20 | | D | |
| 21 | **Total Property and Equipment** | | $70,000 |
| | **Other Assets** | | |
| 22 | Loans to shareholders | | |
| 23 | Loans to affiliates | | |
| 24 | Intangibles - Goodwill | | $1,342,628 |
| 25 | Intangibles - Customer Lists | | $407,029 |
| 26 | Investment in PNH Nevada | | $264,200 |
| 27 | | | |
| 28 | **Total Other Assets** | | $2,013,857 |
| 29 | **Total Assets** | | $2,928,219 |

**NOTE:**

Indicate the method used to estimate the market value of assets (e.g., appraisals; familiarity with comparable market prices, etc.) and the date the value was determined.

Revised 1/1/98

# Liabilities and Equity
## (General Business Case)

**Liabilities From Schedules**

### Post-Petition

#### Current Liabilities

| | | | |
|---|---|---|---|
| 30 | Salaries and wages | | |
| 31 | Payroll taxes | | |
| 32 | Real and personal property taxes | | |
| 33 | Income taxes | | |
| 34 | Sales taxes | | |
| 35 | Notes payable (short term) | | |
| 36 | Accounts payable (trade) | A | $20,326 |
| 37 | Real property lease arrearage | | |
| 38 | Personal property lease arrearage | | |
| 39 | Accrued professional fees | | $60,145 |
| 40 | Current portion of long-term post-petition debt (due within 12 months) | | |
| 41 | Other: | | |
| 42 | | | |
| 43 | | | |
| 44 | **Total Current Liabilities** | | $80,471 |
| 45 | **Long-Term Post-Petition Debt, Net of Current Portion** | | $150,000 |
| 46 | **Total Post-Petition Liabilities** | | $230,471 |

#### Pre-Petition Liabilities (allowed amount)

| | | | |
|---|---|---|---|
| 47 | Secured claims | F | $5,068,157 |
| 48 | Priority unsecured claims | F | $49,850 |
| 49 | General unsecured claims | F | $11,050,000 |
| 50 | **Total Pre-Petition Liabilities** | | $16,168,007 |
| 51 | **Total Liabilities** | | $16,398,478 |

### Equity (Deficit)

| | | |
|---|---|---|
| 52 | Retained Earnings/(Deficit) at time of filing | ($21,190,228) |
| 53 | Capital Stock - 1,000,000 shares issued and outstanding | $6,012,118 |
| 54 | Additional paid-in capital | $101,617 |
| 55 | Cumulative profit/(loss) since filing of case | $11,088 |
| 56 | Post-petition contributions/(distributions) or (draws) | $1,581,596 |
| 57 | Adjustment for Pre petition liabilities (allowed amount) | $0 |
| 58 | Market value adjustment | $13,550 |
| 59 | **Total Equity (Deficit)** | ($13,470,259) |
| 60 | **Total Liabilities and Equity (Deficit)** | $2,928,219 |

Revised 1/1/98

# SCHEDULES TO THE BALANCE SHEET
## (General Business Case)

### Schedule A
### Accounts Receivable and (Net) Payable

| Receivables and Payables Agings | Accounts Receivable [Pre and Post Petition] | Accounts Payable [Post Petition] | Past Due Post Petition Debt |
|---|---|---|---|
| 0 -30 Days | $87,521 | $20,326 | |
| 31-60 Days | $6,000 | $0 | |
| 61-90 Days | $0 | $0 | $0 |
| 91+ Days | $235,753 | | |
| Total accounts receivable/payable | $329,274 | $20,326 | |
| Allowance for doubtful accounts | | | |
| Accounts receivable (net) | $329,274 | | |

### Schedule B
### Inventory/Cost of Goods Sold

| Types and Amount of Inventory(ies) | Inventory(ies) Balance at End of Month | Cost of Goods Sold | |
|---|---|---|---|
| | | **Inventory Beginning of Month** | |
| | | Add - | |
| Retail/Restaurants - | | Net purchase | |
| Product for resale | | Direct labor | $342,746 |
| | | Manufacturing overhead | |
| Distribution - | | Freight in | |
| Products for resale | | Other: | |
| | | | |
| Manufacturer - | | | |
| Raw Materials | | | |
| Work-in-progress | | Less - | |
| Finished goods | | Inventory End of Month | |
| | | Shrinkage | |
| Other - Explain | | Personal Use | |
| | | | |
| TOTAL | $0 | Cost of Goods Sold | $342,746 |

### Method of Inventory Control

Do you have a functioning perpetual inventory system?

Yes _____  No _____

How often do you take a complete physical inventory?

| | |
|---|---|
| Weekly | _____ |
| Monthly | _____ |
| Quarterly | _____ |
| Semi-annually | _____ |
| Annually | _____ |

Date of last physical inventory was _____

Date of next physical inventory is _____

### Inventory Valuation Methods

Indicate by a checkmark method of inventory used.

