James S. Monroe, Esq. (SBN 102328)
MONROE LAW GROUP
101 California Street, Suite 2450
San Francisco, CA 94111
Telephone: (415) 869-1575
Facsimile: (415) 723-7423
Email: jim@monroe-law.com

Attorneys for Debtors

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

In re:

THE RYNESS COMPANY, INC., a California
corporation; THE RYNESS COMPANY
CALIFORNIA, INC., a California corporation;
and TRC SERVICES CORPORATION, INC., a
California corporation,

Debtors.

801 San Ramon Valley Blvd.
Danville, CA 94526

Employer's Tax ID No.: 14-1878323; 33-0805836;
94-2314419

Case Nos. 09-41466
09-41475
09-41476

[Jointly Administered Under Case No. 09-
41466; Pleading Applies to All Cases]

Chapter 11

**PLAN SUPPLEMENT**

Date:     October 22, 2009
Time:    2:30 p.m.
Place:   1300 Clay Street, Room 215
            Oakland, CA 94612
Judge:   Honorable Edward D. Jellen

     Pursuant to the terms of the Debtors' Joint Plan of Reorganization (Dated August 25, 2009)

(the "Plan"), attached are Exhibits D, E and F of the Plan which were not attached to the Plan on the

date the Plan was filed with the Court but are to be filed on or before the Exhibit Filing Date as

provided in the Plan.

Dated: October 2, 2009

MONROE LAW GROUP

By: */s/ James S. Monroe*
Attorneys for Debtors

Case: 09-41466     Doc# 174     Filed: 10/02/09     Entered: 10/02/09 20:10:39     Page 1 of 68

# EXHIBIT D

**Amended Loan Agreement**
**(To be filed by Exhibit Filing Date)**

# SECOND AMENDED AND RESTATED LOAN AGREEMENT

This SECOND AMENDED AND RESTATED LOAN AGREEMENT (this "Agreement") dated as of [ ], 2009, is between ADRIENNE ALBERT ("Albert" or "Lender") and THE RYNESS COMPANY, a California corporation (the "Borrower").

## PRELIMINARY STATEMENTS

WHEREAS, the Lender and the Borrower are parties to an Amended and Restated Loan Agreement (as amended, supplemented and modified, the "Existing Loan Agreement") dated as of June 28, 2007 ("Original Effective Date");

WHEREAS, on July 7, 2008, George A. Ryness, III ("Ryness"), individually, and as trustee of The George A. Ryness, III and Kathleen A. Ryness Trust Dated April 9, 1987, and Kathleen A. Ryness ("Kathleen"), individually, and as trustee of The George A. Ryness, III and Kathleen A. Ryness Trust Dated April 9, 1987 (the "Trust"), entered into a Securities Purchase and Sale Agreement dated July 7, 2008 with Adrienne Albert Associates, LLC, a Delaware limited liability company owned directly or indirectly by the Lender, and The Marketing Directors SE, LLC, a Delaware limited liability company owned directly or indirectly by the Lender ("2008 Purchase Agreement");

WHEREAS, as provided in the 2008 Purchase Agreement, the Borrower sold to the Lender or her affiliates all of the capital stock and limited liability company membership interests held by the Borrower in certain subsidiaries of the Borrower (the "TMD Transaction and Stock Purchase");

WHEREAS, in connection with the TMD Transaction and Stock Purchase, the Lender and Borrowers, entered into a First Amendment to Amended and Restated Loan Agreement dated as of July 7, 2008 ("Amendment No. 1");

WHEREAS, the Lender the Borrower and certain of its then operating subsidiaries, subsequently entered into a Second Amendment to Amended and Restated Loan Agreement dated as of July 7, 2008 ("Amendment No. 2," and, together with Amendment No. 1, the "Amendments");

WHEREAS, on February 26, 2009, the Borrower and two of its subsidiaries, The Ryness Company California, Inc.. a California corporation, and TRC Services Corporation, Inc., a California corporation (collectively, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") before the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court").

WHEREAS, the Lender, the Debtors and Jean C. Mills ("Mills") entered into an Agreement for Post-Petition Financing, the Granting of Security Interests, Superpriority Administrative Expense Treatment, Use of Cash Collateral, Modifying the Automatic Stay, the Granting of Replacement Liens and Related Matters as of March 16, 2009 (the "DIP Loan Agreement");

WHEREAS, on March 16, 2009, the Bankruptcy Court entered an order approving, as modified, the DIP Loan Agreement on an interim basis (the "First Interim DIP Order");

WHEREAS, on April 3, 2009, the Bankruptcy Court entered a second order approving, as modified, the DIP Loan Agreement on an interim basis (the "Second Interim DIP Order");

WHEREAS, on April 9, 2009, the Bankruptcy Court entered a final order approving, as modified, the DIP Loan Agreement and granting related relief (the "Final DIP Order" and collectively with the First Interim DIP Order and the Second Interim DIP Order, the "DIP Orders");

WHEREAS, on August 27; 2009, the Debtors filed their Joint Plan of Reorganization (Dated August 25. 2009) (the "Plan") for their bankruptcy cases;

WHEREAS, on [ ], 2009, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order");

WHEREAS, this Agreement amends, restates, and replaces in its entirety the Existing Loan Agreement on the terms set forth herein.

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

1.    THE LOANS

1.1.    Tranche A Loans. Subject to the terms and conditions set forth in the Existing Loan Agreement and pursuant to the Loan Sale and Assignment Agreement between Albert and Bank of America, N.A. (the "Bank"), Albert purchased from the Bank its outstanding loan to the Borrowers in the aggregate amount of $5,000,000 as of such date (the "Existing Facility 1 Loan"). After giving effect to such purchase of the Facility 1 Loan, such Facility 1 Loan was thereafter referred to as the "Tranche A Loan" and was evidenced by the Tranche A Note as set forth in the Existing Loan Agreement and shall continue to be evidenced by the Tranche A Note attached hereto as Exhibit A (the "Tranche A Note"). The Tranche A Loan, if repaid, may not be reborrowed.  As of the Effective Date (as such term is defined below) of this Agreement, the Borrower is indebted to Lender on the Tranche A Loan in the principal amount of $5,000,000, plus accrued interest in the amount of $34,247: total of $5,034,247.

1.2.    Tranche B Loan. As of the Original Effective Date, the Borrower owed Albert $4,000,000 aggregate principal amount under Section 3.1.2 (prior to any amendment) of the Stock Purchase and Sale Agreement dated as of January 1, 2006 between the Borrowers, Albert, The Marketing Directors, Inc. (NY), and The Marketing Directors, Inc. (NJ) (the "2005 Purchase Agreement"). Such obligation was referred to as the "Tranche B Loan" (together with the Tranche A Loan, the "Loans") and was evidenced by the Tranche B Note as set forth in the Existing Loan Agreement and shall continue to be evidenced by the Tranche B Note attached hereto as Exhibit B (the "Tranche B Note").  The Tranche B Loan, if repaid, may not be reborrowed. As of the Effective Date of this Agreement, the Borrower is indebted to Lender on the Tranche B Loan in the principal amount of $26,910.

CG&R DRAFT 10/2/08 7:45 PM                    #01852043v2CQM.DOC

Case: 05-41408    Doc# 174    Filed: 10/02/09    Entered: 10/02/09 20:10:39    Page 4 of
68

1.3.   Repayment Terms.  The Borrower will make payments on the Loans consisting of:

(a)   fifty percent (50%) of Free Cash Flow (as defined below) for the applicable period within 30 days after end of each fiscal quarter; plus

(b)   a payment equal to the amount of payment made to the Exit Lender (as such term is defined in the Plan) under the Exit Financing Agreements (as such term is defined in the Plan) (excluding the periodic interest payments to the Exit Lender) and made concurrently with each such payment to the Exit Lender.

All such payments to Lender shall be applied first to the remaining outstanding balance of the Tranche B Loan and, after the outstanding balance of the Tranche B Loan has been paid in full, to pay the outstanding balance of the Tranche A Loan.

"Free Cash Flow" shall mean an amount, calculated at the end of each fiscal quarter of the Borrower, equal to the Borrower's gross receipts during such fiscal quarter (including, but not limited to: gross sales, repayment of interest and principal on loans receivable, the net proceeds of any lawsuit settlement, judgment or award, and the conversion to cash of any real, personal, or intangible property owned or acquired by the Borrower (expressly excluding, without limitation, builder draw money and advances under the DIP Loan Agreement), reduced by payments made in the ordinary course of business during such fiscal quarter (including but not limited to: rent, utilities, liability, hazard and workers' compensation insurances, wages, salaries, commissions and benefit expenses, income, property, payroll and other taxes, costs of goods sold, and other costs incurred as a necessity in running the day-to-day operations of the business), further reduced by payments made by the Debtors during such fiscal quarter for fees and expenses, including Professional Fees (as such term is defined in the Plan), incurred in connection with the Bankruptcy Cases, and further reduced by an amount necessary for the Borrower to maintain an operating reserve from gross receipts in the amount of $100,000.

1.4.   Maturity.  The Borrower will pay all outstanding principal plus accrued and unpaid interest on the Loans on or before February 27, 2016.

1.5.   Interest Rate.  Commencing as of February 26, 2009, the interest rate on the Loans shall be zero percent (0%) per annum.  Commencing as of February 26, 2010, the interest rate on the Loans shall be two percent (2%) per annum. Thereafter, the interest rate on the Loans shall increase by one percent (1%) per annum each year on February 26 of that year. The interest rate shall continue to increase by one percent (1%) per annum each year until it reaches seven percent (7%) per annum on February 26, 2015.

2.   GUARANTIES.

The obligations of the Borrower hereunder will continue to be secured by an Amended and Restated Payment Guaranty, dated as of June 28, 2007, of Ryness, individually, and as Trustee of The George A. Ryness, III and Kathleen A. Ryness Family Trust dated April 9, 1987 (the "Trust"), and Kathleen (together with Ryness, the "Guarantors"), individually, and as Trustee of the Trust, executed in favor of the Lender (as amended from time to time, collectively, the "Guaranties" or each, a "Guaranty").

CG&R DRAFT 4/10/08 7:46 PM

3. FEES AND EXPENSES.

    3.1. <u>Fees</u>. RESERVED

    3.2. <u>Expenses</u>. The Borrower agrees to immediately repay the Lender for expenses that include, but are not limited to, filing, recording and search fees, appraisal fees, title report fees, and documentation fees.

    3.3. <u>Reimbursement of Costs</u>. The Borrower agrees to reimburse the Lender:

    (a) for any expenses (including, but are not limited to, reasonable attorneys' fees) she incurs in connection with (i) the enforcement of any and all of the Lender's rights and remedies under this Agreement and (ii) the 2008 Purchase Agreement or any related agreement; and

    (b) for the cost of periodic field examinations of the Borrower's books, records and collateral, and appraisals of the collateral, at such intervals as the Lender may reasonably require. The actions described in this paragraph may be performed by the Lender's representatives or by independent appraisers.

4. COLLATERAL.

    4.1. <u>Personal Property of Borrowers</u>. Borrower's obligations to the Lender under this Agreement shall be secured by a security agreement, pledge agreement or similar agreement executed by the Borrower in favor of the Lender. The collateral described in the foregoing agreements is hereinafter referred to as "the Collateral". In addition, all personal property collateral owned by the Borrower securing any obligation under this Agreement shall also secure all other present and future obligations of the Borrower to the Lender (excluding any consumer credit covered by the federal Truth in Lending law, unless the Borrower has otherwise agreed in writing or received written notice thereof). All personal property collateral securing any other present or future obligations of the Borrower to the Lender shall also secure this Agreement.

    4.2. <u>Ryness Family Trust Loan</u>. The Trust has made a loan to the Borrowers of $8,655,000 pursuant to the terms of the Amended and Restated Company Subordinated Promissory Note, dated July 7, 2008 (the "Company Subordinated Note"), which indebtedness is being converted into capital stock of the Borrower and discharged pursuant to the Plan.

5. DISBURSEMENTS, PAYMENTS AND COSTS.

    5.1. <u>Disbursements and Payments</u>. Each payment by the Borrower will be made in U.S. Dollars and immediately available funds by wire transfer to an account designated by the Lender to the Borrower.

    5.2. RESERVED.

    5.3. RESERVED.

5.4.    Banking Days.  Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in New York. All payments, disbursements, and adjustments to interest rates which would be scheduled to occur on a day which is not a banking day will instead be scheduled to occur on the next banking day. All payments received on a day which is not a banking day will be applied to the credit on the next banking day.

5.5.    Interest Calculation.  Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 365-day year. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid.

5.6.    Default Rate.  Upon the occurrence of any default or after maturity or after judgment has been rendered on any obligation under this Agreement, all amounts outstanding under this Agreement, including any interest, fees, or costs which are not paid when due, will at the option of the Lender bear interest at a rate which is 5.0 percentage point(s) higher than the rate of interest otherwise provided under this Agreement. This may result in compounding of interest. This will not constitute a waiver of any default.

5.7.    Taxes.  If any payments to the Lender under this Agreement are made from outside the United States, the Borrower will not deduct any foreign taxes from any payments it makes to the Lender. If any such taxes are imposed on any payments made by the Borrower (including payments under this paragraph), the Borrower will pay the taxes and will also pay to the Lender, at the time interest is paid, any additional amount which the Lender may specify as necessary to preserve the after-tax yield the Lender would have received if such taxes had not been imposed.  The Borrower will confirm that it has paid the taxes by giving the Lender official tax receipts (or notarized copies) within thirty (30) days after the due date.

6.    CONDITIONS.

6.1.    Effective Date.  This Agreement shall become effective (the "Effective Date") on the date on which:

(a)    Executed Counterparts.  The Lender shall have received from each party hereto either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Lender (which may include telecopy transmission of a signed signature page to this Agreement) that such party has signed a counterpart of this Agreement.

(b)    Opinion of Counsel to the Borrowers.  The Lender shall have received a written opinion (addressed to the Lender) of the Monroe Law Group, counsel for the Bor-rower, substantially in the form of Exhibit D (and the Borrower hereby instructs such counsel to deliver such opinion to the Lender).

(c)    Corporate Documents.  The Lender shall have received such documents and certificates as the Lender may reasonably request relating to the organization, exis-tence and good standing of the Borrower, the authorization of this Agreement and any

CG&R DRAFT 10/2/08 7:46 PM                                                                     #1018520 v3 02COPA.DOC

Case: 05-41468   Doc# 174   Filed: 10/02/09   Entered: 10/02/09 20:10:39   Page 7 of 68

other legal matters relating to the Borrower or this Agreement, all in form and substance satisfactory to the Lender.

(d)     <u>Bankruptcy Court Approval</u>. The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Lender, and it shall have become final and non-appealable.

(e)     <u>Intercreditor Agreement</u>. The Lender and Mills shall have entered into, and the Borrower shall have acknowledged, an intercreditor agreement in the form of Exhibit E hereto (the "<u>Intercreditor Agreement</u>").

(f)     <u>Amended Security Documents and Guarantees</u>. (i) The Lender and the Borrower shall have entered into an amendment to the Amended and Restated Pledge Agreement and each other security document or pledge agreement delivered in accordance with applicable law to grant a valid, perfected security interest in any property as collateral for the Obligations, and all UCC or other financing statements or instruments of perfection required by this Agreement, the Amended and Restated Pledge Agreement or any other such security document or pledge agreement to be filed with respect to the security interests in property and fixtures created pursuant to the Amended and Restated Pledge Agreement and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest or lien on any property as collateral for the Obligations (collectively, the "<u>Security Documents</u>"), (ii) Ryness, Kathleen and the Trust shall have entered into affirmations of the Guarantees and related share pledges (including delivery of applicable new share collateral) on terms reasonably satisfactory to the Lender and (iii) Mills and the Borrower shall have entered into documents securing Borrower's obligations to Mills on terms reasonably satisfactory to the Lender.

## 7.   REPRESENTATIONS AND WARRANTIES.

When the Borrower signs this Agreement, the Borrower, makes the following representations and warranties:

7.1.     <u>Formation</u>. The Borrower is duly formed and existing under the laws of the state or other jurisdiction where organized.

7.2.     <u>Authorization</u>. This Agreement, and any instrument or agreement required hereunder, are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational papers.

7.3.     <u>Enforceable Agreement.</u> This Agreement is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable.

7.4.     <u>Good Standing</u>. In each state in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

CG&R DRAFT 10/2/09 7:46 PM
Case 05-41745 Doc# 174 Filed: 10/02/09 Entered: 10/02/09 20:10:39 Page 8 of 68

7.5.   <u>No Conflicts</u>.  This Agreement does not conflict with any law, agreement, or obligation by which the Borrower is bound.

7.6.   <u>Financial Information</u>.  All financial and other information that has been or will be supplied to the Lender is sufficiently complete to give the Lender accurate knowledge of the Borrower's financial condition, including all material contingent liabilities. Since the date of the most recent financial statement provided to the Lender, there has been no material adverse change in the business condition (financial or otherwise), operations, properties or prospects of the Borrower.