Valuation methods -
| | |
|---|---|
| FIFO cost | __ |
| LIFO cost | __ |
| Lower of cost or market | __ |
| Retail method | __ |
| Other | __ |
| Explain | |

**Schedule C**
**Real Property**

| Description | Cost | Market Value |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| Total | $0 | $0 |

**Schedule D**
**Other Depreciable Assets**

| Description | Cost | Market Value |
|---|---|---|
| Machinery & Equipment - | | |
| | | |
| | | |
| Total | $0 | $0 |
| | | |
| Furniture & Fixtures - | | |
| Danville Office Furniture | unknown | $15,000 |
| | | |
| | | |
| Total | $0 | $15,000 |
| | | |
| Office Equipment - | | |
| Danville Office equipment and supplies | Unknown | $5,000 |
| TRC Services office Equip and Cap. software development | $758,053 | $20,000 |
| Total | $758,053 | $25,000 |
| | | |
| Leasehold Improvements - | | |
| | | |
| | | |
| Total | $0 | $0 |
| | | |
| Vehicles - | | |
| 2003 GMC Yukon | $42,057 | $12,000 |
| 2006 Ford Escape Hybrid | $35,760 | $15,000 |
| 1999 Chrysler Town and Country | $25,000 | $3,000 |
| Total | $102,817 | $30,000 |

Revised 1/1/98

**Schedule E**
**Aging of Post-Petition Taxes**
**(As of End of the Current Reporting Period)**

| Taxes Payable | 0-30 Days | 31-60 Days | 61-90 Days | 91+ Days | Total |
|---|---|---|---|---|---|
| **Federal** | | | | | |
| Income Tax Withholding | | | | | $0 |
| FICA - Employee | | | | | $0 |
| FICA - Employer | | | | | $0 |
| Unemployment (FUTA) | | | | | $0 |
| Income | | | | | $0 |
| Other (Attach List) | | | | | $0 |
| **Total Federal Taxes** | $0 | $0 | $0 | $0 | $0 |
| **State and Local** | | | | | |
| Income Tax Withholding | | | | | $0 |
| Unemployment (UT) | | | | | $0 |
| Disability Insurance (DI) | | | | | $0 |
| Empl. Training Tax (ETT) | | | | | $0 |
| Sales | | | | | $0 |
| Excise | | | | | $0 |
| Real property | | | | | $0 |
| Personal property | | | | | $0 |
| Income | | | | | $0 |
| Other (Attach List) | | | | | $0 |
| **Total State & Local Taxes** | $0 | $0 | $0 | $0 | $0 |
| **Total Taxes** | $0 | $0 | $0 | $0 | $0 |

**Schedule F**
**Pre-Petition Liabilities**

| List Total Claims For Each Classification - | Claimed Amount | Allowed Amount (b) |
|---|---|---|
| Secured claims  (a) | $5,068,157 | $5,068,157 |
| Priority claims other than taxes | $4,350 | $4,350 |
| Priority tax claims | $62,000 | $45,500 |
| General unsecured claims | $11,186,578 | $11,050,000 |

(a)   List total amount of claims even it under secured.

(b)   Estimated amount of claim to be allowed after compromise or litigation. As an example, you are a defendant in a lawsuit alleging damage of $10,000,000 and a proof of claim is filed in that amount. You believe that you can settle the case for a claim of $3,000,000. For Schedule F reporting purposes you should list $10,000,000 as the Claimed Amount and $3,000,000 as the Allowed Amount.

**Schedule G**
**Rental Income Information**
**Not applicable to General Business Cases**

**Schedule H**
**Recapitulation of Funds Held at End of Month**

| | Account 1 | Account 2 | Account 3 | Account 4 |
|---|---|---|---|---|
| Bank | | | | |
| Account Type | | | | |
| Account No. | | | | |
| Account Purpose | | | | |
| Balance, End of Month | | | | |
| Total Funds on Hand for all Accounts | $0 | | | |

Attach copies of the month end bank statement(s), reconciliation(s), and the check register(s) to the Monthly Operating Report.

Revised 1/1/98

## STATEMENT OF CASH RECEIPTS AND DISBURSEMENTS
### Increase/(Decrease) in Cash and Cash Equivalents
### For the Month Ended ___07/31/09___