7.7.   <u>Lawsuits</u>.  There is no lawsuit, tax claim or other dispute pending or threatened against the Borrower which, if lost, would materially impair such Borrower's financial condition or ability to repay the loan, except as have been disclosed in writing to the Lender.

7.8.   <u>Collateral</u>.  All collateral required in this Agreement and the Security Documents is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except those which have been approved by the Lender in writing.

7.9.   <u>Permits, Franchise</u>.  The Borrower possesses all permits, memberships, franchises, contracts and licenses (including real estate broker licenses for each state where such license is required for the business conducted or to be conducted by the Borrower) required and all trademark rights, trade name rights, patent rights, copyrights, and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

7.10.   <u>Other Obligations</u>.  The Borrower is not in default on any obligation for borrowed money, any purchase money obligation or any other material lease, commitment, contract, instrument or obligation, except as have been disclosed in writing to the Lender.

7.11.   <u>Tax Matters</u>.  The Borrower has no knowledge of any pending assessments or adjustments of its income tax for any year and all taxes due have been paid, except as have been disclosed in writing to the Lender.

7.12.   <u>No Event of Default</u>.  There is no event which is, or with notice or lapse of time or both would be, a default under this Agreement or under the Security Documents.

7.13.   <u>Insurance</u>.  The Borrower has obtained, and maintained in effect, the insurance coverage required in the 'Covenants' Section of this Agreement.

7.14.   <u>Location of Borrower</u>.  The place of business of the Borrower (or, if the Borrower has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Agreement.

7.15.   <u>No Subsidiaries</u>.  As of the date hereof, the Borrower has no subsidiaries other than PNH Realty Nevada, LLC, a Nevada limited liability company, which the Borrower is in the process of winding up and dissolving.

8.     COVENANTS.

   The Borrower agrees, so long as credit is available under this Agreement and until the Lender is repaid in full:

      8.1.    RESERVED.

      8.2.    <u>Financial Information</u>.  To provide the following financial information and statements in form and content acceptable to the Lender, and such additional information as requested by the Lender from time to time:

         (a)     Within 90 days of each fiscal year end, the annual financial statements of the Borrower, (i) certified and dated by an authorized financial or executive officer and (ii) audited (with an opinion satisfactory to the Lender) by a certified public accountant acceptable to the Lender.

         (b)     The Borrower will use its best efforts to deliver quarterly financial statements of the Borrower, certified and dated by an authorized financial or executive officer, within 30 days after the end of each quarter (including the last quarter in each fiscal year), and shall, in any event, deliver such quarterly financial statements no later than 45 days after the end of each quarter (including the last quarter in each fiscal year). These financial statements may be company-prepared; provided that if at the end of fiscal year ended December 31, 2010 the variance between the information contained in the four quarterly financial statements required to be provided pursuant to this clause (b) and the audited annual financial statements required to be delivered pursuant to clause (a) of this Section 8.1 is deemed in good faith by the Lender to be significant, the Lender shall be entitled to require the Borrower to deliver quarterly financial statements that have been reviewed by a certified public accountant acceptable to the Lender or take such other steps as may be requested by the Lender. The statements shall be prepared on a consolidated and consolidating basis.

         (c)     [Intentionally deleted.]

         (d)     [Intentionally deleted.]

         (e)     [Intentionally deleted.]

         (f)     [Intentionally deleted.]

         (g)     [Intentionally deleted.]

         (h)     Immediately upon the Borrower obtaining knowledge thereof, the filing of a bankruptcy petition by or against any party to any Marketing Agreement (as defined in the Pledge Agreement).

         (i)     [Intentionally deleted.]

         (j)     [Intentionally deleted.]

(k)     [Intentionally deleted.]

(l)     Immediately, and in reasonable detail of:

(i)     Any change in the name of the Borrower or any Subsidiary.

(ii)    Any change in the present location of the Collateral other than in the ordinary course of the Borrower's business.

(iii)   Any termination or cancellation of any insurance policy which the Borrower is required to maintain, or any uninsured or partially un-insured loss through liability or property damage, or through fire, theft or other cause affecting the Collateral in excess of an aggre-gate sum of $5,000,000.

(m)     [Intentionally deleted.]

(n)     Within 10 days after the end of each full calendar month, starting with the Effective Date and continuing thereafter until all of the payment obligations under this Agreement are fulfilled, the Borrower will deliver to the Lender a list of all the contracts of the Borrower with builders, developers and other property owners for the listing and sale or rental of properties ("Listing Agreement(s)"), and (i) with respect to each Listing Agreement, the date of such written agreement and all amendments, (ii) with respect to each oral Listing Agreement, a summary of the terms of such oral agreement and any amendments and (iii) accurate and com-plete copies of all written Listing Agreements and all amendments, together with estimated closing dates and commission values.

8.3.    [Intentionally deleted.]

8.4.    [Intentionally deleted.]

8.5.    <u>Expenditures</u>.  Not to spend or incur obligations or expenses for more than Fifty Thousand Dollars ($50,000) without the prior written consent of the Lender.  In addition, the Borrower shall not enter into any new contracts including employment agreements that are for a period in excess of one year and that would cause such Borrower to be obligated to make payments in excess of $100,000; provided, however, that compliance with existing written contractual obligations shall not require the Lender's consent.

8.6.    <u>Dividends, Distributions and Other Payments</u>.  Not to declare or pay any dividends, redemptions of stock or membership interests, distributions and withdrawals (as applicable) to its owners or make any payments to Ryness, Kathleen, the Trust or their affiliates, except:

(a)     dividends payable in capital stock;

(b)     so long as no event of default exists or would exist immediately before and after giving effect to any such dividend or distribution, payments of ordinary and customary salaries in an amount no more than $10,000 per month to Ryness, plus reim-

-9-

bursement for business expenses incurred thereby on behalf of the Borrower; provided, however, that this in no way limits the discretion of the Borrower's management to allocate additional compensation or make other payments thereto from the remaining 50% of Free Cash Flow as provided in clause (c) below;

(c)      so long as no event of default exists or would exist immediately before and after giving effect to any such dividend or distribution, payments of the remaining 50% of Free Cash Flow, as determined by the Borrower's management, in their sole discretion, concurrently with the periodic payments of 50% of Free Cash Flow to Lender as provided in Section 1.3(a) above; and

(d)      distributions in an amount in each fiscal year sufficient to cover the federal and state income tax liability of its owners on the excess of reported income for such fiscal year less reported losses for all prior fiscal years (beginning in 2006) which have not previously been taken into account in determining tax distributions under this section, provided that (i) as a condition precedent to any such payment, the Borrower shall deliver to the Lender a letter from the Borrower's independent public accountants, in form and substance satisfactory to the Lender, detailing the amount necessary to cover each such owners' tax liabilities, which letter shall relate to the estimated tax payments for such fiscal year, and (ii) such payment or distribution shall be limited to the amounts specified in said letter.

8.7.   Banking Relationships.

(a)      To maintain the Borrower's and any subsidiary's bank accounts, including for the maintenance of business, cash management, operating and administrative deposit accounts at a bank or financial institution acceptable to the Lender, which bank or financial institution shall maintain an account control agreement satisfactory to the Lender.

(b)      The Borrower and any subsidiary shall not maintain or transfer any bank account(s) with a bank or financial institution with a balance in excess of $50,000 for each account or for accounts the aggregate balance of which constitute at least eighty percent (80%) of the cash of the Borrower and any subsidiary unless each such account is subject to an account control agreement satisfactory to the Lender.

8.8.   Other Debts.

Not to have outstanding or incur any direct or contingent liabilities or lease obligations (other than those to the Lender), or become liable for the liabilities of others, without the Lender's written consent. This does not prohibit:

(a)      Acquiring goods, supplies, or merchandise on normal trade credit.

(b)      Endorsing negotiable instruments received in the usual course of business.

(c)      Obtaining surety bonds in the usual course of business.

-10-

(d)     Liabilities, lines of credit and leases in existence on the date of this Agreement disclosed in writing to the Lender.

(e)     Additional debts and lease obligations for the acquisition of fixed assets, to the extent permitted elsewhere in this Agreement.

8.9.    <u>Other Liens</u>.

Not to create, assume, or allow any security interest or lien (including judicial liens) on property the Borrower now or later owns, except:

(a)     Liens and security interests in favor of the Lender.

(b)     Liens for taxes not yet due.

(c)     Liens outstanding on the date of this Agreement disclosed in writing to the Lender

(d)     Additional purchase money security interests in assets acquired after the date of this Agreement, if the total principal amount of debts secured by such liens does not exceed Twenty Five Thousand Dollars ($25,000) at any one time; provided that such Liens are not extended to the property and assets of the Borrower other than the property or assets acquired.

8.10.    <u>Maintenance of Assets</u>.

(a)     Not to sell, assign, lease, transfer or otherwise dispose of any part of any the Borrower's business or the Borrower's assets except in the ordinary course of the Borrower's business.

(b)     Not to sell, assign, lease, transfer or otherwise dispose of any assets for less than fair market value, or enter into any agreement to do so.

(c)     Not to enter into any sale and leaseback agreement covering any of its fixed assets.

(d)     To maintain and preserve all rights, privileges, and franchises the Borrower now has.

(e)     To make any repairs, renewals, or replacements to keep the Borrower's properties in good working condition.

8.11.    <u>Investments</u>.

Not to have any existing, or make any new, investments in any individual or entity, or make any capital contributions or other transfers of assets to any individual or entity, except for:

(a)     Existing investments disclosed to the Lender in writing.

(b)     Investments in any of the following:

(i)     certificates of deposits; and

(ii)     U.S. treasury bills and other obligations of the federal government.

8.12.   Loans.

Not to make any loans, advances or other extensions of credit to any individual or entity, except for:

(a)     Existing extensions of credit disclosed to the Lender on Schedule 8.12 hereof.

(b)     Extensions of credit in the nature of accounts receivable or notes receivable arising from the sale or lease of goods or services in the ordinary course of business to non-affiliated entities.

8.13.   Change of Management.

To retain Gary Ryness in his current management positions with the Borrower

8.14.   Change of Ownership; Maintenance of Existence.

(a)     Not to cause, permit, or suffer any change in capital ownership of the Borrower such that there is a change of more than twenty-five percent (25%) in the direct or indirect capital ownership of the Borrower.

(b)     Maintain and preserve, its existence, rights and privileges, and become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

8.15.   Mergers, Acquisitions, Dissolutions.

Not to, without the Lender's written consent:

(a)     Enter into any consolidation, merger, or other combination, or become a partner in a partnership, a member of a joint venture, or a member of a limited liability company.

(b)     Engage in any business activities substantially different from the Borrower's present business.

(c)     Liquidate or dissolve the Borrower's business.

(d)     Voluntarily suspend its business.

8.16.   Notices to Lender.

To promptly notify the Lender in writing of:

(a)   Any lawsuit over One Hundred Thousand Dollars ($100,000) against the Borrower.

(b)   Any substantial dispute between any governmental authority and the Borrower.

(c)   Any event of default under this Agreement or any Security Document, or any event which, with notice or lapse of time or both, would constitute an event of default.

(d)   Any material adverse change in the Borrower's business condition (financial or otherwise), operations, properties or prospects, or ability to repay the credit.

(e)   Any change in the Borrower's name, legal structure, place of business, or chief executive office if the Borrower has more than one place of business.

(f)   Any actual contingent liabilities of any Borrower, and any such contingent liabilities which are reasonably foreseeable, where such liabilities are in excess of One Hundred Thousand Dollars ($100,000) in the aggregate.

(g)   [Intentionally deleted.]

(h)   [Intentionally deleted.]

(i)   as soon as possible, and in any event within 15 days after the filing thereof by the Borrower or any Guarantor, copies of the federal income tax returns filed by the Borrower or any Guarantor;

8.17.   Insurance.

(a)   General Business Insurance. To maintain insurance satisfactory to the Lender as to amount, nature and carrier covering property damage (including loss of use and occupancy) to any of the Borrower's properties, public liability insurance including coverage for contractual liability, product liability and workers' compensation, and any other insurance which is usual for the Borrower's business. Each policy shall provide for at least thirty (30) days prior notice to the Lender of any cancellation thereof.

(b)   Evidence of Insurance. Upon the request of the Lender, to deliver to the Lender a copy of each insurance policy, or, if permitted by the Lender, a certificate of insurance listing all insurance in force.

8.18.   Compliance with Laws.

To comply in all material respects with all applicable laws, rules, regulations, orders, judgments and awards (including any settlement of any claim that, if breached, could give rise to any of the foregoing), such compliance to include, without limitation, (i) paying before the same become delinquent all taxes, assessments and governmental charges or levies imposed upon it or upon its income or profits or upon any of its properties, and (ii) paying all lawful claims which if unpaid might become a Lien or charge upon any of its properties, except to the extent contested in good faith by proper proceedings which stay the imposition of any penalty, fine or Lien resulting from the non-payment thereof and with respect to which adequate reserves have been set aside for the payment thereof in accordance with GAAP. The Lender shall have no obligation to make any advance to the Borrower except in compliance with all applicable laws and regulations and the Borrower shall fully cooperate with the Lender in complying with all such applicable laws and regulations.

8.19.   ERISA Plans.

Promptly during each year, to pay and cause any subsidiaries to pay contributions adequate to meet at least the minimum funding standards under ERISA with respect to each and every Plan; file each annual report required to be filed pursuant to ERISA in connection with each Plan for each year; and notify the Lender within ten (10) days of the occurrence of any Reportable Event that might constitute grounds for termination of any capital Plan by the Pension Benefit Guaranty Corporation or for the appointment by the appropriate United States District Court of a trustee to administer any Plan. 'ERISA' means the Employee Retirement Income Security Act of 1974, as amended from time to time. Capitalized terms in this paragraph shall have the meanings defined within ERISA.

8.20.   Books and Records.

To maintain adequate books and records, with complete entries made to permit the preparation of financial statements in accordance with GAAP.

8.21.   Audits; Collateral Monitoring.

To allow the Lender and her agents to inspect the Borrower's properties and examine, audit, and make copies of books and records at any reasonable time. If any of the Borrower's properties, books or records is in the possession of a third party, the Borrower authorizes that third party to permit the Lender or her agents to have access to perform inspections or audits and to respond to the Lender's requests for information concerning such properties, books and records. The Borrower will make its officers and employees available to meet with and discuss the Borrower's books and records upon request no less frequently than monthly. The Borrower shall fully cooperate with all reasonable requests for information or notices from any of the Lender's consultants and representatives at all times. The Borrower shall reimburse the Lender for all reasonable and invoiced collateral monitoring fees, audit fees, consulting fees and attorney's fees.

-14-

8.22.  Creation of Subsidiaries.

Not to establish, create or acquire any additional subsidiaries without the prior written consent of the Lender.

8.23.  Further Assurances.

Take such action and execute, acknowledge and deliver, at its sole cost and expense, such agreements, instruments or other documents as the Lender may reasonably require from time to time in order (i) to carry out more effectively the purposes of this Agreement and the other Loan Documents (as such term is defined in Section 9.3 below). (ii) to subject to valid and perfected first priority Liens any of the Collateral or any other property of the Borrower or any Guarantor, (iii) to establish and maintain the validity and effectiveness of any of the Loan Documents and the validity, perfection and priority of the Liens intended to be created thereby, and (iv) to better assure, convey, grant, assign, transfer and confirm unto the Lender the rights now or hereafter intended to be granted to it under this Agreement or any other Loan Document. In furtherance of the foregoing, to the maximum extent permitted by applicable law, the Borrower and each Guarantor (i) authorizes the Lender to execute any such agreements, instruments or other documents in such party's name and to file such agreements, instruments or other documents in any appropriate filing office, (ii) authorizes the Lender to file any financing statement required hereunder or under any other Loan Document, and any continuation statement or amendment with respect thereto, in any appropriate filing office without the signature of the Borrower or such Guarantor, and (iii) ratifies the filing of any financing statement, and any continuation statement or amendment with respect thereto, filed without the signature of the Borrower and such Guarantor prior to the date hereof. To take any action reasonably requested by the Lender to carry out the intent of this Agreement.

8.24.  Performance of Material Agreements.

Not agree to (i) any amendment or other change to or waiver of any of its rights under any indebtedness that is subordinated to the Loans or (ii) any material adverse amendment or other material adverse change to or material adverse waiver of any of its rights under any other material contracts.

8.25.  Transactions with Affiliates.

Not enter into, renew, extend or be a party to, or permit any subsidiary to enter into, renew, extend or be a party to, any transaction or series of related transactions (including, without limitation, the purchase, sale, lease, transfer or exchange of property or assets of any kind or the rendering of services of any kind) with any affiliate, except (i) transactions in the ordinary course of business in a manner and to an extent consistent with past practice and necessary or desirable for the prudent operation of its business, for fair consideration and on terms no less favorable to it or its Subsidiaries than would be obtainable in a comparable arm's length transaction with a Person that is not an affiliate thereof, and (ii) transactions with Albert.