| | | Actual Current Month | Cumulative (Case to Date) |
|---|---|---|---|
| **Cash Receipts** | | | |
| 1 | Rent/Leases Collected | | |
| 2 | Cash Received from Sales | $526,514 | $2,434,628 |
| 3 | Interest Received | | |
| 4 | Borrowings | $0 | $150,000 |
| 5 | Funds from Shareholders, Partners, or Other Insiders | | |
| 6 | Capital Contributions | | |
| 7 | | | |
| 8 | | | |
| 9 | | | |
| 10 | | | |
| 11 | | | |
| 12 | **Total Cash Receipts** | $526,514 | $2,584,628 |
| **Cash Disbursements** | | | |
| 13 | Payments for Inventory | | |
| 14 | Selling | | |
| 15 | Administrative | $19,843 | $204,985 |
| 16 | Capital Expenditures | | |
| 17 | Principal Payments on Debt | | |
| 18 | Interest Paid | | |
| | Rent/Lease: | | |
| 19 | Personal Property | | |
| 20 | Real Property | $10,013 | $52,867 |
| | Amount Paid to Owner(s)/Officer(s) | | |
| 21 | Salaries | $14,375 | $41,875 |
| 22 | Draws | | |
| 23 | Commissions/Royalties | | |
| 24 | Expense Reimbursements | $4,088 | $19,917 |
| 25 | Other | | |
| 26 | Salaries/Commissions (less employee withholding) | $427,761 | $1,747,655 |
| 27 | Management Fees | | |
| | Taxes: | | |
| 28 | Employee Withholding | $13,106 | $85,393 |
| 29 | Employer Payroll Taxes | $4,820 | $33,071 |
| 30 | Real Property Taxes | | |
| 31 | Other Taxes | | |
| 32 | Other Cash Outflows: | | |
| 33 | Employee Health Bennefits - Aetna | $3,831 | $48,921 |
| 34 | | | |
| 35 | | | |
| 36 | | | |
| 37 | | | |
| 38 | **Total Cash Disbursements:** | $497,837 | $2,234,684 |
| 39 | **Net Increase (Decrease) in Cash** | $28,677 | $349,944 |
| 40 | **Cash Balance, Beginning of Period** | $460,617 | $139,350 |
| 41 | **Cash Balance, End of Period** | $489,294 | $489,294 |

Revised 1/1/98

## 2009 Nor Cal Budget Revised

| | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **TOTAL  REGULAR CLOSINGS** | 51 | 44 | 42 | 42 | 43 | 44 | 43 | 309 |
| **MGMT CLOSINGS** | 17 | 17 | 19 | 20 | 19 | 19 | 18 | 129 |
| **TOTAL CLOSINGS MGMT AND REGULAR** | **68** | **61** | **61** | **62** | **62** | **63** | **61** | **438** |
| | | | | | | | | |
| **NEW HOME COMMISION REVENUE** | 465,053 | 417,513 | 393,038 | 406,250 | 376,000 | 375,125 | 378,325 | **2,811,304** |
| **MANAGEMENT REVENUE** | 2,550 | 2,550 | 2,850 | 3,000 | 2,850 | 2,850 | 2,700 | **19,350** |
| **RESALE /REFERRAL REVENUE** | | | | | | | | **0** |
| **RESEARCH RYNESS REPORT REVENUE** | | | | | 7,334 | 7,333 | 7,333 | **22,000** |
| **OTHER INCOME** | 0 | 3,500 | 3,500 | 3,500 | 78,500 | 3,500 | 3,500 | **96,000** |
| **TOTAL REVENUE** | **467,603** | **423,563** | **399,388** | **412,750** | **464,684** | **388,808** | **391,858** | **2,948,654** |
| | | | | | | | | |
| **TOTAL COST OF SALES** | **270,970** | **231,875** | **228,063** | **231,658** | **219,472** | **220,622** | **217,277** | **1,619,937** |
| **GROSS PROFIT** | **196,633** | **191,688** | **171,325** | **181,092** | **245,212** | **168,186** | **174,581** | **1,328,717** |
| **AM/SM COMMISSIONS EXPENSE CALCULATION** **TOTAL SM/AM EXPENSE** | 53,240 | 46,730 | 46,730 | 47,660 | 47,660 | 48,590 | 46,730 | **337,340** |
| **Personnel Expense - Office Staff** | | | | | | | | |
| Salary - Office | 57,170 | 57,837 | 52,822 | 52,822 | 52,822 | 52,822 | 52,822 | **379,117** |
| Health Benefits - Office | 3,931 | 3,931 | 3,545 | 3,545 | 3,545 | 3,545 | 3,545 | **25,587** |
| Payroll Tax Expense | 4,574 | 4,627 | 4,226 | 4,226 | 4,226 | 4,226 | 4,226 | **30,331** |
| Total Personnel - Office Staff Expense | 65,675 | 66,395 | 60,593 | 60,593 | 60,593 | 60,593 | 60,593 | **435,035** |
| **TOTAL PERSONNEL EXPENSE** | **118,915** | **113,125** | **107,323** | **108,253** | **108,253** | **109,183** | **107,323** | **772,375** |
| **NEW BUSINESS DEVELOPMENT** | | | | | | | | |
| Commission Compensation | | | | | | | | |
| **TOTAL NEW BUSINESS DEVELOPMENT** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| **GENERAL AND ADMINISTRATIVE COSTS** | | | | | | | | |
| **Travel and Entertainment** | | | | | | | | |
| Meals & Entertainment-50% | 350 | 350 | 350 | 350 | 350 | 350 | 350 | **2,450** |
| Travel - Airfare | 450 | 250 | 250 | 250 | 250 | 250 | 250 | **1,950** |
| Travel -Lodging | 250 | 250 | 250 | 250 | 250 | 250 | 250 | **1,750** |
| Travel-Gound Transportation. - Auto | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | **20,650** |
| **Total Travel & Entertainment** | 4,000 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | **26,800** |