-15-

8.26.  Subordination.

Cause all indebtedness and other obligations now or hereafter owed by it to any of its owners or shareholders to be subordinated in right of payment and security to the indebtedness and other obligations owing to the Lender hereunder in accordance with a subordination agreement in form and substance satisfactory to the Lender.

9.  DEFAULT AND REMEDIES.

9.1.  Failure to Pay.

The Borrower fails to make a payment when due under this Agreement or in the Loan Documents.

9.2.  Other Loan Documents.

The Borrower or any Obligor (as defined below) shall take any action, or claim that any of the Loan Documents or this Agreement are not the legal, valid, binding agreements enforceable against any party executing same, or attempt in any way to terminate or declare ineffective or inoperative, or shall in any way whatsoever cease to give or provide the respective liens, security interests, rights, titles, interests, remedies, powers or privileges intended to be created thereby or any default occurs under any Loan Document that the Borrower (or any Obligor) or any of Kathleen, Ryness, the Trust or a subsidiary or affiliate of any of the foregoing (collectively, the "Ryness Affiliates") has with the Lender or any affiliate of the Lender; provided, however, that to the extent the applicable agreement contains a cure period with respect to such default, then an event of default shall not be deemed to have occurred hereunder if such default is timely cured during the applicable cure period. For purposes of this Agreement, "Obligor" shall mean any guarantor or any party pledging collateral to the Lender and "Loan Document" shall mean each of this Agreement, the Tranche A Note, the Tranche B Note, the Pledge Agreement, any guaranty of any Obligor, any collateral agreement delivered by any Obligor, including any security agreements, mortgages, deeds of trust and similar documents.

9.3.  Cross-default.

Any default occurs under any agreement in connection with any credit in excess of $25,000 that the Borrower (or any Obligor) or any Ryness Affiliate has obtained from anyone else or which the Borrower (or any Obligor) or any Ryness Affiliate has guaranteed.

9.4.  False Information.

Any representation or warranty made under this Agreement, or other Loan Document, or any certificate or statement furnished or made in writing to the Lender pursuant thereto, or any financial information furnished to the Lender pursuant to this Agreement shall prove to be untrue in any material respect as of the date on which such representation or warranty is made or as of the date such financial information was furnished to the Lender.

-16-

9.5. <u>Bankruptcy</u>.

(a)     Any Obligor shall do any of the following acts, or violate any other term or provision of this Agreement: (i) apply for or consent to the appointment of a receiver, trustee, custodian, intervener or liquidator of all or a substantial part of its assets; (ii) file a voluntary petition in Bankruptcy court or admit in writing that it is unable to pay its debts as they become due; (iii) make a general assignment for the benefit of creditors; (iv) file a petition or answer seeking reorganization or take advantage of any bankruptcy or insolvency laws; (v) file an answer admitting any of the material allegations of, or consent to, or default in answering a petition filed against it in any bankruptcy, reorganization or insolvency proceeding; or (vi) take any action for the purpose of effecting any of the foregoing; or

(b)     Any of the following acts or events occur: (i) an order for relief, judgment or decree shall be entered by any court of competent jurisdiction or other competent authority approving a petition seeking reorganization of any Obligor, (ii) an order shall be entered by any court of competent jurisdiction or other competent authority appointing a receiver, custodian, trustee, intervener or liquidator for any Obligor as to all or substantially all of its assets, and such order, judgment or decree shall continue unstayed and in effect for a period of thirty (30) days, or (iii) an involuntary petition seeking bankruptcy, reorganization or receivership shall be filed against any Obligor which is not dismissed within thirty (30) days of the filing thereof; or

(c)     Any of an Obligor's property shall be transferred or sold, or shall be pledged, mortgaged or otherwise encumbered, either voluntarily or involuntarily, without the prior written consent of the Lender; or

(d)     Any creditor or judgment creditor of any Obligor shall execute on or otherwise obtain any rights against or interest in any of said Obligor's property in connection with any legal proceeding against said Obligor in an amount in excess of $25,000.

9.6.     <u>Receivers</u>.

A receiver or similar official is appointed for a substantial portion of the Borrower's or any Obligor's business, or the business is terminated, or, if any Obligor is anything other than a natural person, such Obligor is liquidated or dissolved.

9.7.     <u>Lien Priority</u>.

The Lender fails to have an enforceable first lien (except for any prior liens to which the Lender has consented in writing) on or security interest in any property given as security for this Agreement (or any guaranty).

9.8.     <u>Lawsuits</u>.

Any lawsuit or lawsuits are filed on behalf of one or more trade creditors against the Borrower or any Obligor in an aggregate amount of One Hundred Thousand Dollars ($100,000) or more in excess of any insurance coverage.

9.9.   Judgments.

Any judgments or arbitration awards are entered against the Borrower or any Obligor, or the Borrower or any Obligor enters into any settlement agreements with respect to any litigation or arbitration, in an aggregate amount of Twenty-Five Thousand Dollars ($25,000) or more in excess of (i) the amount corresponding to the underlying obligation in the financial statements of the Borrower previously delivered to the Lender corresponding to the underlying claim that gave rise to such judgment, arbitration award or settlement, or if no amount was reflected in the financial statements corresponding to the underlying claim that gave rise to such judgment, arbitration award or settlement, the amount in the financial statements shall be deemed to be zero ($0), plus (ii) the amount of any insurance coverage payable to the Borrower with respect to such underlying claims.

9.10.   Government Action.

Any government authority takes action that the Lender believes materially adversely affects the Borrower's or any Obligor's financial condition or ability to repay or Borrower shall make any improper or illegal expenditures, or any expenditures that violate this Agreement.

9.11.   Default under Related Documents.

Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this Agreement or any such document is no longer in effect, or any Guarantor purports to revoke or disavow its Guaranty.

9.12.   ERISA Plans.

Any one or more of the following events occurs with respect to a Plan of the Borrower subject to Title IV of ERISA, provided such event or events could reasonably be expected, in the judgment of the Lender, to subject the Borrower to any tax, penalty or liability (or any combination of the foregoing) which, in the aggregate, could have a material adverse effect on the financial condition of the Borrower:

(a)   A reportable event shall occur under Section 4043(c) of ERISA with respect to a Plan.

(b)   Any Plan termination (or commencement of proceedings to terminate a Plan) or the full or partial withdrawal from a Plan by the Borrower.

9.13.   Other Breach Under Agreement.

A default occurs under (i) Section 8.2 and such default is not cured within fifteen (15) days following the occurrence of such default, (ii) Section 8.16 or 8.21 hereof and such default is not cured within five (5) Banking Days following the occurrence of such default, or (iii) any other term or condition of this Agreement not specifically referred to in this Article.

9.14.   [Intentionally deleted].

-18-

Case: 09-41860   Doc# 174   Filed: 10/02/09   Entered: 10/02/09 20:10:39   Page 20 of 68

9.15.  __Remedies.__

(a)  If any of the preceding events of default occurs, the Lender may do one or more of the following: (i) declare the Borrower in default and (ii) require the Borrower to re-pay its entire debt immediately and without prior notice. If an event of default occurs under the paragraph entitled "Bankruptcy," above, with respect to any Borrower, then the entire debt out-standing under this Agreement automatically will be due immediately without further action by the Lender. In addition, if any event of default occurs, the Lender shall have all rights, powers and remedies available under any instruments and agreements required by or executed in con-nection with this Agreement, as well as all rights and remedies available at law or in equity, in-cluding but not limited to the following:

(b)  The Lender may proceed to enforce the Loan Documents, this Agree-ment and exercise any or all of the rights and remedies afforded to Lender by the New York Commercial Code, the New York General Obligations Law, the New York General Business Law, the New York Civil Practice Law and Rules or otherwise possessed by Lender;

(c)  The Lender may, to the fullest extent permitted by law: (1) sell her Colla-teral or any interest therein at public or private sale for cash or upon credit and for immediate or future delivery and for such price and on such terms as the Lender shall deem appropriate, and negotiate, endorse, assign, transfer and deliver to the purchaser or purchasers thereof (which may be the Lender) the Collateral so sold, and each purchaser at any sale shall hold the property sold absolutely free from any claim or right on the part of Obligors (as defined in Section 9.2) (and Obligors each hereby waive, to the extent permitted by law, all rights of redemption, stay and/or appraisal which they now have or may at any time in the future have), and/or (2) obtain specific performance by any Borrower of any covenant or undertaking of such Borrower herein or in the Loan Documents; and/or (3) without notice to any of the Obligors, proceed by suit or suits at law or in equity to foreclose its security interest and sell its Collateral or any portion thereof pursuant to judgment or decree of a court or courts having competent jurisdiction;

(d)  Without regard to the adequacy of the Lender's Collateral, or to the sol-vency of the Borrower, the Lender may institute legal proceedings for the appointment of a re-ceiver or receivers with respect to any or all of its Collateral pending foreclosure hereunder or for the sale of any or all of its Collateral under the order of competent jurisdiction or under oth-er legal process.

(e)  Either personally, or by means of a court-appointed receiver, the Lender may enter onto the premises where its Collateral is located and take possession of all or any of its Collateral and exclude therefrom the Borrower and all others claiming under the Borrower, and perform any acts necessary or appropriate to care for, maintain, preserve and protect its Collateral. In the event the Lender demands or attempts to take possession of her Collateral in the exercise of any rights hereunder, the Borrower promises and agrees to turn over promptly and to deliver complete possession thereof to the Lender.

(f)  Without notice to or demand upon Obligors, the Lender may make such payments and do such acts as the Lender may deem necessary to protect her security interest in the Collateral including, without limitation, paying, purchasing, contesting or compromising

-19-

any encumbrance, charge or lien which is prior to or superior to the security interests granted in the Loan Documents and, in exercising any such powers or authority, to pay all expenses incurred in connection therewith; and/or

(g) Enforce all of the rights granted to the Lender in the Guarantees.

All rights and remedies granted to the Lender are cumulative and the Lender shall have the right to exercise any one or more of such rights and remedies alternatively, successively or concurrently as the Lender may, in her sole and absolute discretion, deem advisable.

In the event of a Default under Section 9.1, the Borrowers may cure such default within three Banking Days after written notice from the Lender (the "Cure Period") provided that (i) such notice and cure right shall not apply to the payments due on the final maturity date of the Tranche A Note or the Tranche B Note and (ii) such notice and cure right shall be available only twice while any Loans are outstanding hereunder. During the Cure Period, the Lender shall not exercise her remedies to collect the indebtedness except as the Lender reasonably deems necessary to protect her interest in the Collateral securing the indebtedness.

10. ENFORCING THIS AGREEMENT; MISCELLANEOUS.

10.1. <u>GAAP.</u>

Except as otherwise stated in this Agreement, all financial information provided to the Lender and all financial covenants will be made under generally accepted accounting principles, consistently applied.

10.2. <u>New York Law.</u>

This Agreement is governed by New York law.

10.3. <u>Successors and Assigns.</u>

This Agreement is binding on the Borrower's and the Lender's successors and assignees. The Borrower agrees that it may not assign this Agreement without the Lender's prior consent. The Lender may sell participations in or assign the Loans, and may exchange information about the Borrower (including, without limitation, any information regarding any hazardous substances) with actual or potential participants or assignees.

10.4. <u>Arbitration.</u>

If any dispute arises between the parties, including any dispute arising out of or relating to this Agreement or the transactions and agreements contemplated hereunder or related hereto, such dispute shall be submitted to arbitration which shall be conducted in the City of New York in accordance with the Complex Commercial Arbitration Rules of the American Arbitration Association ("AAA") pursuant to the following procedures:

(a) Any party may request arbitration of the dispute by giving the other parties written notice that specifies the matter sought to be arbitrated and filing the petition with

the AAA. The dispute shall be submitted before three arbitrators; the Lender and the Borrower shall each choose one arbitrator and the original two party arbitrators shall choose a third arbitrator who shall in all cases be a disinterested former judge of a United States Federal Court or a former judge of a New York State Court, and who shall act as chairperson of the arbitration panel. No arbitrator shall be related to any party or have been employed or engaged in any capacity by any party.

(b)     If the two original party arbitrators shall in any case fail to chose a third arbitrator within thirty (30) days after they are chosen, then upon application of any party to the dispute, such third arbitrator shall be chosen from the AAA lists of former judges of United States Courts, or New York State Courts pursuant to the procedure set forth in Rule 13 of the Commercial Arbitration Rules. In the event that any party should fail to choose an arbitrator within thirty (30) days following notice of arbitration specifying the matter to be arbitrated, then the party giving such notice of arbitration may choose two arbitrators, who shall in turn chose the third arbitrator.

(c)     Promptly after the arbitrators' designation, but in no event later than thirty (30) days thereafter, at a date to be set by the arbitrators, an arbitration hearing shall be held in New York, New York. The arbitrators shall allow each party to present, in the presence of the other party, its case, including opening statement, evidence, witnesses, if any, and summation.

(d)     The arbitrators shall not be bound by the rules of evidence or civil procedure, but rather may consider such writings and oral presentations as a reasonable businessperson would consider in the conduct of his or her day-to-day affairs, and may require the parties to submit some or all of the presentation orally or in written form as the arbitrators may deem appropriate.

(e)     The parties (or respective groups thereof) shall share equally the costs of arbitration and the arbitrators' fees and shall bear their own attorneys' fees, except that the arbitrators shall have the discretion to award the costs of arbitration, arbitrator's fees and attorneys' fees of the parties as the arbitrators see fit.

(f)     The arbitrators shall make their award in accordance with the applicable law and based on the evidence presented, and at the request of any party shall include in the award findings of fact and conclusions of law of the kind which would be required under Rule 52 of the Federal Rules of Civil Procedure. The award may contain equitable relief, such as specific performance or orders to take, or refrain from taking, certain affirmative actions. The arbitrators shall retain jurisdiction after the award for the purpose of dividing costs and attorneys' fees if the award is not paid, or orders contained therein complied with, within 30 days after entry.

(g)     The arbitrators shall use their best efforts to make a decision within thirty (30) days of the date the hearing closes or submissions are permitted. The parties shall use their best efforts to expedite the arbitration proceedings.

(h)     The arbitrators shall act by majority vote, with all arbitrators present and voting.

(i)     Nothing herein shall limit the right of any party (with such rights hereby confirmed) to: (i) exercise self-help remedies, such as but not limited to, setoff; (ii) initiate judicial or non judicial foreclosure against any real or personal property collateral; (iii) exercise any judicial power of sale rights, or (iv) act in a court of law to obtain an interim remedy, such as but not limited to, injunctive relief, writ of possession or appointment of a receiver, or additional or supplementary remedies.

(j)     The arbitrators' award shall be enforceable in the Southern District of New York or in New York State Supreme Court, or in any other court of competent jurisdiction.

(k)     The dispute, the fact that an arbitration has been commenced, and the proceedings in and the results of such arbitration shall be kept confidential by the parties, except to the extent required by law or reasonably necessary to enforce the terms thereof.

### 10.5.   Severability, Waivers.

If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Lender retains all rights. If the Lender waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

### 10.6.   Attorneys' Fees.

The Borrower shall reimburse the Lender for any reasonable costs and attorneys' fees incurred by the Lender in connection with the enforcement or preservation of any rights or remedies under this Agreement and any other documents executed in connection with this Agreement, and in connection with any amendment, waiver, 'workout' or restructuring under this Agreement. In the event of a lawsuit or arbitration proceeding, the prevailing party is entitled to recover costs and reasonable attorneys' fees incurred in connection with the lawsuit or arbitration proceeding, as determined by the court or arbitrator. In the event that any case is commenced by or against the Borrower under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute, the Lender is entitled to recover costs and reasonable attorneys' fees incurred by the Lender related to the preservation, protection, or enforcement of any rights of the Lender in such a case.

### 10.7.   One Agreement.

This Agreement and any related security or other agreements required by this Agreement, collectively:

(a)     represent the sum of the understandings and agreements between the Lender and the Borrower concerning this credit;

(b)     replace any prior oral or written agreements between the Lender and the Borrower concerning this credit; and

(c)     are intended by the Lender and the Borrower as the final, complete and exclusive statement of the terms agreed to by them.

-22-

Case: 09-41760   Doc# 174   Filed: 10/02/09   Entered: 10/02/09 20:10:39   Page 24 of 68

In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail. Any reference in any related document to a "promissory note" or a "note" executed by the Borrower and dated as of the date of this Agreement shall be deemed to refer to this Agreement, as now in effect or as hereafter amended, renewed, or restated.