Case: 09-41466    Doc# 153    Filed: 08/27/09    Entered: 08/27/09 20:59:25    Page 85 of 96

**2009 Nor Cal Budget Revised**

| | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **Occupancy** | | | | | | | | |
| Rent | 10,013 | 12,500 | 12,500 | 12,500 | 12,500 | 12,500 | 8,500 | **81,013** |
| Outside Storage Fees | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | **10,500** |
| | | | | | | | | |
| **Total Occupancy** | 11,513 | 14,000 | 14,000 | 14,000 | 14,000 | 14,000 | 10,000 | **91,513** |
| | | | | | | | | |
| **Other Office Expense** | | | | | | | | |
| Bank/Payroll Fees/Cobra Admin/BK fees | 550 | 5,000 | 250 | 400 | 5,000 | 400 | 400 | 12,000 |
| Computers Hardware Software | 625 | 100 | 100 | 100 | 100 | 100 | 100 | 1,225 |
| Computer - Consulting | 11,407 | 4,000 | 4,000 | 3,500 | 3,500 | 3,500 | 3,500 | 33,407 |
| Copiers & Faxes | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 3,500 |
| Dues, Subscriptions & Sponsorships | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 1,300 | 9,100 |
| MLS Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office Supplies | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 3,500 |
| Postage | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 2,800 |
| Telephone/-Office | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 3,850 |
| Telephone-cell | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 14,000 |
| Internet/ Data lines | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 2,940 |
| **Total Office Expense** | 18,252 | 14,770 | 10,020 | 9,670 | 14,270 | 9,670 | 9,670 | 86,322 |
| | | | | | | | | |
| **Other Personnel** | | | | | | | | |
| Education & Training | | | | | | | | 0 |
| Employee Morale | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 350 |
| **Total Other Personnel** | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 350 |
| | | | | | | | | |
| **Other Operating** | | | | | | | | |
| General Liability Insurance | 900 | 0 | 0 | 0 | 0 | 0 | 0 | 900 |
| E&O Insurance | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 7,200 | 50,400 |
| E&0 Insurance Recapture from Agents | -6,800 | -6,100 | -6,100 | -6,200 | -6,200 | -6,300 | -6,100 | -43,800 |
| Workers Compensation Insurance | 365 | 365 | 365 | 365 | 365 | 365 | 365 | 2,555 |
| Corp Auto Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 1,257 | 1,257 |
| Public Relations/Sponsorships | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 350 |
| Misc Sales Expenses | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 700 |
| **Total Other Operating** | 1,815 | 1,615 | 1,615 | 1,515 | 1,515 | 1,415 | 2,872 | 12,362 |

## 2009 Nor Cal Budget Revised

| | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **Professional Fees** | | | | | | | | |
| Accounting/Tax Preparation | 0 | 7,500 | 7,500 | 7,500 | 0 | 0 | 0 | 22,500 |
| Legal - Outside including BK | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 12,000 | 84,000 |
| Legal - Inside | 6,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 7,000 | 48,000 |
| Management Consulting&Svc Fees | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 14,000 |
| Other Professional Services | 15,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 27,000 |
| **Total Professional Fees** | 35,000 | 30,500 | 30,500 | 30,500 | 23,000 | 23,000 | 23,000 | 195,500 |
| | | | | | | | | |
| **Depreciation and Amortization** | | | | | | | | |
| Amortization Expense | | | | | | | | |
| Depreciation Expense | | | | | | | | |
| **Total Depreciation and Amortization** | | | | | | | | |
| | | | | | | | | |
| **TOTAL OPERATING EXPENSES** | 460,514 | 409,735 | 395,371 | 399,446 | 384,360 | 381,740 | 373,992 | 2,805,158 |
| | | | | | | | | |
| **OPERATING INCOME /(LOSS)** | 7,089 | 13,828 | 4,017 | 13,304 | 80,324 | 7,068 | 17,866 | 143,496 |
| | | | | | | | | |
| **OTHER REVENUE/(EXPENSE)** | | | | | | | | |
| Interest Income | | | | | | | | |
| Interest Expense | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 14,000 |
| **Total Other Revenue/(Expense** | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 14,000 |
| | | | | | | | | |
| **TOTAL NET INCOME / (LOSS)** | 5,089 | 11,828 | 2,017 | 11,304 | 78,324 | 5,068 | 15,866 | 129,496 |

| | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **TOTAL REGULAR CLOSINGS** | 2 | 1 | 0 | 2 | 1 | 0 | 0 | 6 |
| **MGMT CLOSINGS** | 10 | 3 | 10 | 10 | 10 | 10 | 10 | 63 |
| **TOTAL CLOSINGS MGMT AND REGULAR** | **12** | **4** | **10** | **12** | **11** | **10** | **0** | **59** |
| | | | | | | | | |
| **NEW HOME COMMISION REVENUE** | | | | | | | | **0** |
| **MANAGEMENT REVENUE** | 12,000 | 5,000 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | **54,500** |
| **RESALE /REFERRAL REVENUE** | | | | | | | | |
| **RESEARCH RYNESS REPORT REVENUE** | | | | | 0 | 0 | 0 | **0** |
| **OTHER INCOME** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| **TOTAL REVENUE** | **12,000** | **5,000** | **7,500** | **7,500** | **7,500** | **7,500** | **7,500** | **54,500** |
| | | | | | | | | |
| **TOTAL COST OF SALES** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| | | | | | | | | |
| **GROSS PROFIT** | 12,000 | 5,000 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | **54,500** |
| | | | | | | | | |
| **AM/SM COMMISSIONS EXPENSE CALCULATION** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| **TOTAL SM/AM EXPENSE** | | | | | | | | |
| | | | | | | | | |
| **Personnel Expense - Office Staff** | | | | | | | | |
| Salary - Office | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Health Benefits - Office | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Payroll Tax Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Total Personnel - Office Staff Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| | | | | | | | | |
| **TOTAL PERSONNEL EXPENSE** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| | | | | | | | | |
| **NEW BUSINESS DEVELOPMENT** | | | | | | | | |
| Commission Compensation | | | | | | | | |
| **TOTAL NEW BUSINESS DEVELOPMENT** | | | | | | | | |
| | | | | | | | | |
| **GENERAL AND ADMINISTRATIVE COSTS** | | | | | | | | |
| | | | | | | | | |
| **Travel and Entertainment** | | | | | | | | |
| Meals & Entertainment-50% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Travel - Airfare | 0 | | | | | | | **0** |
| Travel -Lodging | | | | | | | | |
| Travel-Gound Transportation. - Auto | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| **Total Travel & Entertainment** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |

7/8/2009

**2009 SOCAL**
**Budget Revised**

| | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **Occupancy** | | | | | | | | |
| Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Outside Storage Fees | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | **8,400** |
| | | | | | | | | |
| **Total Occupancy** | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | **8,400** |
| | | | | | | | | |
| **Other Office Expense** | | | | | | | | |
| Bank/Payroll Fees/Cobra Admin | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Computers Hardware Software | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Computer - Consulting | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Copiers & Faxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dues, Subscriptions & Sponsorships | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MLS Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office Supplies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Postage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Telephone/-Office | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Telephone-cell | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Internet/ Data lines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Office Expense** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| **Other Personnel** | | | | | | | | |
| Education & Training | | | | | | | | 0 |
| Employee Morale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Personnel** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| **Other Operating** | | | | | | | | |
| General Liability Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| E&O Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| E&O Insurance Recapture from Agents | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Workers Compensation Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Corp Auto Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charitable Contribution | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Misc Sales Expenses | | | | | | | | 0 |
| **Total Other Operating** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

7/8/2009

|  | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **Professional Fees** | | | | | | | | |
| Accounting/Tax Preparation | | 0 | | | | | | 0 |
| Legal - Outside | | | | | | | | |
| Legal - Inside | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Management Consulting&Svc Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Professional Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Professional Fees** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| **Depreciation and Amortization** | | | | | | | | |
| Amortization Expense | | | | | | | | |
| Depreciation Expense | | | | | | | | |
| **Total Depreciation and Amortization** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| **TOTAL OPERATING EXPENSES** | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 1,200 | 8,400 |
| **OPERATING INCOME /(LOSS)** | 10,800 | 3,800 | 6,300 | 6,300 | 6,300 | 6,300 | 6,300 | 46,100 |
| **OTHER REVENUE/(EXPENSE)** | | | | | | | | |
| Interest Income | | | | | | | | |
| Interest Expense | | | | | | | | |
| Total Other Revenue/(Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| **TOTAL NET INCOME / (LOSS)** | **10,800** | **3,800** | **6,300** | **6,300** | **6,300** | **6,300** | **6,300** | **46,100** |