10.8.  Indemnification.

The Borrower will indemnify and hold the Lender harmless from any loss, liability, damages, judgments, and costs of any kind relating to or arising directly or indirectly out of (a) this Agreement or any document required hereunder, (b) any credit extended or committed by the Lender to the Borrower hereunder, and (c) any litigation or proceeding related to or arising out of this Agreement, any such document, or any such credit. This indemnity includes but is not limited to attorneys' fees (including the allocated cost of in-house counsel). This indemnity extends to the Lender, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys, and assigns.  This indemnity will survive repayment of the Borrower's obligations to the Lender.  All sums due to the Lender hereunder shall be obligations of the Borrower, due and payable immediately without demand.

10.9.  Notices.

Unless otherwise provided in this Agreement or in another agreement between the Lender and the Borrower, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as the Lender and the Borrower may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or, (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

10.10.  Headings.

Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

10.11.  Counterparts.

This Agreement may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement.

10.12.  Effect of Amendment and Restatement.

On such date that the conditions in Section 6.1 are satisfied, the Existing Loan Agreement shall be amended, restated, and replaced in its entirety in the form hereof. The parties hereto acknowledge and agree that (i) this Agreement does not constitute a novation, payment

-23-

CG&R DRAFT 19/2/09 7:45 PM
Case: 09-41760    Doc# 174    Filed: 10/02/09    Entered: 10/02/09 20:10:39    Page 25 of 68

and reborrowing, or termination of the obligations under the Existing Loan Agreement as in effect immediately prior to the Effective Date, which obligations remain outstanding (as amended and restated hereby), and (ii) such obligations are in all respects continuing (as amended and restated hereby).

[SIGNATURE PAGE FOLLOWS]

This Agreement is executed as of the date stated at the top of the first page.

**ADRIENNE ALBERT**

_____

Telephone:
Facsimile:

**BORROWER**

**THE RYNESS COMPANY,** a California
 corporation

By: _____
       Name:
       Title:


By: _____
       Name:
       Title:

Address for notices to Borrower:

801 San Ramon Valley Boulevard
Danville, CA 94526
Attention: G. A. Ryness, III
Telephone:  (925) 820-3432
Facsimile:   (925) 820-8595

S-2

# SECOND AMENDMENT TO
# AMENDED AND RESTATED PLEDGE AGREEMENT

This Second Amendment to Amended and Restated Pledge Agreement ("**Agreement**") is entered into as of [     ], 2009 (the "**Effective Date**"), by and among The Ryness Company, a California corporation (the "**Pledgor**") and Adrienne Albert, an individual (together with her successors and assigns, "**Lender**").

## Recitals

A.     The Lender and the Borrower are parties to an Amended and Restated Loan Agreement (as amended, supplemented and modified, the "**Existing Loan Agreement**") dated as of June 28, 2007 ("**Original Effective Date**");

B.     On July 7, 2008, George A. Ryness, III ("**Ryness**"), individually, and as trustee of The George A. Ryness, III and Kathleen A. Ryness Trust Dated April 9, 1987, and Kathleen A. Ryness ("**Kathleen**"), individually, and as trustee of The George A. Ryness, III and Kathleen A. Ryness Trust Dated April 9, 1987, entered into a Securities Purchase and Sale Agreement dated July 7, 2008 with Adrienne Albert Associates, LLC, a Delaware limited liability company owned directly or indirectly by the Lender, and The Marketing Directors SE, LLC, a Delaware limited liability company owned directly or indirectly by the Lender ("**2008 Purchase Agreement**");

C.     As provided in the 2008 Purchase Agreement, the Borrower sold to the Lender or her affiliates all of the capital stock and limited liability company membership interests held by the Borrower in certain subsidiaries of the Borrower (the "**TMD Transaction and Stock Purchase**");

D.     In connection with the TMD Transaction and Stock Purchase, the Lender and Borrowers, entered into a First Amendment to Amended and Restated Loan Agreement dated as of July 7, 2008 ("**Amendment No. 1**");

E.     The Lender, the Borrower and certain of its then operating subsidiaries, subsequently entered into a Second Amendment to Amended and Restated Loan Agreement dated as of July 7, 2008 ("**Amendment No. 2**," and, together with Amendment No. 1, the "**Amendments**");

F.     The obligations of the Pledgors under the Loan Agreement and the Notes are secured by an Amended and Restated Pledge Agreement dated as of June 28, 2007 for the benefit of Lender (the "**Pledge Agreement**").  The capitalized terms used herein shall have the same meaning as set forth in the Pledge Agreement unless otherwise defined herein.

G.     In connection with the Amendments, the Lender, the Borrower and certain of its then operating subsidiaries, subsequently entered into a First Amendment to the Amended and Restated Pledge Agreement dated as of July 7, 2008 for the benefit of the Lender.

H.     Additionally, George A. Ryness III, individually, and as trustee of The George A. Ryness III and Kathleen A. Ryness Trust Dated April 9, 1987, and Kathleen A. Ryness, individually, and as trustee of The George A. Ryness III and Kathleen A. Ryness Trust Dated

Case: 09-41466     Doc# 174     Filed: 10/02/09     Entered: 10/02/09 20:10:39     Page 29 of 68

April 9, 1987 executed an Amended and Restated Payment Guaranty dated June 28, 2007 (as amended on July 7, 2008 and as further amended concurrently herewith, the "**Restated Guaranty**") for the benefit of Lender.

        I.      On February 26, 2009, the Borrower and two of its subsidiaries, The Ryness Company California, Inc., a California corporation, and TRC Services Corporation, Inc., a California corporation (collectively, the "**Debtors**"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "**Bankruptcy Cases**") before the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "**Bankruptcy Court**").

        J.      The Lender, the Debtors and Jean C. Mills ("**Mills**") entered into an Agreement for Post-Petition Financing, the Granting of Security Interests, Superpriority Administrative Expense Treatment, Use of Cash Collateral, Modifying the Automatic Stay, the Granting of Replacement Liens and Related Matters as of March 4, 2009 (the "**DIP Loan Agreement**");

        K.      On March 16, 2009, the Bankruptcy Court entered an order approving, as modified, the DIP Loan Agreement on an interim basis, effective as of March 4, 2009 (the "**First Interim DIP Order**");

        L.      On April 3, 2009, the Bankruptcy Court entered a second order approving, as modified, the DIP Loan Agreement on an interim basis (the "**Second Interim DIP Order**");

        M.      On April 9, 2009, the Bankruptcy Court entered a final order approving, as modified, the DIP Loan Agreement and granting related relief (the "**Final DIP Order**" and collectively with the First Interim DIP Order and the Second Interim DIP Order, the "**DIP Orders**");

        N.      On August 27, 2009, the Debtors filed their Joint Plan of Reorganization (Dated August 25. 2009) (the "**Plan**") for their bankruptcy cases;

        O.      On [ ], 2009, the Bankruptcy Court entered an order confirming the Plan (the "**Confirmation Order**");

        P.      The Pledgor and Lender are entering into a Second Amendment to the Amended and Restated Loan Agreement (the "**Loan Agreement Amendment**"), and George A. Ryness III, individually, and as trustee of The George A. Ryness III and Kathleen A. Ryness Trust Dated April 9, 1987, Kathleen A. Ryness, individually, and as trustee of The George A. Ryness III and Kathleen A. Ryness Trust Dated April 9, 1987, and Lender are entering into a Reaffirmation of and First Amendment to the Amended and Restated Payment Guaranty of even date herewith.

        Q.      In connection with the Loan Agreement Amendment and the Plan, the Lender and Mills are entering into an Intercreditor Agreement of even date herewith.

        In light of the foregoing, Pledgor and Lender now desire to further amend the Pledge Agreement to add Mills as a secured party, on the terms and conditions of this Agreement.

Case: 09-41466   Doc# 174   Filed: 10/02/09   Entered: 10/02/09 20:10:39   Page 30 of 68

**<u>Agreement</u>**

NOW, THEREFORE, in consideration of the mutual agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereby covenant and agree as follows:

1.    <u>Amendment to Pledge Agreement</u>.

(a)    The terms "Pledgors" and "Pledgor" in Section 1 of the Pledge Agreement refer only to The Ryness Company, a California corporation and no other parties.

(b)    Article 1 of the Pledge Agreement is hereby amended to change the defined term "Lender" in Section 1.1 to "Albert Lender" and adding the following Sections 1.2 and 1.3 at the end of Article 1:

"1.2    As security for Exit Financing Obligations (as such term is defined in the Intercreditor Agreement), the Pledgor hereby irrevocably and unconditionally grants (and confirms the prior grant of) a security interest in, a lien upon and the right of set-off against, and assigns and transfers (and confirms the prior assignment and transfer) to Mills and her successors and assigns (collectively with the Albert Lender referred to as "<u>Lender</u>") all Collateral.

1.3    The relative rights and priorities of the Albert Lender and Mills in respect of the Collateral shall be governed and controlled by the terms of the Intercreditor Agreement. In furtherance thereof and without limitation of the foregoing, the rights and remedies of "Lender" in Sections 4.10, 5, 6.2.2 through 6.2.17, inclusive, 14.2 and 14.3 of this Agreement, and the deliveries pursuant to Section 9 of this Agreement, shall be deemed to be and refer solely to "Albert Lender"."

(c)    Section 2.1 is hereby deleted in its entirety and replaced with the following:

"The security interest granted to Albert shall secure all Indebtedness of Pledgors to the Albert Lender and the security interest granted to Mills shall secure all Indebtedness of Pledgors to Mills under the Exit Financing Obligations."

(d)    Section 2.2 is hereby deleted in its entirety and replacing it with the following:

"2.2    "<u>Indebtedness</u>" means:

2.2.1    all debts, obligations or liabilities to the Albert Lender arising under that certain Second Amended and Restated Loan Agreement date of even date herewith, among the Pledgor and the Albert Lender (the "<u>Loan Agreement</u>") and all other instruments, documents and agreement of every kind and nature now or hereafter executed in connection with the Loan Agreement, including all renewals, increases, extensions, restatements and replacements thereof and amendments and modifications of any of the foregoing, including without limitation the Loan Agreement (together with this Agreement, collectively, the "<u>Loan Documents</u>");

2.2.2.  all debts, obligations or liabilities to Mills arising under the Exit Financing Obligations and all other instruments, documents and agreement of every kind and nature now or hereafter executed in connection with the Exit Financing Obligations, including all renewals, increases, extensions, restatements and replacements thereof and amendments and modifications of any of the foregoing;

2.2.3.  all obligations and liabilities of the Pledgor to the Albert Lender hereunder; and

2.2.4  all costs, attorneys' fees and expenses incurred by the Albert Lender and Mills in connection with the collection or enforcement of any of the above or in collection Commissions (as defined below), with or without suit."

2.    <u>Miscellaneous</u>.

(a)     This Amendment constitutes the legal, valid and binding obligation of the Pledgor.

(b)     This Amendment shall be governed by, and construed in accordance with, the laws of the State of New York.

(c)     This Amendment, together with the Pledge Agreement (as amended to the date hereof), contains the final and complete agreement of the parties with respect to the subject matter hereof and thereof.  This Amendment supersedes all prior drafts and discussions regarding the matters contained herein.

(d)     This Amendment may be executed and delivered in any number of counterparts, all of which taken together shall constitute but one and the same document.

(Signatures appear on next page.)

IN WITNESS WHEREOF, the parties have caused this Second Amendment to Amended and Restated Pledge Agreement to be duly executed as of the day and year first above written.

PLEDGOR:                           THE RYNESS COMPANY,
                                   a California corporation

                                   By: _____
                                   Name: _____
                                   Title: _____


                                   By: _____
                                   Name: _____
                                   Title: _____


                                   Organizational Identification Number:  C2502394
                                   EIN 14-1878323


[Signatures continue on next page.]

Case: 09-41466    Doc# 174    Filed: 10/02/09    Entered: 10/02/09 20:10:39    Page 33 of 68

**ADRIENNE ALBERT**

_____
Telephone:
Facsimile:

**JEAN C. MILLS**

_____

Telephone:
Facsimile:

## **EXHIBIT E**

**Exit Financing Agreements**
**(To be filed by Exhibit Filing Date)**

# LOAN AGREEMENT

This LOAN AGREEMENT (this "Agreement") dated as of [ ], 2009, is between JEAN C. MILLS ("Mills" or "Lender") and THE RYNESS COMPANY, INC., a California corporation (the "Borrower").

## RECITALS

WHEREAS, on February 26, 2009, the Borrower and two of its subsidiaries, The Ryness Company California, Inc., a California corporation, and TRC Services Corporation, Inc., a California corporation (collectively, the "Debtors"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (the "Bankruptcy Cases") before the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court");

WHEREAS, the Lender, the Debtors and Adrienne Albert ("Albert") entered into an Agreement for Post-Petition Financing, the Granting of Security Interests, Superpriority Administrative Expense Treatment, Use of Cash Collateral, Modifying the Automatic Stay, the Granting of Replacement Liens and Related Matters dated as of February 26, 2009 (the "DIP Loan Agreement");

WHEREAS, the Lender and Debtors entered into a Security Agreement, dated as of February 26, 2009 (the "DIP Loan Security Agreement"), whereby the Debtors granted to Lender a security interest in substantially all of the Debtors' assets to secure their obligations under the DIP Loan Agreement;

WHEREAS, on March 16, 2009, the Bankruptcy Court entered an order approving, as modified, the DIP Loan Agreement and DIP Loan Security Agreement (collectively, the "DIP Loan Documents"), effective as of March 4, 2009, on an interim basis (the "First Interim DIP Order");

WHEREAS, on April 3, 2009, the Bankruptcy Court entered a second order approving, as modified, the DIP Loan Documents on an interim basis (the "Second Interim DIP Order");

WHEREAS, on April 9, 2009, the Bankruptcy Court entered a final order approving, as modified, the DIP Loan Agreement and granting related relief (the "Final DIP Order" and collectively with the First Interim DIP Order and the Second Interim DIP Order, the "DIP Orders");

WHEREAS, on August 27, 2009, the Debtors filed their Joint Plan of Reorganization (Dated August 25, 2009) (the "Plan") for their bankruptcy cases;

WHEREAS, on [ ], 2009, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order");

Case: 09-41466    Doc# 174    Filed: 10/02/09    Entered: 10/02/09 20:10:39    Page 37 of 68

WHEREAS, this Agreement amends, restates, and replaces in its entirety the DIP Loan Agreement on the terms set forth herein;

## AGREEMENT

In consideration of the mutual covenants and agreements herein contained, the parties hereto covenant and agree as follows:

1.    THE LOAN.

1.1.    <u>Indebtedness.</u>  The Borrower is indebted to Lender in the principal amount of $200,000.00 (the "<u>Loan</u>").

1.2.    <u>Repayment Terms</u>.  The Borrower will pay interest on the Loan at the rate 10% per annum on the first Banking Day of each month, beginning on [ ], until payment in full of all principal outstanding under the Loan.

1.3.    <u>Maturity</u>.  The Borrower will pay all outstanding principal plus accrued and unpaid interest on the Loan on or before February 27, 2016.

2.    COLLATERAL.

Borrower's obligations to the Lender under this Agreement shall be secured by, among other things, the DIP Loan Security Agreement and the Second Amendment to Amended and Restated Pledge Agreement (substantially in the form of Exhibit __ to the Plan Supplement) (collectively, the "<u>Security Documents</u>").  This Agreement, the DIP Loan Security Agreement and the Second Amendment to Amended and Restated Pledge Agreement, and all other documents and instruments executed by Borrower in connection with the Loan are referred to herein collectively as the "<u>Loan Documents</u>" and individually as a "<u>Loan Document</u>."

3.    DISBURSEMENTS, PAYMENTS AND COSTS.

3.1.    <u>Disbursements and Payments</u>.  Each payment by the Borrower will be made in U.S. Dollars and immediately available funds by wire transfer to an account designated by the Lender to the Borrower.

3.2.    <u>Banking Days</u>.  Unless otherwise provided in this Agreement, a banking day is a day other than a Saturday, Sunday or other day on which commercial banks are authorized to close, or are in fact closed, in New York. All payments, disbursements, and adjustments to interest rates which would be scheduled to occur on a day which is not a banking day will instead be scheduled to occur on the next banking day. All payments received on a day which is not a banking day will be applied to the credit on the next banking day.

3.3.    <u>Interest Calculation</u>.  Except as otherwise stated in this Agreement, all interest and fees, if any, will be computed on the basis of a 365-day year. Installments of principal which are not paid when due under this Agreement shall continue to bear interest until paid.

2

4.     CONDITIONS.

4.1.    Effective Date.   This Agreement shall become effective (the "Effective Date") on the date on which:

(a)    Executed Counterparts.   The Lender shall have received from the Borrower either (i) a counterpart of this Agreement signed on behalf of such party or (ii) written evidence satisfactory to the Lender (which may include telecopy transmission of a signed signature page to this Agreement) that the Borrower has signed a counterpart of this Agreement.