7/8/2009

# 2009 NV Budget Revised

| | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **TOTAL  REGULAR CLOSINGS** | | | | | | | | |
| **MGMT CLOSINGS** | | | | | | | | |
| **TOTAL CLOSINGS MGMT AND REGULAR** | **6** | **4** | **5** | **4** | **4** | **4** | **4** | **31** |
| | | | | | | | | |
| **NEW HOME COMMISION REVENUE** | | | | | | | | |
| **MANAGEMENT REVENUE** | 10,500 | 5,100 | 6,375 | 5,100 | 5,100 | 5,100 | 5,100 | **42,375** |
| **RESALE /REFERAL REVENUE** | | | | | | | | |
| **RESEARCH RYNESS REPORT REVENUE** | | | | | 0 | 0 | 0 | **0** |
| **OTHER INCOME** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| **TOTAL REVENUE** | **10,500** | **5,100** | **6,375** | **5,100** | **5,100** | **5,100** | **5,100** | **42,375** |
| | | | | | | | | |
| **TOTAL COST OF SALES** | **0** | **0** | **0** | **0** | **0** | **0** | **0** | **0** |
| | | | | | | | | |
| **GROSS PROFIT** | 10,500 | 5,100 | 6,375 | 5,100 | 5,100 | 5,100 | 5,100 | **42,375** |
| | | | | | | | | |
| **AM/SM COMMISSIONS EXPENSE CALCULATION** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| **TOTAL SM/AM EXPENSE** | | | | | | | | |
| | | | | | | | | |
| **Personnel Expense - Office Staff** | | | | | | | | |
| Salary - Office | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Health Benefits - Office | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Payroll Tax Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Total Personnel - Office Staff Expense | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| | | | | | | | | |
| **TOTAL PERSONNEL EXPENSE** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| | | | | | | | | |
| **NEW BUSINESS DEVELOPMENT** | | | | | | | | |
| Commission Compensation | | | | | | | | |
| **TOTAL NEW BUSINESS DEVELOPMENT** | | | | | | | | |
| | | | | | | | | |
| **GENERAL AND ADMINISTRATIVE COSTS** | | | | | | | | |
| | | | | | | | | |
| **Travel and Entertainment** | | | | | | | | |
| Meals & Entertainment-50% | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Travel - Airfare | 0 | | | | | | | **0** |
| Travel -Lodging | | | | | | | | |
| Travel-Gound Transportation. - Auto | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| **Total Travel & Entertainment** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |

## 2009 NV Budget Revised

| | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|
| Rent | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Outside Storage Fees | 120 | 120 | 120 | 120 | 120 | 120 | 120 | **840** |
| | | | | | | | | |
| **Total Occupancy** | 120 | 120 | 120 | 120 | 120 | 120 | 120 | **840** |
| | | | | | | | | |
| **Other Office Expense** | | | | | | | | |
| Bank/Payroll Fees/Cobra Admin | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Computers Hardware Software | 0 | 0 | 0 | | 0 | 0 | 0 | 0 |
| Computer - Consulting | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Copiers & Faxes | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dues, Subscriptions & Sponsorships | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| MLS Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Office Supplies | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Postage | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Telephone/-Office | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Telephone-cell | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Internet/ Data lines | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Office Expense** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| **Other Personnel** | | | | | | | | |
| Education & Training | | | | | | | | 0 |
| Employee Morale | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Other Personnel** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| **Other Operating** | | | | | | | | |
| General Liability Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| E&O Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| E&O Insurance Recapture from Agents | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Workers Compensation Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Corp Auto Insurance | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Charitable Contribution | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Misc Sales Expenses | | | | | | | | 0 |
| **Total Other Operating** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Case: 09-41466    Doc# 153    Filed: 08/27/09    Entered: 08/27/09 20:59:25    Page 92 of 96

| | June | July | August | September | October | November | December | TOTAL |
|---|---|---|---|---|---|---|---|---|
| **Professional Fees** | | | | | | | | |
| Accounting/Tax Preparation | 3,750 | 3,750 | | | | | | 7,500 |
| Legal - Outside | | | | | | | | |
| Legal - Inside | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Management Consulting&Svc Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Other Professional Services | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **Total Professional Fees** | 3,750 | 3,750 | 0 | 0 | 0 | 0 | 0 | 7,500 |
| | | | | | | | | |
| **Depreciation and Amortization** | | | | | | | | |
| Amortization Expense | | | | | | | | |
| Depreciation Expense | | | | | | | | |
| **Total Depreciation and Amortization** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| **TOTAL OPERATING EXPENSES** | 3,870 | 3,870 | 120 | 120 | 120 | 120 | 120 | 8,340 |
| | | | | | | | | |
| **OPERATING INCOME /(LOSS)** | 6,630 | 1,230 | 6,255 | 4,980 | 4,980 | 4,980 | 4,980 | 34,035 |
| | | | | | | | | |
| **OTHER REVENUE/(EXPENSE)** | | | | | | | | |
| Interest Income | | | | | | | | |
| Interest Expense | | | | | | | | |
| **Total Other Revenue/(Expense** | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| | | | | | | | | |
| **TOTAL NET INCOME / (LOSS)** | 6,630 | 1,230 | 6,255 | 4,980 | 4,980 | 4,980 | 4,980 | 34,035 |

Case: 09-41466   Doc# 153   Filed: 08/27/09   Entered: 08/27/09 20:59:25   Page 93 of 96