(b)    Bankruptcy Court Approval.   The Bankruptcy Court shall have entered the Confirmation Order, in form and substance acceptable to the Lender, and it shall have become final and non-appealable.

(c)    Intercreditor Agreement.   The Lender and Albert shall have entered into, and the Borrower shall have acknowledged, an intercreditor agreement in substantially the form of Exhibit __ to the Plan Supplement (the "Intercreditor Agreement").

(d)    Amended Security Documents.   (i) The Lender, Albert and the Borrower shall have entered into the Second Amendment to Amended and Restated Pledge Agreement (substantially in the form of Exhibit __ to the Plan Supplement) and each other security document or pledge agreement delivered in accordance with applicable law to grant a valid, perfected security interest in any property which is defined as Collateral therein, and all UCC or other financing statements or instruments of perfection required by this Agreement, the Amended and Restated Pledge Agreement or any other such security document or pledge agreement to be filed with respect to the security interests in property and fixtures created pursuant to the Amended and Restated Pledge Agreement and any other document or instrument utilized to pledge or grant or purport to pledge or grant a security interest or lien on any property as Collateral.

5.    REPRESENTATIONS AND WARRANTIES.

When the Borrower signs this Agreement, the Borrower, makes the following representations and warranties:

5.1.    Formation.   The Borrower is duly formed and existing under the laws of the state or other jurisdiction where organized.

5.2.    Authorization.   This Agreement, and any instrument or agreement required hereunder, are within the Borrower's powers, have been duly authorized, and do not conflict with any of its organizational papers.

5.3.    Enforceable Agreement.   This Agreement is a legal, valid and binding agreement of the Borrower, enforceable against the Borrower in accordance with its terms, and any instrument or agreement required hereunder, when executed and delivered, will be similarly legal, valid, binding and enforceable.

3

5.4.  <u>Good Standing</u>.  In each state in which the Borrower does business, it is properly licensed, in good standing, and, where required, in compliance with fictitious name statutes.

5.5.  <u>No Conflicts</u>.  This Agreement does not conflict with any law, agreement, or obligation by which the Borrower is bound.

5.6.  <u>Collateral</u>.  All collateral required in this Agreement and the Security Documents is owned by the grantor of the security interest free of any title defects or any liens or interests of others, except those which have been approved by the Lender in writing.

5.7.  <u>Permits, Franchise</u>.  The Borrower possesses all permits, memberships, franchises, contracts and licenses (including real estate broker licenses for each state where such license is required for the business conducted or to be conducted by the Borrower) required and all trademark rights, trade name rights, patent rights, copyrights, and fictitious name rights necessary to enable it to conduct the business in which it is now engaged.

5.8.  <u>No Event of Default</u>.  There is no event which is, or with notice or lapse of time or both would be, a default under this Agreement or under the Security Documents.

5.9.  <u>Location of Borrower</u>.  The place of business of the Borrower (or, if the Borrower has more than one place of business, its chief executive office) is located at the address listed on the signature page of this Agreement.

6.  DEFAULT AND REMEDIES.

6.1.  <u>Failure to Pay</u>.

The Borrower fails to make a payment when due under this Agreement or in the Loan Documents.

6.2.  <u>Other Loan Documents</u>.

The Borrower shall take any action, or claim that any of the Loan Documents or this Agreement are not the legal, valid, binding agreements enforceable against any party executing same, or attempt in any way to terminate or declare ineffective or inoperative, or shall in any way whatsoever cease to give or provide the respective liens, security interests, rights, titles, interests, remedies, powers or privileges intended to be created thereby or any default occurs under any Loan Document that the Borrower has with the Lender; provided, however, that to the extent the applicable agreement contains a cure period with respect to such default, then an event of default shall not be deemed to have occurred hereunder if such default is timely cured during the applicable cure period.

6.3.  <u>Cross-default</u>.

Any default occurs under any agreement in connection with any credit in excess of $100,000 that the Borrower has obtained from anyone else or which the Borrower has guaranteed.

4

6.4. <u>Bankruptcy</u>.

(a)    The Borrower shall do any of the following acts, or violate any other term or provision of this Agreement: (i) apply for or consent to the appointment of a receiver, trustee, custodian, intervener or liquidator of all or a substantial part of its assets; (ii) file a voluntary petition in Bankruptcy court or admit in writing that it is unable to pay its debts as they become due; (iii) make a general assignment for the benefit of creditors; (iv) file a petition or answer seeking reorganization or take advantage of any bankruptcy or insolvency laws; (v) file an answer admitting any of the material allegations of, or consent to, or default in answering a petition filed against it in any bankruptcy, reorganization or insolvency proceeding; or (vi) take any action for the purpose of effecting any of the foregoing; or

(b)    Any of the following acts or events occur: (i) an order for relief, judgment or decree shall be entered by any court of competent jurisdiction or other competent authority approving a petition seeking reorganization of the Borrower, (ii) an order shall be entered by any court of competent jurisdiction or other competent authority appointing a receiver, custodian, trustee, intervener or liquidator for the Borrower as to all or substantially all of its assets, and such order, judgment or decree shall continue unstayed and in effect for a period of thirty (30) days, or (iii) an involuntary petition seeking bankruptcy, reorganization or receivership shall be filed against the Borrower which is not dismissed within thirty (30) days of the filing thereof; or

(c)    Any creditor or judgment creditor of Borrower shall execute on or otherwise obtain any rights against or interest in any of Borrower's property in connection with any legal proceeding against Borrower in an amount in excess of $50,000.

6.5. <u>Receivers</u>.

A receiver or similar official is appointed for a substantial portion of the Borrower's business, or the business is terminated, or, if the Borrower is liquidated or dissolved.

6.6. <u>Lien Priority</u>.

The Lender fails to have an enforceable first lien (except for any prior liens to which the Lender has consented in writing) on or security interest in any property given as security for this Agreement.

6.7. <u>Lawsuits</u>.

Any lawsuit or lawsuits are filed on behalf of one or more trade creditors against the Borrower in an aggregate amount of One Hundred Thousand Dollars ($100,000) or more in excess of any insurance coverage.

6.8. <u>Default under Related Documents</u>.

Any default occurs under any guaranty, subordination agreement, security agreement, deed of trust, mortgage, or other document required by or delivered in connection with this

Case: 09-41466    Doc# 174    Filed: 10/02/09    Entered: 10/02/09 20:10:39    Page 41 of 68

Agreement or any such document is no longer in effect, or any Guarantor purports to revoke or disavow its Guaranty.

      6.9.   <u>Remedies.</u>

If any of the preceding events of default occurs, the Lender may do one or more of the following: (i) declare the Borrower in default and (ii) require the Borrower to repay its entire debt immediately and without prior notice. If an event of default occurs under the paragraph entitled "Bankruptcy," above, with respect to the Borrower, then the entire debt outstanding under this Agreement automatically will be due immediately without further action by the Lender. In addition, if any event of default occurs, the Lender shall have all rights, powers and remedies available under any instruments and agreements required by or executed in connection with this Agreement, as well as all rights and remedies available at law or in equity. All rights and remedies granted to the Lender are cumulative and the Lender shall have the right to exercise any one or more of such rights and remedies alternatively, successively or concurrently as the Lender may, in her sole and absolute discretion, deem advisable.

7.     ENFORCING THIS AGREEMENT; MISCELLANEOUS.

      7.1.   <u>California Law</u>.

This Agreement is governed by California law.

      7.2.   <u>Successors and Assigns</u>.

This Agreement is binding on the Borrower's and the Lender's successors and assignees. The Borrower agrees that it may not assign this Agreement without the Lender's prior consent.

      7.3.   <u>Severability, Waivers</u>.

If any part of this Agreement is not enforceable, the rest of the Agreement may be enforced. The Lender retains all rights. If the Lender waives a default, it may enforce a later default. Any consent or waiver under this Agreement must be in writing.

      7.4.   <u>Attorneys' Fees</u>.

The Borrower shall reimburse the Lender for any reasonable costs and attorneys' fees incurred by the Lender in connection with the enforcement or preservation of any rights or remedies under this Agreement and any other documents executed in connection with this Agreement, and in connection with any amendment, waiver, "workout" or restructuring under this Agreement. In the event of a lawsuit or arbitration proceeding, the prevailing party is entitled to recover costs and reasonable attorneys' fees incurred in connection with the lawsuit or arbitration proceeding, as determined by the court or arbitrator. In the event that any case is commenced by or against the Borrower under the Bankruptcy Code (Title 11, United States Code) or any similar or successor statute, the Lender is entitled to recover costs and reasonable attorneys' fees incurred by the Lender related to the preservation, protection, or enforcement of any rights of the Lender in such a case.

6

7.5.    <u>One Agreement</u>.

This Agreement and any related security or other agreements required by this Agreement, collectively:

(a)    represent the sum of the understandings and agreements between the Lender and the Borrower concerning this credit;

(b)    replace any prior oral or written agreements between the Lender and the Borrower concerning this credit; and

(c)    are intended by the Lender and the Borrower as the final, complete and exclusive statement of the terms agreed to by them.

In the event of any conflict between this Agreement and any other agreements required by this Agreement, this Agreement will prevail.

7.6.    <u>Notices</u>.

Unless otherwise provided in this Agreement or in another agreement between the Lender and the Borrower, all notices required under this Agreement shall be personally delivered or sent by first class mail, postage prepaid, or by overnight courier, to the addresses on the signature page of this Agreement, or sent by facsimile to the fax numbers listed on the signature page, or to such other addresses as the Lender and the Borrower may specify from time to time in writing. Notices and other communications shall be effective (i) if mailed, upon the earlier of receipt or five (5) days after deposit in the U.S. mail, first class, postage prepaid, (ii) if telecopied, when transmitted, or, (iii) if hand-delivered, by courier or otherwise (including telegram, lettergram or mailgram), when delivered.

7.7.    <u>Headings</u>.

Article and paragraph headings are for reference only and shall not affect the interpretation or meaning of any provisions of this Agreement.

7.8.    <u>Counterparts</u>.

This Agreement may be executed in as many counterparts as necessary or convenient, and by the different parties on separate counterparts each of which, when so executed, shall be deemed an original but all such counterparts shall constitute but one and the same agreement.

7.9.    <u>Effect of Amendment and Restatement</u>.

On such date that the conditions in Section 4.1 are satisfied, the DIP Loan Agreement shall be amended, restated, and replaced in its entirety in the form hereof. The parties hereto acknowledge and agree that (i) this Agreement does not constitute a novation, payment and reborrowing, or termination of the obligations under the DIP Loan Agreement as in effect immediately prior to the Effective Date, which obligations remain outstanding (as amended and

7

restated hereby), and (ii) such obligations are in all respects continuing (as amended and restated hereby).

This Agreement is executed as of the date stated at the top of the first page.

**LENDER:**

_____

**JEAN C MILLS**
521 Miguel Place
Fullerton, CA 92835
Telephone: (714) 879-6794
Facsimile: (714) 879-6794

**BORROWER:**

**THE RYNESS COMPANY, INC.,** a California
corporation

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

     801 San Ramon Valley Boulevard
     Danville, CA 94526
     Attention: Gary Ryness
     Telephone:  (925) 820-3432
     Facsimile:   (925) 820-8595

# EXHIBIT F

**Intercreditor Agreement**
**(To be filed by Exhibit Filing Date)**

# INTERCREDITOR AGREEMENT

THIS INTERCREDITOR AGREEMENT dated as of October __, 2009, is entered into by and among THE RYNESS COMPANY, INC., a California corporation (the "Borrower"), each other Grantor (as defined below) from time to time party hereto, Adrienne Albert (the "Pre-petition Lender") and Jean C. Mills, (the "DIP Lender"). Capitalized terms used herein but not otherwise defined herein have the meanings set forth in Section 1 below.

## RECITALS

WHEREAS, on July 7, 2008, the Borrower, George A. Ryness, III, individually, and as trustee of The George A. Ryness, III and Kathleen A. Ryness Trust dated April 9, 1987, and Kathleen A. Ryness, individually, and as trustee of The George A. Ryness, III and Kathleen A. Ryness Trust Dated April 9, 1987, entered into a Securities Purchase and Sale Agreement dated July 7, 2008 with Adrienne Albert Associates, LLC, a Delaware limited liability company owned directly or indirectly by the Pre-petition Lender, and The Marketing Directors SE, LLC, a Delaware limited liability company owned directly or indirectly by the Pre-petition Lender ("2008 Purchase Agreement");

WHEREAS, as provided in the 2008 Purchase Agreement, the Borrower sold to the Pre-petition Lender or her affiliates all of the capital stock and limited liability company membership interests held by the Borrower in certain subsidiaries of the Borrower (the "TMD Transaction and Stock Purchase");

WHEREAS, in connection with the TMD Transaction and Stock Purchase, the Pre-petition Lender, the Borrower and subsidiaries of the Borrower entered into a First Amendment to Amended and Restated Loan Agreement dated as of July 7, 2008 ("Amendment No. 1");

WHEREAS, the Pre-petition Lender, the Borrower and subsidiaries of the Borrower subsequently entered into a Second Amendment to Amended and Restated Loan Agreement dated as of July 7, 2008 ("Amendment No. 2," and, together with Amendment No. 1, the "Amendments");

WHEREAS, on February 26, 2009, the Borrower, The Ryness Company California, Inc., a California corporation, and TRC Services Corporation, Inc., a California corporation (collectively, the "Debtors") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code before the United States Bankruptcy Court for the Northern District of California, Oakland Division (the "Bankruptcy Court");

WHEREAS, the Lender, the Debtors and the DIP Lender entered into an Agreement for Post-Petition Financing, the Granting of Security Interests, Superpriority Administrative Expense Treatment, Use of Cash Collateral, Modifying the Automatic Stay, the Granting of Replacement Liens and Related Matters as of March 16, 2009 (the "DIP Loan Agreement");

WHEREAS, on March 16, 2009, the Bankruptcy Court entered an order approving, as modified, the DIP Loan Agreement on an interim basis (the "First Interim DIP Order");

WHEREAS, on April 3, 2009, the Bankruptcy Court entered a second order approving, as modified, the DIP Loan Agreement on an interim basis (the "Second Interim DIP Order");

WHEREAS, on April 9, 2009, the Bankruptcy Court entered a final order approving, as modified, the DIP Loan Agreement and granting related relief (the "Final DIP Order" and collectively with the First Interim DIP Order and the Second Interim DIP Order, the "DIP Orders");

WHEREAS, on August 27, 2009, the Debtors filed their Joint Plan of Reorganization (Dated August 25, 2009) (the "Plan") for their bankruptcy cases;

WHEREAS, on [     ], 2009, the Bankruptcy Court entered an order confirming the Plan (the "Confirmation Order");

WHEREAS, in accordance with the Plan and the Confirmation Order, the Borrower and the Pre-petition Lender have entered into that certain Second Amended and Restated Loan Agreement dated as of the date hereof (as the same may be further amended, restated, supplemented, or otherwise modified or Refinanced from time to time, the "Existing Credit Agreement"), in order to further amend the Amended and Restated Loan Agreement dated as of June 28, 2007 on the terms set forth in the Existing Credit Agreement and to reflect the prior amendments in the Existing Credit Agreement;

WHEREAS, in accordance with the Plan and the Confirmation Order, the Borrower and the DIP Lender have entered into that certain Exit Financing Agreement dated as of the date hereof (as amended, restated, supplemented, or otherwise modified or Refinanced from time to time, the "Exit Financing Agreement"), pursuant to which the DIP Lender has agreed to provide loans (the "Exit Financing Indebtedness") to the Borrower which will be pari passu in terms of lien priority to the Existing Obligations of the Grantors to the Pre-petition Lender;

WHEREAS, the obligations of the Grantors under the Existing Loan Documents are secured by all or substantially all the assets of the Grantors, pursuant to the terms of the Existing Security Documents, subject to certain limited exceptions as described therein; and

WHEREAS, the obligations of the Grantors under the Exit Financing Agreement will also be secured by all of the assets of the Grantors, pursuant to the terms of the Exit Financing Security Documents, the Plan and the Confirmation Order;

NOW, THEREFORE, in consideration of the foregoing, the mutual covenants and obligations herein set forth and for other good and valuable consideration, the sufficiency and receipt of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

CG&R DRAFT 10/28/09 7:43 PM                                                                  911008018 v3 ZCG07.DOC

Case: 09-41760    Doc# 174    Filed: 10/02/09    Entered: 10/02/09 20:10:39    Page 47 of 68

SECTION 1.   Definitions.

   1.1   Defined Terms.  As used in this Agreement, the following terms shall have the following meanings:

   "Agreement" means this Intercreditor Agreement, as amended, restated, supplemented, or otherwise modified from time to time in accordance with the terms hereof.

   "Bankruptcy Code" means title 11 of the United States Code entitled "Bankruptcy," as now and hereafter in effect, or any successor statute.

   "Bankruptcy Law" means the Bankruptcy Code and any similar federal, state or foreign law for the relief of debtors.