**2010 Budget -Prelim**

| | Jan | Feb | March | Apr | May | June | July | August | Sept | Oct | Nov | Dec | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| TOTAL REGULAR CLOSINGS | 45 | 61 | 68 | 51 | 50 | 52 | 45 | 48 | 55 | 29 | 36 | 35 | 575 |
| MGMT CLOSINGS | 10 | 12 | 10 | 15 | 14 | 17 | 18 | 9 | 12 | 12 | 11 | 10 | 150 |
| TOTAL CLOSINGS REG&MGMT | **55** | **73** | **78** | **66** | **64** | **69** | **63** | **57** | **67** | **41** | **47** | **45** | **725** |
| | | | | | | | | | | | | | |
| NEW HOME COMMISION REVENUE | 405,000 | 549,000 | 612,000 | 459,000 | 450,000 | 468,000 | 405,000 | 432,000 | 495,000 | 261,000 | 324,000 | 315,000 | **5,175,000** |
| MANAGEMENT REVENUE | 1,500 | 1,800 | 1,500 | 2,250 | 2,100 | 2,550 | 2,700 | 1,350 | 1,800 | 1,800 | 1,650 | 1,500 | **22,500** |
| RESALE /REFERRAL REVENUE | | | | | | | | | | | | | **0** |
| RESEARCH RYNESS RPT REVENUE | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | **60,000** |
| OTHER INCOME | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 3,500 | 78,500 | 3,500 | 3,500 | **117,000** |
| **TOTAL REVENUE** | **415,000** | **559,300** | **622,000** | **469,750** | **460,600** | **479,050** | **416,200** | **441,850** | **505,300** | **346,300** | **334,150** | **325,000** | **5,374,500** |
| | | | | | | | | | | | | | |
| **TOTAL COST OF SALES** | **232,400** | **313,208** | **348,320** | **263,060** | **257,936** | **268,268** | **233,072** | **247,436** | **282,968** | **193,928** | **187,124** | **182,000** | **3,009,720** |
| **GROSS PROFIT** | **182,600** | **246,092** | **273,680** | **206,690** | **202,664** | **210,782** | **183,128** | **194,414** | **222,332** | **152,372** | **147,026** | **143,000** | **2,364,780** |
| AM/SM COMMISSIONS EXPENSE | 41,500 | 55,930 | 62,200 | 46,975 | 46,060 | 47,905 | 41,620 | 44,185 | 50,530 | 34,630 | 33,415 | 32,500 | **537,450** |
| TOTAL SM/AM EXPENSE | | | | | | | | | | | | | |
| **Personnel Expense - Office Staff** | | | | | | | | | | | | | |
| Salary - Office | 50,222 | 50,222 | 50,222 | 50,222 | 50,222 | 50,222 | 50,222 | 50,222 | 50,222 | 50,222 | 50,222 | 50,222 | **602,664** |
| Health Benefits - Office | 3,545 | 3,545 | 3,545 | 3,545 | 3,545 | 3,545 | 3,545 | 3,545 | 3,545 | 3,545 | 3,545 | 3,545 | **42,540** |
| Payroll Tax Expense | 4,223 | 4,223 | 4,223 | 4,223 | 4,223 | 4,223 | 4,223 | 4,223 | 4,223 | 4,223 | 4,223 | 4,223 | **50,670** |
| Total Personnel - Office Staff Expense | 57,990 | 57,990 | 57,990 | 57,990 | 57,990 | 57,990 | 57,990 | 57,990 | 57,990 | 57,990 | 57,990 | 57,990 | **695,874** |
| **TOTAL PERSONNEL EXPENSE** | **99,490** | **113,920** | **120,190** | **104,965** | **104,050** | **105,895** | **99,610** | **102,175** | **108,520** | **92,620** | **91,405** | **90,490** | **1,233,324** |
| **NEW BUSINESS DEVELOPMENT** | | | | | | | | | | | | | |
| Commission Compensation | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | **18,000** |
| TOTAL NEW BUSINESS DEV. | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | **18,000** |
| **GENERAL &ADMINISTRATIVE COSTS** | | | | | | | | | | | | | |
| **Travel and Entertainment** | | | | | | | | | | | | | |
| Meals & Entertainment-50% | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | 350 | **4,200** |
| Travel - Airfare | 450 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | **3,200** |
| Travel -Lodging | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | 250 | **3,000** |
| Travel-Gound Transportation. - Auto | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | 2,950 | **35,400** |
| **Total Travel & Entertainment** | 4,000 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | 3,800 | **45,800** |