   "Business Day" means a day other than a Saturday, Sunday, or other day on which banking institutions are authorized or required by law or other government action to close in the State of New York.

   "Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, constituting Existing Collateral or Exit Financing Collateral.

   "Creditors" means, collectively, the Pre-petition Lender and the DIP Lender.

   "DIP Lender" has the meaning set forth in the preamble of this Agreement.

   "Discharge" means, with respect to any Obligations, (a) payment in full in cash of the principal of and interest and premium, if any, on all such Obligations, (b) payment in full in cash of all other Obligations that are due and payable or otherwise accrued and owing at or prior to the time such principal, interest, and premium are paid, and (c) termination of all other commitments with respect to such Obligations.

   "Existing Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or purported to be granted) as security for any Existing Obligations.

   "Existing Credit Agreement" has the meaning set forth in the recitals hereto.

   "Existing Loan Documents" means the Existing Credit Agreement, the other Loan Documents (as defined in the Existing Credit Agreement), and each of the other agreements, documents, and instruments providing for or evidencing any other Existing Obligation and any other document or instrument executed or delivered at any time in connection with any Existing Obligation, to the extent such are effective at the relevant time, as each may be amended, modified, restated or supplemented from time to time.

   "Existing Obligations" means all Obligations under (and as defined in) the Existing Credit Agreement and under the other Existing Loan Documents.

"Existing Security Agreement" means the Amended and Restated Security Agreement, dated as of the date hereof, among the Borrower, the other Grantors from time to time party thereto and the Pre-petition Lender, as the same may be amended, restated, supplemented or modified from time to time.

"Existing Security Documents" means the Existing Security Agreement, the Security Documents (as defined in the Existing Credit Agreement), and any other agreement, document, mortgage, or instrument pursuant to which a Lien is granted (or purported to be granted) securing any Existing Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, supplemented, restated or modified from time to time.

"Exit Financing Collateral" means all of the assets and property of any Grantor, whether real, personal or mixed, with respect to which a Lien is granted (or purported to be granted) as security for any Exit Financing Obligations.

"Exit Financing Loan Documents" means the Exit Financing Agreement, and each of the other agreements, documents and instruments providing for or evidencing any other Exit Financing Obligation, and any other document or instrument executed or delivered at any time in connection with any Exit Financing Obligation, to the extent such are effective at the relevant time, as the same may be amended, restated, supplemented or modified from time to time.

"Exit Financing Obligations" means all Obligations under the Exit Financing Loan Documents.

"Exit Financing Security Agreement" means the Security Agreement, dated as of the date hereof, among the Borrower, the other Grantors from time to time party thereto and the DIP Lender, as the same may be amended, restated, supplemented or modified from time to time.

"Exit Financing Security Documents" means the Exit Financing Security Agreement and any other agreement, document, mortgage or instrument pursuant to which a Lien is granted (or purported to be granted) securing any Exit Financing Obligations or under which rights or remedies with respect to such Liens are governed, as the same may be amended, restated, supplemented or modified from time to time.

"Governmental Authority" means the government of the United States or any other nation, or of any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Grantors" means collectively, the Borrower and each of the Subsidiaries of the Borrower which is, from time to time, a Subsidiary Guarantor under the Existing Credit Agreement and that may from time to time hereafter execute and deliver an Existing Security Document.

"Insolvency or Liquidation Proceeding" means (a) any voluntary or involuntary case or proceeding under the Bankruptcy Code with respect to any Grantor, (b) any other voluntary or involuntary insolvency, reorganization or bankruptcy case or proceeding, or any receivership,

liquidation, reorganization or other similar case or proceeding with respect to any Grantor or with respect to a material portion of its respective assets, (c) any liquidation, dissolution, reorganization or winding up of any Grantor, whether voluntary or involuntary and whether or not involving insolvency or bankruptcy, or (d) any assignment for the benefit of creditors or any other marshalling of assets and liabilities of any Grantor.

"Lien" means any mortgage, pledge, security interest, hypothecation, assignment, deposit arrangement, encumbrance, lien (statutory or other), charge preference, priority or other security interest or agreement, or preferential payment of any kind or nature whatsoever (including, without limitation, any agreement to give any of the foregoing, any conditional sale or other title retention agreement, any easement, right of way or other encumbrance on title to real property, any financing or similar statement or notice filed under the UCC or any other similar recording or notice statute having substantially the same effect as any of the foregoing).

"Non-Conforming Plan of Reorganization" any Plan of Reorganization which either grants the DIP Lender any right or benefit, directly or indirectly, which right or benefit is expressly prohibited at such time by the provisions of this Agreement, or fails to provide for the Discharge of the Existing Obligations upon the effective date thereof.

"Obligations" means any and all obligations (including guaranty obligations), whether now existing or hereafter arising, liquidated or contingent, with respect to the payment and performance of (a) any principal of or interest or premium on any indebtedness, and (b) any fees, indemnification obligations, expense reimbursement obligations or other liabilities payable under the documentation governing any indebtedness (including, without limitation, the retaking, holding, selling or otherwise disposing of or realizing on the Collateral).

"Person" means any natural person, limited partnership, general partnership, joint venture, firm, corporation, association, limited liability company, limited liability partnership, joint stock company, trust, bank, trust company, land trust, business trust or other enterprise, or any Governmental Authority or other entity.

"Plan of Reorganization" means any plan of reorganization, plan of liquidation, agreement for composition, or other type of plan of arrangement proposed in or in connection with any Insolvency or Liquidation Proceeding.

"Pre-petition Lender" has the meaning set forth in the recitals hereto.

"Security Documents" means, collectively, the Existing Security Documents and the Exit Financing Security Documents.

"Shared Collateral" means, at any time, Collateral in which both the Pre-petition Lender and the DIP Lender hold a valid and perfected security interest at such time.

"Subsidiary" of any Person means (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary voting power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of

any contingency) is at the time owned by such Person or one or more Subsidiaries of such Person and (ii) any partnership, limited liability company, association, joint venture or other entity (other than a corporation) in which such Person or one or more Subsidiaries of such Person has more than a 50% equity interest at the time.

"UCC" means the Uniform Commercial Code as from time to time in effect in the relevant jurisdiction.

1.2     Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined.  Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms.  The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation."  The word "will" shall be construed to have the same meaning and effect as the word "shall."  Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented, restated or otherwise modified, (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights, (e) terms defined in the UCC but not otherwise defined herein shall have the same meanings herein as are assigned thereto in the UCC, (f) a reference to any law means such law as amended, modified, codified, replaced or re-enacted, in whole or in part, and in effect on the date hereof, including rules, regulations, enforcement procedures and any interpretations promulgated thereunder, and (g) references to Sections or clauses shall refer to those portions of this Agreement, and any references to a clause shall, unless otherwise identified, refer to the appropriate clause within the same Section in which such reference occurs.

SECTION 2.     Liens.

2.1     Prohibition on Contesting Liens.  Each of the DIP Lender and the Pre-petition Lender agrees that she shall not (and hereby waives any right to) take any action to challenge or contest, or support any other Person in contesting or challenging, in any proceeding (including any Insolvency or Liquidation Proceeding), (i) the validity or enforceability of any Security Document or any Obligation thereunder, (ii) the validity, perfection, priority or enforceability of the Liens, mortgages, assignments and security interests granted pursuant to the Security Documents with respect to the Existing Obligations or the Exit Financing Obligations or (iii) the relative rights and duties of the holders of the Existing Obligations and the Exit Financing Obligations granted and established in this Agreement or any other Security Document with respect to such Liens, mortgages, assignments, and security interests; provided that nothing in this Agreement shall be construed to prevent or impair the rights of the Pre-petition Lender or DIP Lender to enforce this Agreement.

2.2     No New Liens; Title Collateral.  So long as the Discharge of the Exit Financing Obligations or the Existing Obligations has not occurred, the parties hereto agree that the Borrower shall not, and shall not permit any other Grantor or Subsidiary to, grant or permit any addi-

-6-

tional Liens, or take any action to perfect any Liens, on any asset or property to secure any Exit Financing Obligation unless it has also granted or contemporaneously grants to the Pre-petition Lender a Lien on such asset or property to secure the Existing Obligations and has taken all actions to perfect such Liens. To the extent that the foregoing provisions are not complied with for any reason, without limiting any other rights and remedies available to the Pre-petition Lender, the DIP Lender shall, without the need for any further consent of any other Person and notwithstanding anything to the contrary in any other Exit Financing Loan Document (x) hold and be deemed to have held such Lien for the benefit of the Pre-petition Lender as security for the Existing Obligations (and all amounts received by or distributed to any of them pursuant to or as a result of the Liens granted in contravention of this Section 2.2 shall be subject to Section 4.2) and (y) at the request of the Pre-petition Lender, either assign such Lien to the Pre-petition Lender to secure the Existing Obligations or release such Lien.

2.3     Similar Liens and Agreements. The parties hereto agree that it is their intention that the Exit Financing Collateral shall not be more expansive than, and shall be identical to, the Existing Collateral. In furtherance of the foregoing and of Section 8.7 hereof, the DIP Lender agrees, subject to the other provisions of this Agreement upon request by the Pre-petition Lender, to cooperate in good faith (and to direct their counsel to cooperate in good faith) from time to time in order to determine the specific items included in the Exit Financing Collateral and the steps taken to perfect the Liens thereon and the identity of the respective parties obligated under the Exit Financing Loan Documents.

SECTION 3.   Enforcement.

3.1     Exercise of Remedies.

(a)     So long as the Discharge of Existing Obligations has not occurred, whether or not any Insolvency or Liquidation Proceeding has been commenced by or against the Borrower or any other Grantor: (i) the DIP Lender will not exercise or seek to exercise any rights or remedies (including, without limitation, the exercise of any right under any lockbox agreement, control account agreement, landlord waiver or bailee's letter or similar agreement or arrangement to which the DIP Lender is a party) or institute or commence, or join with any Person in commencing, any action or proceeding or Insolvency or Liquidation Proceeding against the Borrower or any other Grantor with respect to such rights or remedies (including any action of foreclosure, enforcement, collection or execution and any Insolvency or Liquidation Proceeding), and will not contest, protest, seek to enjoin or object to any foreclosure proceeding or action brought by the Pre-petition Lender or any other exercise by the Pre-petition Lender, of any rights and remedies relating to the Collateral under the Existing Loan Documents or otherwise, or contest, protest, seek to enjoin or object to the forbearance by the Pre-petition Lender from bringing or pursuing any foreclosure proceeding or action or any other exercise of any rights or remedies relating to the Collateral; and (ii) the Pre-petition Lender shall have the exclusive right to enforce rights, exercise remedies (including setoff and the right to credit bid their debt) and make determinations regarding the release, disposition, or restrictions with respect to the Collateral without any consultation with or the consent of the DIP Lender, all as though the Exit Financing Obligations did not exist; provided, that, in any Insolvency or Liquidation Proceeding commenced by or against the Borrower or any other Grantor, the DIP

Lender may file a proof of claim or statement of interest with respect to the Exit Financing Obligations. In exercising rights and remedies with respect to the Collateral, the Pre-petition Lender may enforce the provisions of the Existing Loan Documents and exercise remedies thereunder, all in such order and in such manner as she may determine in the exercise of her sole discretion. Such exercise and enforcement shall include the rights of an agent appointed by her to sell or otherwise dispose of Collateral upon foreclosure, to incur expenses in connection with such sale or disposition, and to exercise all the rights and remedies of a secured creditor under the UCC of any applicable jurisdiction and of a secured creditor under Bankruptcy Laws of any applicable jurisdiction.

(b)     The DIP Lender agrees that it will not take or receive any Collateral or any proceeds of Collateral in connection with the exercise of any right or remedy (including setoff or recoupment) with respect to any Collateral, and that any Collateral or proceeds taken or received by it will be paid over to the Pre-petition Lender pursuant to Section 4.2, unless and until the Discharge of Existing Obligations has occurred. Without limiting the generality of the foregoing, unless and until the Discharge of Existing Obligations has occurred, the rights of the DIP Lender with respect to the Collateral are limited to the right to hold a Lien on the Collateral pursuant to the Exit Financing Security Documents for the period and to the extent granted therein, to receive a share of the proceeds thereof, if any, in accordance with Section 4, and to exercise only such other rights as are expressly permitted herein.

(c)     The DIP Lender (i) agrees that the DIP Lender will not take any action that would enjoin, hinder, delay, limit or prohibit any exercise of remedies under the Existing Loan Documents, including any collection, sale, lease, exchange, transfer or other disposition of the Collateral, whether by foreclosure or otherwise, or that would limit, invalidate, avoid or set aside any Lien or Existing Security Document or subordinate the priority of the Existing Obligations to the Exit Financing Obligations and (ii) hereby waives any and all rights it may have as a pari passu lien creditor or otherwise (whether arising under the UCC or under any other law) to object to the manner in which the Pre-petition Lender seeks to enforce or collect the Existing Obligations or the Liens granted in any of the Existing Collateral, regardless of whether any action or failure to act by or on behalf of the Pre-petition Lender is adverse to the interest of the DIP Lender.

(d)     The DIP Lender hereby acknowledges and agrees that no covenant, agreement or restriction contained in the Exit Financing Security Documents or any other Exit Financing Loan Document shall be deemed to restrict in any way the rights and remedies of the Pre-petition Lender with respect to the Collateral as set forth in this Agreement and the Existing Loan Documents.

3.2     Actions Upon Breach.

(a)     If the DIP Lender, contrary to this Agreement, commences or participates in any action or proceeding against any Grantor or the Collateral, the Pre-petition Lender may intervene and interpose as a defense or dilatory plea the making of this Agreement, in its name or in the name of such Grantor.

-8-

(b)     Should the DIP Lender, contrary to this Agreement, in any way take, attempt to or threaten to take any action with respect to the Collateral or take any other action in violation of this Agreement or fail to take any action required by this Agreement, the Pre-petition Lender (in its own name or in the name of the relevant Grantor), (i) may obtain relief against the DIP Lender by injunction, specific performance or other appropriate equitable relief, it being understood and agreed by the DIP Lender that (x) the Pre-petition Lender's damages from its actions would at that time be difficult to ascertain and may be irreparable, and (y) the DIP Lender waives any defense that the Pre-petition Lender cannot demonstrate damage or be made whole by the awarding of damages, and (ii) shall be entitled to damages, as well as reimbursement for all reasonable and documented costs and expenses incurred in connection with any action to enforce the provisions of this Agreement.

SECTION 4.     <u>Payments</u>.

4.1     <u>Application of Proceeds</u>.  So long as the Discharge of Exit Financing Obligations or the Existing Obligations has not occurred, any proceeds of any Collateral (irrespective of the relative priorities of the security interests of the Pre-petition Lender and the DIP Lender in any such Collateral) pursuant to the enforcement of any Security Document or the exercise of any remedial provision thereunder, together with all other proceeds received by any Lender (including all funds received in respect of post-petition interest or fees and expenses) as a result of any such enforcement or the exercise of any such remedial provision or as a result of any distribution of or in respect of any Collateral or under a plan of reorganization (whether or not expressly characterized as such) upon or in any Insolvency or Liquidation Proceeding with respect to any Grantor, or the application of any Collateral (or proceeds thereof) to the payment thereof or any distribution of Collateral (or proceeds thereof) upon the liquidation or dissolution of any Grantor, shall be applied to repay the Existing Obligations and the Exit Financing Obligations in equal dollar-for-dollar amounts.  Notwithstanding the foregoing, with respect to any Collateral for which a third party (other than the Pre-petition Lender) has a lien or security interest that is junior in priority to the security interest of the Pre-petition Lender but senior (as determined by appropriate legal proceedings in the case of any dispute) to the security interest of the DIP Lender (such third party, an "<u>Intervening Creditor</u>"), the value of any Collateral or proceeds which are allocated to such Intervening Creditor shall be deducted on a ratable basis solely from the Collateral or proceeds to be distributed in respect of the Exit Financing Obligations with respect to which such Impairment (as defined below) exists.  Upon the Discharge of Exit Financing Obligations, the DIP Lender shall deliver to the Pre-petition Lender any proceeds of Collateral held by it in the same form as received, with any necessary endorsements or as a court of competent jurisdiction may otherwise direct, to be applied by the DIP Lender to the Exit Financing Obligations in such order as specified in the Exit Financing Security Documents.  It is the intention of the Lenders that only the applicable Lender (and not the other Lender) bear the risk of (i) any determination by a court of competent jurisdiction that (x) any of the Obligations owed to such Lender are unenforceable under applicable law or are subordinated to any other obligations, (y) such Lender does not have an enforceable security interest in any of the Collateral securing such Obligations and/or (z) any intervening security interest exists securing any other obligations (other than the Existing Obligations or the Exit Financing Obligations) on a basis ranking prior to the security interest of such Lender but junior to the security interest of the other Lender or (ii) the existence of any Collateral that is not Shared Collateral (any such condition referred to in the

foregoing clauses (i) or (ii) with respect to any Obligations, an "Impairment" of such Obligations). In the event of any Impairment with respect to any Obligations, the results of such Impairment shall be borne solely by the holder of such Obligations, and the rights of the holder of such Obligations (including, without limitation, the right to receive distributions in respect of such Obligations pursuant to this Section 4.1) set forth herein shall be modified to the extent necessary so that the effects of such Impairment are borne solely by the holder of such Obligations subject to such Impairment.