7/8/2009

**2010 Budget -Prelim**

| | Jan | Feb | March | Apr | May | June | July | August | Sept | Oct | Nov | Dec | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Occupancy** | | | | | | | | | | | | | |
| Rent | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | 8,500 | **102,000** |
| Outside Storage Fees | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | 1,500 | **18,000** |
| **Total Occupancy** | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | 10,000 | **120,000** |
| | | | | | | | | | | | | | |
| **Other Office Expense** | | | | | | | | | | | | | |
| Bank/Payroll Fees/Cobra Admin | 550 | 250 | 250 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | **4,650** |
| Computers Hardware Software | 625 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | **1,725** |
| Computer - Consulting | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | **36,000** |
| Copiers & Faxes | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | **6,000** |
| Dues, Subscriptions & Sponsorships | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | 3,300 | **39,600** |
| MLS Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Office Supplies | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | **6,000** |
| Postage | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | 400 | **4,800** |
| Telephone-/Office | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | 550 | **6,600** |
| Telephone-cell | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | **24,000** |
| Internet/ Data lines | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 420 | 420 | **5,040** |
| **Total Office Expense** | 11,845 | 11,020 | 11,020 | 11,170 | 11,170 | 11,170 | 11,170 | 11,170 | 11,170 | 11,170 | 11,170 | 11,170 | **134,415** |
| | | | | | | | | | | | | | |
| **Other Personnel** | | | | | | | | | | | | | |
| Education & Training | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Employee Morale | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | **600** |
| **Total Other Personnel** | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | **600** |
| | | | | | | | | | | | | | |
| **Other Operating** | | | | | | | | | | | | | |
| General Liability Insurance | 0 | 0 | 0 | 0 | 0 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | **1,000** |
| E&O Insurance | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | 7,500 | **90,000** |
| E&O Insurance Recapture from Agents | -5,500 | -7,300 | -7,800 | -6,600 | -6,400 | -6,900 | -6,300 | -5,700 | -6,700 | -4,100 | -4,700 | -4,500 | **-72,500** |
| Workers Compensation Insurance | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | 625 | **7,500** |
| Corp Auto Insurance | 0 | 0 | 0 | 0 | 1,257 | 0 | 0 | 0 | 0 | 0 | 0 | 1,257 | **2,514** |
| Public Relations/Sponsorships | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | **600** |
| Misc Sales Expenses | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | 100 | **1,200** |
| **Total Other Operating** | 2,775 | 975 | 475 | 1,675 | 3,132 | 2,375 | 1,975 | 2,575 | 1,575 | 4,175 | 3,575 | 5,032 | **30,314** |

7/8/2009

Case: 09-41466     Doc# 153     Filed: 08/27/09     Entered: 08/27/09 20:59:25     Page 95 of 96

## 2010 Budget -Prelim

| | Jan | Feb | March | Apr | May | June | July | August | Sept | Oct | Nov | Dec | TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Professional Fees** | | | | | | | | | | | | | |
| Accounting/Tax Preparation | 4,042 | 4,042 | 4,042 | 4,042 | 4,042 | 4,042 | 4,042 | 4,042 | 4,042 | 4,042 | 4,042 | 4,042 | **48,500** |
| Legal - Outside | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | **36,000** |
| Legal - Inside | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | 6,000 | **72,000** |
| Management Consulting&Svc Fees | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **0** |
| Other Professional Services | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | 1,000 | **12,000** |
| **Total Professional Fees** | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | 14,042 | **168,500** |
| | | | | | | | | | | | | | |
| **Depreciation and Amortization** | | | | | | | | | | | | | |
| Amortization Expense | | | | | | | | | | | | | **0** |
| Depreciation Expense | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | **24,000** |
| **Total Depre & Amortization** | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | 2,000 | **24,000** |
| | | | | | | | | | | | | | |
| **TOTAL OPERATING EXPENSES** | 378,101 | 470,514 | 511,396 | 412,261 | 407,679 | 419,099 | 377,218 | 394,747 | 435,624 | 333,284 | 324,665 | 320,083 | **4,784,673** |
| | | | | | | | | | | | | | |
| **OPERATING INCOME /(LOSS)** | 36,899 | 88,786 | 110,604 | 57,489 | 52,921 | 59,951 | 38,982 | 47,103 | 69,676 | 13,016 | 9,485 | 4,917 | **589,827** |
| | | | | | | | | | | | | | |
| **OTHER REVENUE/(EXPENSE)** | | | | | | | | | | | | | |
| Mgmt IHN Income | -7,500 | -7,500 | -7,500 | -7,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | **-30,000** |
| Interest Expense | 2,000 | 2,000 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | **109,000** |
| **Total Other Revenue/(Expense** | -5,500 | -5,500 | 3,000 | 3,000 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | 10,500 | **79,000** |
| | | | | | | | | | | | | | |
| **TOTAL NET INCOME / (LOSS)** | 42,399 | 94,286 | 107,604 | 54,489 | 42,421 | 49,451 | 28,482 | 36,603 | 59,176 | 2,516 | -1,015 | -5,583 | **510,827** |
| | 42,399 | 94,286 | 107,604 | 54,489 | 42,421 | 49,451 | 28,482 | 36,603 | 59,176 | 2,516 | -1,015 | -5,583 | **510,827** |