4.2     Payment Turnover.  Until such time as the Discharge of Exit Financing Obligations or Existing Obligations has occurred, any Collateral or proceeds thereof (or any distribution in respect of the Collateral, whether or not expressly characterized as such) received by the DIP Lender or the Pre-petition Lender in connection with the exercise of any right or remedy (including setoff or recoupment) relating to the Collateral or that is otherwise inconsistent with this Agreement shall be segregated and held in trust and forthwith paid over in the order set forth in Section 4.1; provided that nothing in this Agreement is intended to or shall impair the rights of either the Pre-petition Lender or the DIP Lender to receive payments from the Borrower or any other Grantor as and when the same become due and payable in accordance with the terms of the Existing Loan Documents and the Exit Financing Loan Documents; provided, further, that any payments by the Borrower under the Exit Financing Loan Documents (other than payments of interest to the DIP Lender) shall be made to the Pre-petition Lender and the DIP Lender in equal dollar-for-dollar amounts.

SECTION 5.   Other Agreements.

(a)     Without the prior written consent of the Pre-petition Lender, no Exit Financing Loan Document may be amended, restated, supplemented, modified or Refinanced or entered into to the extent such amendment, supplement, restatement, modification or Refinancing, or the terms of any new Exit Financing Loan Document, would contravene the provisions or intent of this Agreement, the Existing Credit Agreement, or any other Existing Loan Document.  The DIP Lender shall not agree to any amendment, supplement, restatement, modification or Refinancing of the Exit Financing Security Documents without prior written consent of the Pre-petition Lender.  The Borrower and the DIP Lender each agree that each Exit Financing Security Document shall include the following language (or language to similar effect approved by the Pre-petition Lender):

> "Notwithstanding anything herein to the contrary, the lien and security interest granted to the DIP Lender pursuant to this Agreement and the exercise of any right or remedy by the DIP Lender hereunder are subject to the provisions of that certain Intercreditor Agreement, dated as of October __, 2009 (as amended, restated, supplemented or otherwise modified from time to time in accordance with the terms thereof, the "Intercreditor Agreement"), among The Ryness Company, Inc., the other Grantors from time to time party thereto, Adrienne Albert and Jean C. Mills.  In the event of any conflict between the terms of the Intercreditor Agreement and this Agreement, the terms of the Intercreditor Agreement shall govern and control."

-10-

(b)     In the event the Pre-petition Lender and the relevant Grantor(s) enter into any amendment, supplement, restatement, modification, Refinancing, waiver or consent in respect of any of the Existing Security Documents for the purpose of adding to, or deleting from, or waiving or consenting to any departures from any provisions of, any Existing Security Document or changing in any manner the rights of the Pre-petition Lender, the Borrower or any other Grantor thereunder, then such amendment, supplement, restatement, waiver or consent shall apply automatically to any comparable provision of the Exit Financing Security Document without the consent of the DIP Lender and without any action by the DIP Lender, the Borrower or any other Grantor, provided that (A) no such amendment, restatement, waiver or consent shall have the effect of (i) removing or releasing assets subject to the Lien of the Exit Financing Security Documents or (ii) imposing additional duties on the DIP Lender without its consent, and (B) written notice of such amendment, restatement, waiver or consent shall have been given to the DIP Lender (although the failure to give any such notice shall in no way affect the effectiveness of any such amendment, waiver or consent); and provided, further that this paragraph is intended solely to set forth provisions by which the Exit Financing Collateral Documents shall be automatically affected by amendments, waivers and consents given by the Pre-petition Lender under the Existing Credit Agreement and the Existing Security Documents and is not intended to impose any liability on the Pre-petition Lender.  Nothing herein shall limit the Pre-petition Lender's ability to amend, supplement, restate, modify or Refinance the Existing Credit Agreement and the Existing Security Documents.

SECTION 6.   Reliance; Waivers; Etc.

6.1     Reliance.  Other than any reliance on the terms of this Agreement, the Pre-petition Lender under the Existing Loan Documents, acknowledges that it has, independently and without reliance on the DIP Lender, and based on documents and information deemed by her appropriate, made her own credit analysis and decision to enter into such Existing Loan Documents and be bound by the terms of this Agreement and she will continue to make her own credit decision in taking or not taking any action under any Existing Loan Document or this Agreement.  The DIP Lender acknowledges that she has, independently and without reliance on the Pre-petition Lender, and based on documents and information deemed by her appropriate, made her own analysis and decision to enter into each of the Exit Financing Loan Documents and be bound by the terms of this Agreement and she will continue to make their own decision in taking or not taking any action under the Exit Financing Loan Documents or this Agreement.

6.2     No Warranties or Liability.  The Pre-petition Lender, acknowledges and agrees that the DIP Lender  has made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Exit Financing Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  The DIP Lender, acknowledges and agrees that the Pre-petition Lender has made no express or implied representation or warranty, including with respect to the execution, validity, legality, completeness, collectibility or enforceability of any of the Existing Loan Documents, the ownership of any Collateral or the perfection or priority of any Liens thereon.  The Pre-petition Lender will be entitled to manage and supervise her loans under the Existing Loan Documents in accordance with law and as she may otherwise, in her sole discretion, deem appropriate.  The Pre-petition Lender shall have no duty to the DIP Lender, to act or refrain from

C&R DRAFT 10/2/09 7:43 PM
Case: 09-41460   Doc# 174   Filed: 10/02/09   Entered: 10/02/09 20:10:39   Page 56 of 68

acting in a manner which allows, or results in, the occurrence or continuance of an event of default or default under any agreements with the Borrower or any other Grantor (including under the Existing Loan Documents), regardless of any knowledge thereof which they may have or be charged with.

6.3    <u>No Waiver of Lien Priorities</u>.

(a)    No right of the Pre-petition Lender to enforce any provision of this Agreement or any Existing Loan Document shall at any time in any way be prejudiced or impaired by any act or failure to act on the part of the Borrower or any other Grantor or by any act or failure to act by the Pre-petition Lender, or by any noncompliance by any Person with the terms, provisions and covenants of this Agreement, any of the Existing Loan Documents or any of the Exit Financing Loan Documents, regardless of any knowledge thereof which the Pre-petition Lender may have or be otherwise charged with.

(b)    Without in any way limiting the generality of the foregoing paragraph (but subject to the rights of the Borrower under the Existing Loan Documents and the rights of the DIP Lender expressly set forth in this Agreement), the Pre-petition Lender may, at any time and from time to time in accordance with the Existing Loan Documents and/or applicable law, without the consent of, or notice to, the DIP Lender, without incurring any liabilities to the DIP Lender and without impairing or releasing the Lien priorities and other benefits provided in this Agreement (even if any right of subrogation or other right or remedy of the DIP Lender is affected, impaired or extinguished thereby) do any one or more of the following:

(i)    make loans and advances to any Grantor or issue, guaranty or obtain letters of credit for account of any Grantor or otherwise extend credit to any Grantor, in any amount and on any terms, whether pursuant to a commitment or as a discretionary advance and whether or not any default or event of default or failure of condition is then continuing;

(ii)    change the manner, place or terms of payment or change or extend the time of payment of, or amend, renew, exchange, increase or alter, the terms of any of the Existing Obligations or any Lien on any Existing Collateral or guaranty thereof or any liability of the Borrower or any other Grantor, or any liability incurred directly or indirectly in respect thereof (including any increase in or extension of the Existing Obligations, without any restriction as to the amount, tenor or terms of any such increase or extension) or otherwise amend, renew, exchange, extend, modify or supplement in any manner any Liens held by the Pre-petition Lender, the Existing Obligations or any of the Existing Loan Documents;

(iii)    sell, exchange, release, surrender, realize upon, enforce or otherwise deal with in any manner and in any order any part of the Existing Collateral or any liability of the Borrower or any other Grantor to the Pre-petition Lender, or any liability incurred directly or indirectly in respect thereof;

(iv)    settle or compromise any Existing Obligation or any other liability of the Borrower or any other Grantor or any security therefor or any liability incurred directly or

-12-

indirectly in respect thereof and apply any sums by whomsoever paid and however rea-
lized to any liability (including the Existing Obligations) in any manner or order;

(v)     exercise or delay in or refrain from exercising any right or remedy against
the Borrower or any other Grantor or any other Person or with respect to any security,
elect any remedy and otherwise deal freely with the Borrower, any other Grantor or any
Existing Collateral and any security and any guarantor or any liability of the Borrower or
any other Grantor to the Pre-petition Lender or any liability incurred directly or indirectly
in respect thereof;

(vi)     take or fail to take any Lien securing the Existing Obligations or any other
collateral security for any Existing Obligations or take or fail to take any action which
may be necessary or appropriate to ensure that any Lien securing Existing Obligations or
any other Lien upon any property is duly enforceable or perfected or entitled to priority
as against any other Lien or to ensure that any proceeds of any property subject to any
Lien are applied to the payment of any Existing Obligation or any Obligation secured the-
reby; and

(vii)     release or discharge any Existing Obligation or any guaranty thereof or
any agreement or obligation of any Grantor or any other person or entity with respect the-
reto.

(c)     The DIP Lender agrees not to assert and hereby waives any right to demand, re-
quest, plead or otherwise assert or otherwise claim the benefit of, any marshalling, appraisal,
valuation or other similar right that may otherwise be available under applicable law with respect
to the Collateral or any other similar rights a junior secured creditor may have under applicable
law.

6.4     <u>Waiver of Liability; Indemnity</u>.  (a) The DIP Lender hereby waives any claim
against the Pre-petition Lender, arising out of any and all actions which the Pre-petition Lender
may take or permit or omit to take with respect to: (i) the Existing Loan Documents (including,
without limitation, any failure to perfect or obtain perfected security interests in the Existing Col-
lateral), (ii) the collection of the Existing Obligations or (iii) the foreclosure upon, or sale, liqui-
dation or other disposition of, any Existing Collateral.  The DIP Lender agrees that the Pre-
petition Lender has no duty, express or implied, fiduciary or otherwise, to her in respect of the
maintenance or preservation of the Existing Collateral, the Existing Obligations or otherwise.
Neither the Pre-petition Lender nor any of her employees or agents will be liable for failure to
demand, collect or realize upon any of the Collateral or for any delay in doing so, or will be un-
der any obligation to sell or otherwise dispose of any Collateral upon the request of the Borrower
or any other Grantor or upon the request of the DIP Lender, any other holder of Exit Financing
Obligations or any other Person or to take any other action whatsoever with regard to the Colla-
teral or any part thereof.  Without limiting the foregoing, the DIP Lender agrees that the Pre-
petition Lender (in taking any action with respect to the Collateral) shall not have any duty or
obligation to realize first upon any type of Collateral or to sell, dispose of or otherwise liquidate
all or any portion of the Collateral in any manner, including as a result of the application of the
principles of marshaling or otherwise, that would maximize the return to any class of Lenders
holding Obligations of any type (whether Existing Obligations or Exit Financing Obligations),

-13-

notwithstanding that the order and timing of any such realization, sale, disposition or liquidation may affect the amount of proceeds actually received by such class of Lenders from such realization, sale, disposition or liquidation.

6.5    Obligations Unconditional.  All rights, interests, agreements and obligations of the Pre-petition Lender and the DIP Lender, respectively, hereunder (including the Lien priorities established hereby) shall remain in full force and effect irrespective of:

(a)    any change in the time, manner or place of payment of, or in any other terms of, all or any of the Existing Obligations or Exit Financing Obligations, or any amendment or waiver or other modification, including any increase in the amount thereof, whether by course of conduct or otherwise, of the terms of any Existing Loan Document or any Exit Financing Loan Document;

(b)    any amendment, waiver or other modification, whether in writing or by course of conduct or otherwise, of all or any of the Existing Obligations or Exit Financing Obligations or any guarantee thereof;

(c)    the commencement of any Insolvency or Liquidation Proceeding in respect of the Borrower or any other Grantor; or

(d)    any other circumstances which otherwise might constitute a defense available to, or a discharge of, the Borrower or any other Grantor in respect of the Existing Obligations, or of the DIP Lender in respect of this Agreement.

SECTION 7.    Insolvency or Liquidation Proceedings.

7.1    Financing Issues.  The DIP Lender agrees that if the Borrower or any other Grantor shall be subject to any Insolvency or Liquidation Proceeding:

(a)    if the Pre-petition Lender shall desire to permit the use of cash collateral or to permit the Borrower or any other Grantor to obtain financing under Section 363 or Section 364 of the Bankruptcy Code or any similar provision in any Bankruptcy Law ("DIP Financing"), including if such DIP Financing is secured by Liens senior in priority to the Liens securing the Exit Financing Obligations, then the DIP Lender agrees that she will raise no objection to, and will not support any objection to, and will not otherwise contest such use of cash collateral or DIP Financing and will not request adequate protection or any other relief in connection therewith (except to the extent permitted by Section 7.2) and, to the extent the Liens securing the Existing Obligations are subordinated or pari passu with such DIP Financing, will subordinate its Liens in the Collateral and any other collateral to (i) such DIP Financing (and all Obligations relating thereto); (ii) any adequate protection granted to the Pre-petition Lender in respect of the Existing Obligations, and (iii) any "carve-out" for professional and United States Trustee fees agreed to by the Pre-petition Lender, in each case, on the same basis as the other Liens securing the Exit Financing Obligations are so subordinated to the Liens securing the Existing Obligations;

-14-

(b)     she will not object to, or otherwise contest (or support any other Person contesting), any motion for relief from the automatic stay or from any injunction against foreclosure or enforcement in respect of Existing Obligations made by the Pre-petition Lender;

(c)     she will not object to, or otherwise contest (or support any other Person contesting), any order relating to a sale of assets of the Borrower or any Grantor for which the Pre-petition Lender has consented that provides, to the extent that sale is to be free and clear of Liens, that the Liens securing the Existing Obligations and the Exit Financing Obligations will attach to the proceeds of the sale on the same basis of priority as the existing Liens in accordance with this Agreement;

(d)     she will not seek relief from the automatic stay or any other stay in any Insolvency or Liquidation Proceeding in respect of the Collateral, the Existing Collateral or any other collateral without the prior written consent of the Pre-petition Lender;

(e)     she will not object to, or otherwise contest (or support any other Person contesting), (i) any request by the Pre-petition Lender for adequate protection or (ii) any objection by the Pre-petition Lender to any motion, relief, action or proceeding based on the Pre-petition Lender's claiming a lack of adequate protection;

(f)     she will not assert or enforce any claim under Section 506(c) of the Bankruptcy Code senior to or on a parity with the Liens securing the Existing Obligations for costs or expenses of preserving or disposing of any Collateral or Existing Collateral;

(g)     none of them will oppose or otherwise contest (or support any Person contesting) any lawful exercise by the Pre-petition Lender of the right to credit bid Existing Obligations at any sale of Collateral or Existing Collateral;

(h)     she will not challenge (or support any other Person challenging) the validity, enforceability, perfection or priority of the Liens on the Collateral or Existing Collateral;

(i)     she shall waive her rights to have any administrative claim arising under Section 507(b) of the Bankruptcy Code attach to the proceeds of causes of action arising under Sections 542, 544, 545, 547, 548, 549, 550, 551, 553(b) or 724(a) of the Bankruptcy Code, and she agrees that any superpriority administrative claim arising under Section 507(b) of the Bankruptcy Code or otherwise may be satisfied by the issuance of a debt or equity security in connection with any plan of reorganization; and

(j)     prior to a Discharge of Existing Obligations, she shall not seek to exercise any rights under Section 1111(b) of the Bankruptcy Code.

7.2     <u>Adequate Protection</u>.  The DIP Lender agrees that she will not file or prosecute in any Insolvency or Liquidation Proceeding any motion for adequate protection (or any comparable request for relief) or raise any objection to or otherwise oppose DIP Financing or use

CG&R DRAFT 10/2/09 7:43 PM
Case: 09-41760    Doc# 174    Filed: 10/02/09    Entered: 10/02/09 20:10:39    Page 60 of 68

of cash collateral supported by the Pre-petition Lender based upon their respective security interests in the Collateral, except that:

(1) she may freely seek and obtain relief granting a junior Lien co-extensive in all respects with, but subordinated to, all Liens granted in the Insolvency or Liquidation Proceeding to, or for the benefit of, the Pre-petition Lender; and

(2) she may freely seek and obtain any relief upon a motion for adequate protection (or any comparable relief), without any condition or restriction whatsoever, at any time after the Discharge of Existing Obligations.

7.3   Preference Issues. If the Pre-petition Lender is required in any Insolvency or Liquidation Proceeding or otherwise to turn over or otherwise pay to the estate of the Borrower or any other Grantor (or any trustee, receiver or similar person therefor), because the payment of such amount was declared to be fraudulent or preferential in any respect or for any other reason, any amount (a "Recovery"), whether received as proceeds of security, enforcement of any right of setoff or otherwise, then as among the parties hereto, the Existing Obligations shall be deemed to be reinstated to the extent of such Recovery and to be outstanding as if such payment had not occurred, and the Pre-petition Lender shall be entitled to a reinstatement of Existing Obligations with respect to all such recovered amounts and shall have all rights hereunder. If this Agreement shall have been terminated prior to such Recovery, this Agreement shall be reinstated in full force and effect, and such prior termination shall not diminish, release, discharge, impair or otherwise affect the obligations of the parties hereto. Any Collateral or Existing Collateral or proceeds thereof received by the DIP Lender prior to the time of such Recovery shall be deemed to have been received prior to the Discharge of Existing Obligations and subject to the provisions of Section 4.2. The Pre-petition Lender shall use commercially reasonable efforts to give written notice to the DIP Lender of the occurrence of any such Recovery (provided that the failure to give such notice shall not affect the Pre-petition Lenders rights hereunder, except it being understood that until the delivery of such notice to the DIP Lender, the DIP Lender shall not be charged with knowledge of such Recovery or required to take any actions based on such Recovery).

7.4   Application. This Agreement shall be applicable prior to and after the commencement of any Insolvency or Liquidation Proceeding. All references herein to any Grantor shall apply to any trustee for such Person and such Person as debtor in possession. The relative rights as to the Collateral and other collateral and proceeds thereof shall continue after the filing thereof on the same basis as prior to the date of the petition, subject to any court order approving the financing of, or use of cash collateral by, any Grantor.

7.5   Reorganization Securities. If, in any Insolvency or Liquidation Proceeding, debt obligations of the reorganized debtor secured by Liens upon any property of the reorganized debtor are distributed, pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of Existing Obligations and on account of Exit Financing Obligations, then, to the extent the debt obligations distributed on account of the Existing Obligations and on account of the Exit Financing Obligations are secured by Liens upon the same property, the provisions of this Agreement will survive the distribution of such debt obligations pursuant to such plan and will apply with like effect to the Liens securing such debt obligations. Without limiting

-16-

the generality of the foregoing, if, in any Insolvency or Liquidation Proceeding, equity securities are distributed, pursuant to a plan of reorganization or similar dispositive restructuring plan, both on account of Existing Obligations and on account of Exit Financing Obligations, then, the priorities of the equity securities distributed on account of the Existing Obligations and on account of the Exit Financing Obligations must be consistent with the provisions of this Agreement

      7.6    <u>Post-Petition Interest</u>.

      (a)    The DIP Lender shall not oppose or seek to challenge any claim by the Pre-petition Lender for allowance in any Insolvency or Liquidation Proceeding of Existing Obligations consisting of post-petition interest, fees or expenses.

      (b)    The Pre-petition Lender shall not oppose or seek to challenge any claim by the DIP Lender for allowance in any Insolvency or Liquidation Proceeding of Exit Financing Obligations consisting of post-petition interest, fees or expenses to the extent of the value of the Lien in favor of the DIP Lender on the Collateral (after taking into account the Lien in favor of the Pre-petition Lender).

      7.7    <u>[Reserved]</u>.

      7.8    <u>Proofs of Claim</u>.  Subject to the limitations set forth in this Agreement, the Pre-petition Lender may file proofs of claim and other pleadings and motions with respect to any Existing Obligations, any Exit Financing Obligations or the Collateral in any Insolvency or Liquidation Proceeding.  If a proper proof of claim has not been filed in the form required in such Insolvency or Liquidation Proceeding at least ten (10) days prior to the expiration of the time for filing thereof, the Pre-petition Lender shall have the right (but not the duty) to file an appropriate claim for and on behalf of the DIP Lender with respect to any of the Exit Financing Obligations or any of the Collateral.  In furtherance of the foregoing, the DIP Lender hereby appoints the Pre-petition Lender as her attorney-in-fact, with full authority in the place and stead of the DIP Lender and full power of substitution and in the name of the DIP Lender or otherwise, to execute and deliver any document or instrument that the Pre-petition Lender is required or permitted to deliver pursuant to this <u>Section 7.8</u>, such appointment being coupled with an interest and irrevocable.

      7.9    <u>Plan of Reorganization</u>.  Without limiting the generality of any provisions of this Agreement, any vote to accept, and any other act to support the confirmation or approval of, any Non-Conforming Plan of Reorganization shall be inconsistent with and accordingly, a violation of the terms of this Agreement, and the Pre-petition Lender shall be entitled to have any such vote to accept a Non-Conforming Plan of Reorganization dismissed and any such support of any Non-Conforming Plan of Reorganization withdrawn.

      7.10    <u>Sales of Assets</u>.  If the Pre-petition Lender consents to a sale, transfer or other disposition (a "<u>Disposition</u>") of Collateral free and clear of its liens pursuant to Section 363(f) of the Bankruptcy Code (with such liens to attach to the proceeds of such sale), the DIP Lender shall not raise any objection to or otherwise oppose such sale or other disposition.  If requested by the Pre-petition Lender, the DIP Lender shall affirmatively consent to such sale or other disposition.  Nothing set forth in this Agreement or this <u>Section 7.10</u> shall be construed to

-17-

in any way limit or impair the right of the DIP Lender from exercising a credit bid in accordance with Section 363(k) of the Bankruptcy Code with respect to the Exit Financing Obligations in a Disposition of Collateral under Section 363 of the Bankruptcy Code, *provided* that in connection with and immediately after giving effect to such sale and credit bid there occurs a Discharge of Existing Obligations.

       7.11   <u>Waiver of Bankruptcy-Related Rights</u>.  Prior to a Discharge of Existing Obligations, the DIP Lender agrees to waive any rights she may have as a secured creditor in an Insolvency or Liquidation Proceeding to seek to have a case or cases commenced by any Grantor or Grantors under Chapter 11 of the Bankruptcy Code converted to a case or cases under Chapter 7 of the Bankruptcy Code pursuant to Section 1112 of the Bankruptcy Code or otherwise; to seek to have a case or cases commenced by any Grantor or Grantors under Chapter 11 of the Bankruptcy Code dismissed pursuant to Section 1112 of the Bankruptcy Code or otherwise; and to seek to have a Chapter 11 trustee or an examiner appointed in any case or cases commenced by any Grantor or Grantors under Chapter 11 of the Bankruptcy Code pursuant to Section 1104 of the Bankruptcy Code or otherwise.

SECTION 8.  <u>Miscellaneous</u>.

     8.1   <u>Conflicts</u>.  In the event of any conflict between the provisions of this Agreement and the provisions of the Existing Loan Documents or the Exit Financing Loan Documents, the provisions of this Agreement shall govern and control.

     8.2   <u>Effectiveness; Continuing Nature of this Agreement; Severability</u>.  This Agreement shall become effective when executed and delivered by the parties hereto.  The Pre-petition Lender may continue, at any time and without notice to the DIP Lender, to extend credit and other financial accommodations and lend monies to or for the benefit of the Borrower or any other Grantor constituting Existing Obligations in reliance hereon.  The DIP Lender, hereby agrees that it will not attempt, directly or indirectly, whether by judicial proceedings or otherwise, to challenge the enforceability of any provision of this Agreement, and waives any right it may have under applicable law to revoke this Agreement or any of the provisions of this Agreement. The terms of this Agreement shall survive, and shall continue in full force and effect, in any Insolvency or Liquidation Proceeding.  Any provision of this Agreement which is prohibited or unenforceable in any jurisdiction shall not invalidate the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.  All references to the Borrower or any other Grantor shall include the Borrower or such Grantor as debtor and debtor-in-possession and any receiver or trustee for the Borrower or any other Grantor (as the case may be) in any Insolvency or Liquidation Proceeding.  This Agreement shall terminate and be of no further force and effect, upon the earlier of the Discharge of Existing Obligations or Discharge of the Exit Financing Obligations, subject to the rights of the Pre-petition Lender under Section 6.5 of this Agreement.  Notwithstanding anything to the contrary in this Agreement, the terms and provisions of this Agreement shall terminate upon the Discharge of the Existing Obligations, except to the extent any such term or provision, by its terms, survives any Discharge of the Existing Obligations or is reinstated in accordance with its terms.

8.3    Amendments; Waivers.

(a)    No amendment, modification or waiver of any of the provisions of this Agreement by the DIP Lender or the Pre-petition Lender shall be made unless the same shall be in writing signed on behalf of each party hereto; provided that additional Grantors may be added as parties hereto in accordance with the provisions of Section 8.16 of this Agreement.

(b)    Each waiver of the terms of this Agreement, if any, shall be a waiver only with respect to the specific instance involved and shall not impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Notwithstanding the foregoing, neither Borrower nor any Grantor shall have any right to consent to or approve any amendment, modification or waiver of any provision of this Agreement except to the extent the liabilities, duties or obligations of the Borrower or such Grantor are increased, expanded, or made more burdensome to the Borrower or such Grantor, as the case may be, as a result of such amendment, modification or waiver.

8.4    Subrogation.  With respect to the value of any payments or distributions in cash, property or other assets that the Pre-petition Lender pays over to the DIP Lender under the terms of this Agreement, the Pre-petition Lender  shall be subrogated to the rights of the DIP Lender; provided that, the Pre-petition Lender hereby agrees not to assert or enforce any or all such rights of subrogation it may acquire as a result of any payment hereunder until the Discharge of the Exit Financing Obligations has occurred.  The Borrower and each other Grantor acknowledges and agrees that, the value of any payments or distributions in cash, property or other assets received by the Pre-petition Lender and paid over to the DIP Lender pursuant to, and applied in accordance with, this Agreement, shall not relieve or reduce any of the Obligations owed by the Borrower or any other Grantor under the Existing Loan Documents.

8.5    SUBMISSION TO JURISDICTION; WAIVERS.

(a)    THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY SUBMIT TO THE NONEXCLUSIVE JURISDICTION OF THE COURTS OF THE STATE OF NEW YORK SITTING IN NEW YORK COUNTY, NEW YORK, AND OF THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.

(b)    THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY OBJECTION WHICH EACH MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE

-19-

OF ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT IN ANY COURT REFERRED TO IN SECTION 8.5(a) HEREOF.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)     EACH PARTY HERETO HEREBY IRREVOCABLY WAIVES, TO THE FUL-LEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTH-ER THEORY).  EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LIT-IGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT, THE EXISTING LOAN DOCUMENTS AND THE EXIT FINANCING LOAN DOCUMENTS BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

8.6     Notices.  Unless otherwise specifically provided herein, any notice or other com-munication herein required or permitted to be given shall be in writing and may be personally served, electronically mailed or sent by courier service or U.S. mail and shall be deemed to have been given when delivered in person or by courier service, upon receipt of electronic mail or four Business Days after deposit in the U.S. mail (registered or certified, with postage prepaid and properly addressed).  For the purposes hereof, the addresses of the parties hereto shall be as set forth below each party's name on the signature pages hereto, or, as to each party, at such other address as may be designated by such party in a written notice to all of the other parties.

8.7     Further Assurances.  Each of the Pre-petition Lender, the DIP Lender and the Borrower, agrees that each of them shall take such further action and shall execute and deliver such additional documents and instruments (in recordable form, if requested) as the Pre-petition Lender or the DIP Lender may reasonably request to effectuate the terms of and the lien priori-ties contemplated by this Agreement.

8.8     APPLICABLE LAW.  THIS AGREEMENT SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK INCLUDING SECTION 5-1401 AND SECTION 5-1402 OF THE GENERAL OBLIGATIONS LAW.

8.9     Successors and Assigns.  The DIP Lender may not assign any of its rights or obli-gations under this Agreement without the prior written consent of the Pre-petition Lender.

8.10     Specific Performance.  Each of the Pre-petition Lender and the DIP Lender may demand specific performance of this Agreement.  Each of the Pre-petition Lender and the DIP Lender hereby irrevocably waives any defense based on the adequacy of a remedy at law and any

other defense which might be asserted to bar the remedy of specific performance in any action which may be brought by the Pre-petition Lender or the DIP Lender, as the case may be.

8.11 <u>Headings</u>. Section headings in this Agreement are included herein for convenience of reference only and shall not constitute a part of this Agreement for any other purpose or be given any substantive effect.

8.12 <u>Counterparts; Fax or Other Transmission</u>. This Agreement may be executed in any number of counterparts and by different parties hereto in separate counterparts, each of which when so executed and delivered shall be deemed to be an original and all of which counterparts, taken together, shall constitute but one and the same instrument. This Agreement may be executed by each party on separate copies, which copies, when combined so as to include the signatures of all parties, shall constitute a single counterpart of the Agreement. Delivery by one or more parties hereto of an executed counterpart of this Agreement via facsimile, telecopy, or other electronic method of transmission pursuant to which the signature of such party can be seen (including, without limitation, Adobe Corporation's Portable Document Format) shall have the same force and effect as the delivery of an original executed counterpart of this Agreement. Any party delivering an executed counterpart of this Agreement by facsimile or other electronic method of transmission shall also deliver an original executed counterpart, but the failure to do so shall not affect the validity, enforceability, or binding effect of this Agreement.

8.13 <u>Authorization</u>. By its signature, each Person executing this Agreement on behalf of a party hereto represents and warrants to the other parties hereto that it is duly authorized to execute this Agreement.

8.14 <u>No Third Party Beneficiaries; Effect of Agreement</u>. This Agreement and the rights and benefits hereof shall inure to the benefit of each of the Pre-petition Lender, the DIP Lender, and their respective successors and assigns. No other Person (including the Borrower and the Grantors) shall have or be entitled to assert rights or benefits hereunder. Nothing in this Agreement shall impair, as between each of the Grantors and the Pre-petition Lender, on the one hand, and each of the Grantors and the Exit Financing Collateral and the DIP Lender, on the other hand, the obligations of each Grantor to pay principal, interest, fees and other amounts as provided in the Existing Loan Documents and the Exit Financing Loan Documents, respectively.

8.15 <u>Provisions Solely to Define Relative Rights</u>. The provisions of this Agreement are and are intended solely for the purpose of defining the relative rights of the Pre-petition Lender, on the one hand, and the DIP Lender, on the other hand. None of the Borrower, any other Grantor or any other creditor thereof shall have any rights hereunder. Nothing in this Agreement is intended to or shall impair the obligations of the Borrower or any other Grantor, which are absolute and unconditional, to pay the Existing Obligations and the Exit Financing Obligations as and when the same shall become due and payable in accordance with the terms of the Existing Loan Documents and the Exit Financing Loan Documents, respectively.

8.16 <u>Grantors; Additional Grantors</u>. It is understood and agreed that the Borrower shall constitute the original Grantor party hereto. The original Grantor hereby covenants and agrees to cause each Subsidiary of the Borrower which becomes a Borrower under (and as defined in) the Existing Credit Agreement or a Subsidiary Grantor under the Exit Financing

-21-

Agreement after the date hereof to contemporaneously become a party hereto (as a Grantor) by executing and delivering a counterpart hereof to the Pre-petition Lender or by executing and delivering a joinder or assumption agreement in form and substance reasonably satisfactory to the Pre-petition Lender.  The parties hereto further agree that, notwithstanding any failure to take the actions required by the immediately preceding sentence, each Person which becomes a Borrower under (and as defined in) the Existing Credit Agreement or a Subsidiary Grantor under the Exit Financing Agreement after the date hereof at any time (and any security granted by any such Person) shall be subject to the provisions hereof as fully as if same constituted a Grantor party hereto and had complied with the requirements of the immediately preceding sentence.

8.17    No Agency.  This Agreement shall not create any agency relationship between the Pre-petition Lender, on the one hand, and DIP Lender, on the other hand.

[Signatures on following pages.]

CG&R DRAFT 10/2/09 7:43 PM

IN WITNESS WHEREOF, the parties hereto have executed this Intercreditor Agreement as of the date first written above.

ADRIENNE ALBERT, in her capacity
As Pre-petition Lender

By: _____
      Name:   Adrienne Albert
      Title:

Notice Address:

Jean C. Mills, in her capacity
As DIP Lender

By: _____
      Name:
      Title:

Notice Address:

Acknowledged by:

**THE RYNESS COMPANY**, a California corporation

By: _____
      Name:
      Title:

CG&R DRAFT 10/2/09 7:43 PM

Case: 09-41760   Doc# 174   Filed: 10/02/09   Entered: 10/02/09 20:10:39   Page 68 of 68

91208010.v3 ZCG07.gDOCS